UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION


THOMAS RICHARDSON,

              Petitioner,                                        Hon. Janet T. Neff

v.                                                               Case No. 1:14-CV-1250

CARMEN PALMER,

              Respondent.
_____/


## REPORT AND RECOMMENDATION

This matter is before the Court on the petition of Thomas Richardson (hereinafter "Petitioner") for writ of habeas corpus. In accordance with 28 U.S.C. § 636(b) authorizing United States Magistrate Judges to submit proposed findings of fact and recommendations for disposition of prisoner petitions, the undersigned recommends that Richardson's petition be **denied**.


## BACKGROUND

As a result of events occurring on June 22, 2006, Petitioner was charged with First Degree Murder and Manslaughter.  (Trial Transcript, February 27, 2008, at PageID.3081-82). Numerous individuals testified at Petitioner's jury trial.   The relevant portions of their testimony are summarized below.

# I.    PROSECUTION WITNESSES

**Stefani Jijon**

On the morning of June 22, 2006, Jijon was visiting Pictured Rocks when she encountered a couple near Miner's Castle.   (Trial Transcript, Mar. 3, 2008, at PageID.3890-92). The couple had been "on the trail" and was "approaching" the lookout.   (PageID.3891-92).   The couple appeared "very normal."   (PageID.3894).

**Harold Cook**

As of June 22, 2006, Cook was employed as a Captain with Pictured Rock Boat Cruises.   (Trial Transcript, Mar. 3, 2008, at PageID.3899-900).   Pictured Rock Boat Cruises provided "boat tour[s]" of Pictured Rocks National Lakeshore and surrounding area. (PageID.3900-02).   Cook did not captain the cruise that departed on the morning of June 22, 2006. (PageID.3900).   However, because the captain of that particular cruise was out of the country, Cook, who had piloted the route in question "about 4,000 times," was permitted to testify about certain matters concerning the tour and the ship's log books.   (PageID.3900-05).

One of the tour's points of interest is Miner's Castle at which point the ship is located "about 100 yards off shore."   (PageID.3902).   Cook estimated that on the morning of June 22, 2006, the ship would have passed Miner's Castle at approximately 10:50 a.m. (PageID.3902-04).   According to the ship's log, the captain received a report at 11:45 a.m. concerning a "person falling from the cliff near Miner's Castle."   (PageID.3910-11).   The captain reported that the ship arrived at the site in question at 11:58 a.m. and that the victim was located "approximately 10 feet above the water line with what appeared to be [a] severe head injury and large amount of blood."   (PageID.3910-12).   The ship was unable to maneuver closer than 200

feet to shore, but the Captain reported that the Sheriff dispatched a "smaller boat" to the scene. (PageID.3912).

**Kari Farkas**

As of June 22, 2006, Farkas was employed at the Miner's Castle Visitor's Center.[1] (Trial Transcript, Mar. 3, 2008, at PageID.3917-18).  The Visitor's Center was located "right along the cliff edges there so that people can have a spot where they can drive out and see some of the sights without having to do a lot of walking."  (PageID.3917).  The Visitor's Center was not equipped with a "landline" telephone and the cell phone service in that particular area was "incredibly patchy" and "definitely not dependable."  (PageID.3921-22).

At approximately 11:30 a.m. that morning, Petitioner entered the Visitor's Center. (PageID.3923-24).  Petitioner was "breathing heavily" and requested that Farkas "call 911" because his wife, Juanita Richardson, had fallen "over the cliff."  (PageID.3924-28).  Petitioner "seemed upset" and "appeared to be crying," although Farkas did not observe any tears from Petitioner or hear the types of sounds generally associated with crying.  (PageID.3929-31). Farkas also heard Petitioner "make sounds [associated with] vomiting," but she discerned no indication that Petitioner had actually vomited.  (PageID.3933).

Farkas contacted Larry Hach on her radio after which Farkas and Petitioner "waited" inside the Visitor's Center.  (PageID.3925-26, 3935).  Farkas asked Petitioner about the incident and Petitioner responded that he and Juanita were visiting "their Honeymoon spot" which was located "along the trail" between Miner's Castle and Sand Point"  (PageID.3936-38).  The location in question was "just out in the wilderness" without any fence, railing, or warning sign.

---

1  This particular location was referred to by Farkas and others as the "Information Station," but identified by others as the "Visitor's Center" or the "Ranger Station."   To lessen the possibility of confusion, and for the ease of the reader, the Court will simply refer to this location as the "Visitor's Center."

(PageID.3972).   Petitioner stated that he then "left to use the bathroom" and when he returned, Juanita was missing.   (PageID.3936-38).   Petitioner reported that he "called for" his wife and then "looked over the - over the cliff edge."   (PageID.3938-42).   Petitioner indicated that Juanita "was wearing a white jacket and he had seen a flash of white when he'd glanced over the cliff edge," at which point he ran to the Visitor's Center.   (PageID.3937-42).

Farkas stayed with Petitioner for approximately 3 hours.   (PageID.3943). Following Petitioner's "initial period of emotional upset," which lasted "somewhere around 30 minutes," Petitioner "was fairly calm."   (PageID.3944).   Petitioner's demeanor was such that "if you didn't know about this catastrophic event in [Petitioner's] life," a person would have no idea what had happened.   (PageID.3959).   Petitioner appeared to be more concerned about the pain he was experiencing in his shoulder and leg than what happened to his wife.   (PageID.3963). When Petitioner later took his sunglasses off, Farkas discerned no indication that Petitioner had ever been crying.   (PageID.3964).

Petitioner never claimed to Farkas that he had passed out or lost consciousness following Juanita's disappearance.   (PageID.3949).   Petitioner also never related to Farkas that he was experiencing amnesia or any "gaps in his memory."   (PageID.3949-50, 3965).   Farkas never indicated to Petitioner that he was required to remain with her at the Visitor's Center and Petitioner never made any attempt to exit therefrom.   (PageID.3953-54, 3965-66).   At one point, two boys approached Farkas with information about the status of Juanita Richardson. (PageID.3954-55).   Farkas stepped outside to speak with the boys in private.   (PageID.3954-55). After Farkas spoke with the boys, Petitioner never asked Farkas what she had learned. (PageID.3955).   Petitioner also never asked Farkas to check on the efforts to locate his wife and never expressed an interest in returning to the location in question.   (PageID.3935, 3957).

**Suzanne Fredrickson**

On the morning of June 22, 2006, Fredrickson was visiting Miner's Castle with her husband.  (Trial Transcript, March 3, 2008, at PageID.4027).   At some point, Fredrickson observed Petitioner speaking with a park ranger.  (PageID.4028).   Petitioner reported to the ranger that his wife "fell off the cliff."  (PageID.4029).   After speaking with the ranger, Petitioner was "very calm."  (PageID.4030-31).   Petitioner was not crying and did not exhibit any behavior associated with crying.   (PageID.4032).

**Jim Northup**

As of June 22, 2006, Northup was employed as the Superintendent of the Pictured Rocks National Lakeshore.  (Trial Transcript, March 4, 2008, at PageID.4059, 4066).   At that juncture, Northup had more than 25 years experience with the National Park Service working in various locations.  (PageID.4059-60).   Between 1972 and June 2006, approximately 14.7 million people visited Pictured Rocks National Lakeshore.  (PageID.4065).   During that span of time, Petitioner's wife was the only person to have fallen off a cliff.   (PageID.4066).

On the morning of June 22, 2006, Northup was working at Park Headquarters at Sand Point.  (PageID.4066).   When Northup was informed that a woman had fallen off the cliff at Miner's Castle, Northup "left Park Headquarters immediately."  (PageID.4066-67).   Northup first stopped at his residence to collect a climbing rope and rescue gear after which he "went directly to Miner's Castle."   (PageID.4067).

While "there are certainly places where the lakeshore trail is very close to the top of the cliff," at no point is the trail "unsafe."  (PageID.4061).   The trail is "well-established," "moderate and well maintained."  (PageID.4062-63).   The trail is not "rugged" and the "trail

surface itself is not loose or crumbly." (PageID.4062). The trail surface is "relatively flat, it does not have a lot of rocks and roots and other things you might see on back country trails." (PageID.4076).

Along the lakeshore trail there are "probably dozens of places where over the years people have created [trails] that lead out to attractive overlooks that provide beautiful views of Lake Superior and over to Grand Island." (PageID.4069). These unofficial trails are referred to as "social trails." (PageID.4069). The site where Juanita Richardson fell was located on a "well-established social trail. . .about 30 feet long, leading from the main trail out to the overlook." (PageID.4069). This location was a "fairly open area" covered in grass below which is a "well-established rock ledge that led out to the very obvious edge of the cliff." (PageID.4070). The footing on this rock ledge was "very stable," "flat [and] smooth" without any roots or other projections that might cause someone to trip. (PageID.4070).

From the rock platform, Northup observed a "lifeless female body with blonde hair and a white shirt lying on the ledge just above the level of Lake Superior." (PageID.4083). There was a "very obvious trail of blood" leading away from the body. (PageID.4083). There was no evidence that the cliff "had given way." (PageID.4085). Northup walked "10 to 15 feet in both directions from where [he] estimated the fall had occurred to see if there was any evidence of broken shrubbery or subsidence of soil or broken rock, and [he] saw no evidence of that." (PageID.4086). Northup considered this location "to be a safe place." (PageID.4095).

After examining this location, Northup returned to the Miner's Castle Visitor's Center where he encountered Petitioner. (PageID.4102). Petitioner was "very composed" and did not appear to have been crying. (PageID.4104-05). Petitioner reported that he and his wife had stopped to picnic at "their honeymoon spot." (PageID.4105). Petitioner left to go to the

bathroom and when he returned "his wife was missing."   (PageID.4105).   Petitioner "looked over the edge and seen something white and, assuming she had probably fallen, had run back to the [Visitor's Center] to make a report."   (PageID.4105).   Petitioner described the relevant events without hesitation and never indicated that he was experienced any lapse in memory. (PageID.4106).   Petitioner did not appear to be dazed, confused, or disoriented.   (PageID.4107).

At one point while describing the events in question, Petitioner "put his face in his hands. . .and made some sobbing noises."   (PageID.4107-08).   This display lasted "for just a very brief moment" and "ended very abruptly."   (PageID.4108).   Petitioner then "uncovered his face" and "continued with the rest of the story."   (PageID.4108).   When Petitioner uncovered his face, Northup "saw no evidence of tears."   (PageID.4108).   Petitioner's display struck Northup as "artificial."   (PageID.4108).

Petitioner later asked Northup if his wife was going to be all right.   (PageID.4113-14).   Northup assumed Petitioner's wife was dead, but he felt it was inappropriate to speculate, so he responded by telling Petitioner that "you were at the scene and you looked over the edge.   You know how far she fell.   It certainly doesn't look good."   (PageID.4114).   Petitioner remained "calm and composed" and responded that he was afraid of heights and "just crawled out to the edge."   (PageID.4115, 4118).   Northup interpreted Petitioner's response "as a denial that he had seen her body at the bottom of the cliff."   (PageID.4117).

**Larry Hach**

As of June 22, 2006, Hach was serving as Chief Ranger at Pictured Rocks National Lakeshore.   (Trial Transcript, March 4, 2008, at PageID.4161-62).   At approximately noon, Hach learned that "a woman had fallen over the cliff's edge near Miner's Castle" at which point he immediately departed for the area, arriving at approximately 1:30 p.m.   (PageID.4163).

Petitioner relayed to Hach the events in question, but did so with "not a whole lot" of emotion.  (PageID.4168).  Petitioner related the events with certainty and never described experiencing unconsciousness or faulty memory.  (PageID.4169).  When Hach later updated Petitioner on the status of the efforts to rescue his wife, Petitioner responded "pretty matter of factly" and "seemed not to show a whole lot of emotion."  (PageID.4164-65).

Hach later transported Petitioner to a local hospital where he was informed that Juanita was dead.  (PageID.4169-73).  Petitioner responded by covering his face with his hands and engaging in "almost fake crying" that produced no tears.  (PageID.4201).  Petitioner acted this way for "not very long" after which he immediately returned to acting in a "matter of fact" manner.  (PageID.4201).

**Gary Koskiniemi**

As of June 22, 2006, Koskiniemi was employed as the Director of Nursing Services at Munising Memorial Hospital.  (Trial Transcript, March 4, 2008, at PageID.4203).  When Juanita Richardson's body arrived at the hospital it was placed on a gurney and prepared for viewing.  (PageID.4204-08).  When Petitioner arrived at the hospital he was wearing sunglasses which he refused to remove.  (PageID.4210-11).  Petitioner stated that "he needed to wear sunglasses because of sensitivity to light due to post traumatic brain syndrome."  (PageID.4211).

Koskiniemi began speaking with Petitioner in an attempt to gauge his state of mind before taking him to view his wife's body.  (PageID.4209-11).  During this time, Petitioner did not ask about Juanita's condition or whether she was even alive.  (PageID.4211-13).  Petitioner did not ask to see his wife.  (PageID.4213).  Petitioner did not ask about Juanita's injuries or whether she might have suffered before passing away.  (PageID.4221).

After approximately 10-15 minutes, Physician's Assistant Sandy Owen approached the pair and informed Petitioner that he wife was dead.  (PageID.4213-14).   In response, Petitioner "sobbed a few times" for "a moment or two" and then "dabbed around his sunglasses with – with a Kleenex – and that was about the end of that."  (PageID.4215).   Koskiniemi did not discern any evidence that Petitioner had actually been crying.   (PageID.4215).

Petitioner was then escorted to view Juanita's body during which time Petitioner exhibited no emotion and "made no attempt" to touch or talk to his wife.  (PageID.4216-17).   After less than one minute, Petitioner stated, "I've had enough, get me out of here now." (PageID.4216-17).   Koskiniemi then asked Petitioner if he could "call a – a minister or priest or – or somebody," to which Petitioner responded, "what for?   She's already dead."  (PageID.4219).

### Sandy Owen

As of June 22, 2006, Owen was working as a Physician's Assistant at Munising Memorial Hospital.  (Trial Transcript, March 4, 2008, at PageID.4253-54).   After Petitioner arrived at the hospital, Owen informed him that Juanita was dead.  (PageID.4255-62).   Petitioner responded by having "a fake seizure" designed "to get attention."  (PageID.4264-65).   When Owen informed Petitioner that he could view Juanita's body, Petitioner entered the room where his wife's body lay, but exited "maybe 20 seconds" later.  (PageID.4262-64).

### Alfred Dennis

On June 22, 2006, Dennis was at the Miner's Castle Visitor's Center.   (Trial Transcript, March 4, 2008, at PageID.4299-301).   Accompanying Dennis were his granddaughter, Kaylee Laitinen, and her boyfriend, Joe Cox.  (PageID.4301-02).   At some point, Petitioner entered and reported that his wife "fell off the cliff."  (PageID.4302-05).   Petitioner stated that

he "crawled over to the edge and looked over and saw her laying there."  (PageID.4304-05). Petitioner appeared "nervous or anxious."   (PageID.4304).

Shortly thereafter, Dennis, Latinen, and Cox stated to Petitioner and the Park Ranger that they were going to hike out and look for Petitioner's wife.  (PageID.4307-10). Petitioner did not express any interest in accompanying the group.  (PageID.4310).   The group hiked to the location in question and observed Junita Richardson's body laying "on the rocks." (PageID.4310-13).   Dennis and his group then secured the area and waited until paramedics arrived.  (PageID.4318-19).   While "curious" people ventured out to the site during this time, Dennis ensured that nothing in the vicinity was moved.   (PageID.4318).

**Joseph Cox, Jr.**

On June 22, 2006, Cox was in the Miner's Castle Visitor's Center with Alfred Dennis and Kaylee Laitinen.   (Trial Transcript, March 4, 2008, at PageID.4343-44).   While the group was talking with the Park Ranger, Petitioner entered the Visitor's Center and stated that somebody "had fallen off the cliff."   (PageID.4344).   Petitioner appeared to be "really distraught."  (PageID.4344).   Soon thereafter, Cox, Laitinen, and Dennis "left to go down the trail to see if we could locate where she was. . ."   (PageID.4344-45).   When the group arrived at the location in question, Cox "looked over the edge and saw that she was on the bottom." (PageID.4345).

**Kaylee Laitinen**

On June 22, 2006, Laitinen was in the Miner's Castle Visitor's Center with Alfred Dennis and Joe Cox.   (Trial Transcript, March 4, 2008, at PageID.4349-50).   At some point, Petitioner entered the Visitor's Center and stated that "his wife fell off the cliff."   (PageID.4350).

Shortly thereafter, Laitinen, Cox, and Dennis began searching for Juanita Richardson. (PageID.4351). Joe Cox spotted Juanita's body first, but then Laitinen approached the cliff edge and observed her body laying on the rocks below. (PageID.4351).

**Steve Webber**

As of June 22, 2006, Webber was employed as an Alger County Deputy Sheriff and paramedic. (Trial Transcript, March 5, 2008, at PageID.4357-58). Late that morning, Webber and Amber Denman, another paramedic, were dispatched to Miner's Castle in response to a report that "a lady had fallen off the cliff." (PageID.4358). After arriving at Miner's Castle, Webber and Denman proceeded to the location in question where they observed Juanita Richardson's body "laying on the lakeshore" at the bottom of the cliff. (PageID.4358-60).

Webber and Denman remained at the scene until the Sheriff's Department arrived and recovered Juanita Richardson's body. (PageID.4362-71). During this time, Webber observed a sandal resting "about two feet down" below the edge of the cliff. (PageID.4363-66). When Webber later spoke with Petitioner, Webber made no mention of "the existence or location" of this sandal. (Trial Transcript, March 6, 2008, at PageID.4574-75). Once Richardson's body was retrieved, Webber and Denman proceeded to the Sheriff's dock where they recovered the body and delivered it to the hospital. (Trial Transcript, March 5, 2008, at PageID.4371-74).

After arriving at the hospital, Webber was asked to assist in the investigation of Juanita Richardson's death. (PageID.4377). After receiving the "go ahead" from the Sheriff's Department, Webber, accompanied by Park Ranger Shaun Hughes, met with Petitioner. (PageID.4377-79). Petitioner wore his sunglasses, alleging that because of a previous head injury, "fluorescent lighting gives him a headache at times." (PageID.4398-400). Petitioner

11

described Juanita as "a good wife" and "a good mother."   (PageID.4383-85).   Webber then asked Petitioner to describe "what happened."   (PageID.4385).

Petitioner stated that after he and Juanita reached "their honeymoon spot," he began experiencing an upset stomach.   (PageID.4385).   Petitioner then walked back to the Visitor's Center to change his shoes and use the bathroom.   (PageID.4385).   When Petitioner returned, he "noticed that [Juanita] wasn't there."   (PageID.4385).   After calling out for Juanita, Petitioner looked over the edge of the cliff and saw his wife at which point he ran back to the Visitor's Center. (PageID.4385).   Petitioner related these events in a calm, unemotional manner.   (PageID.4386). Petitioner did not report experiencing any uncertainty or lapses in his memory and exhibited no indication of such.   (PageID.4386-87, 4395-97, 4400-01).

When asked whether his wife was experiencing any health problems, Petitioner indicated that Juanita's "foot was bothering her" due to a previous surgery.   (PageID.4393). Petitioner also indicated that "she had been diagnosed with a lump or something in her breast," but he "really didn't know a lot about it."   (PageID.4388-89).   Petitioner also indicated that "there was a time that he thought maybe [Juanita] was on some antidepressants, but he thought that maybe she was off of that stuff or off of those pills at that time."   (PageID.4388-89).   Petitioner stated that he was "deathly afraid of heights" and that Juanita "was the risk taker" and would look over the cliff to take photographs.   (PageID.4390-92).   Petitioner indicated that he and Juanita were planning to attend a truck rally the next day.   (PageID.4401).   Petitioner mentioned this truck rally "a few times" and indicated that it was "an important thing for him to get to."   (PageID.4401-02).   Petitioner indicated that he still intended on attending the truck rally the following day. (PageID.4402).

**John Pepin**

As of June 22, 2006, Pepin was employed as a staff writer and photographer for The Mining Journal.   (Trial Transcript, March 5, 2008, at PageID.4497).   That morning, Pepin learned that "there was a rescue that was taking place out at Pictured Rocks."   (PageID.4497-98).   Pepin proceeded to the location where Juanita Richardson fell to her death.   (PageID.4498-99).   By the time Pepin arrived at the site, Deputy Webber had already cordoned off the general area.   (PageID.4499-500).   Pepin moved to a nearby location, looked over the cliff edge, and spotted Juanita Richardson's body at the base of the cliff.   (PageID.4500-02).   Pepin remained in the area until rescuers recovered Juanita Richardson's body.   (PageID.4502-06).

**Julie Sprenger**

As of June 20, 2006, Sprenger owned The Larium Manor and Historic Hotel in Larium, Michigan.   (Trial Transcript, March 5, 2008, at PageID.4512-13).   On this date, Juanita Richardson contacted Sprenger to reserve a room that night for two people.   (PageID.4513-14).   Richardson arrived later that day and checked out the following morning.   (PageID.4514-16).

**Amber Denman**

As of June 22, 2006, Denman was employed as a paramedic for Alger County.   (Trial Transcript, March 5, 2008, at PageID.4517-18).   Her partner that day was Steve Webber.   (PageID.4518).   On that date, Denman and Webber were dispatched to Miner's Castle in response to a report that somebody "went over" the cliff.   (PageID.4518).   When the pair arrived at Miner's Castle, Webber proceeded down the hiking trail while Denman remained with the vehicle in case they needed equipment to effect a rescue.   (PageID.4518).   Shortly thereafter, Webber radioed Denman to proceed to the site in question.   (PageID.4519).

When Denman arrived at the scene, she began recording the names and addresses of the various individuals present.   (PageID.4519-20).   Denman also cordoned off the general area preventing people from walking the secondary trail to the site.   (PageID.4519).   Denman and Webber remained at the scene until Juanita Richardson's body was recovered and on board a Sheriff's boat.   (PageID.4521).   Denman "could see one shoe down there with [Juanita Richardson]", so Webber and Denman attempted to locate the other shoe.   (PageID.4521-22).   Webber subsequently located a sandal that was "stuck" in some vegetation just over the edge of the cliff.   (PageID.4521-24).   Denman examined the edge of the cliff, but was unable to discern any evidence of anything suggesting that Richardson "may have slipped or something."   (PageID.4522).

Denman and Webber subsequently proceeded to the Sheriff's dock to recover Juanita Richardson's body and transport it to Munising Memorial Hospital.   (PageID.4526-28).   After arriving at the hospital, Denman and Webber were informed that Richardson's body would need to be transported to Marquette General Hospital so that an autopsy could be performed.   (PageID.4530).   Accordingly, Denman and Webber remained at Munising Memorial so that they could transport the body once matters there were concluded.   (PageID.4530).

While waiting at the hospital, Denman observed that Petitioner was "calm" and, despite not having been officially informed of Juanita's passing, did not ask any questions about his wife's "condition or status."   (PageID.4530-33).   Denman never observed any indication that Petitioner had been crying.   (PageID.4534).   Petitioner was later taken to view is wife's body, but as soon as Petitioner approached Juanita's body, he immediately said "no, no, no" and exited the room.   (PageID.4534-35).   Petitioner nevertheless remained "calm" and refused offers to contact a minister, friends, or family.   (PageID.4535-36).

**Shaun Hughes**

As of June 22, 2006, Hughes was employed as a Ranger at Pictured Rocks National Lakeshore.  (Trial Transcript, March 6, 2008, at PageID.4576-77).   At approximately 11:40 that morning, Hughes learned that a woman had fallen off the cliff near Miner's Castle.  (PageID.4577-79).   Hughes proceeded to Miner's Castle where he encountered Petitioner and Kari Farkas.  (PageID.4579-80).   Petitioner told Hughes that he and his wife "were walking on the trail from Miner's Castle towards Sand Point and they stopped at an overlook to have lunch."  (PageID.4581-82).   Petitioner then "got up and left to go back to the Miner's Castle [area] to use the bathroom and change his shoes."  (PageID.4582).   Petitioner indicated that "when he came back, he didn't see his wife anywhere, so he yelled, and she didn't answer."  (PageID.4582).   Petitioner then "looked over the cliff edge and saw a white shirt" at which he "went back to Miner's Castle to report it."  (PageID.4582).   While speaking with Hughes, Petitioner repeatedly made reference to a foot injury that his wife had previously suffered.  (PageID.4583).   Specifically, Petitioner stated that his wife "had foot surgery and has trouble walking."   (PageID.4583).

Hughes initially remained at the Miner's Castle Visitor's Center so that he could coordinate the efforts to rescue or recover Juanita Richardson.  (PageID.4584-90).   During this time, Hughes remained in contact with Petitioner who appeared calm and never offered any assistance or offered to go to the location where his wife fell.  (PageID.4589).   At some point, Amber Denman returned to Miner's Castle and informed Hughes that "there was a sandal located partway below the edge of the cliff lodged on some branches."   (PageID.4591).

At approximately 1:00 p.m., Hughes, accompanied by Greg Bruff, proceeded to the location where Richardson fell.  (PageID.4590-91).   Hughes observed, "below the cliff edge on some branches," the sandal which Denman had described.  (PageID.4592).   Hughes measured

15

the distance from the top of the cliff edge to the sandal and then retrieved the sandal using a bent coat hanger.   (PageID.4593).   Hughes also observed a box of crackers and a bottle of soda at the scene.   (PageID.4595-96).   After investigating this location, Hughes returned to the Miner's Castle Visitor's Center.   (PageID.4598).

Hughes then proceeded to Munising Memorial Hospital, arriving at approximately 2:25 p.m.   (PageID.4598-99).   When Hughes arrived at the hospital, Petitioner and several other people were already present and "it was pretty busy."   (PageID.4599-600).   After briefly speaking with various park, law enforcement, and medical officials, Hughes accompanied Steve Webber to speak with Petitioner.   (PageID.4599-601).

Petitioner reported that he and Juanita were on "a honeymooning trip, and part of the trip was to go out and to their honeymooning spot" and also "they were taking photographs of waterfalls to replace ones that were lost in a house fire previously."   (PageID.4605).   Petitioner reported that he "had a head injury that does affect his memory at times."   (PageID.4605-06).   Petitioner further reported that as a result he wears sunglasses because "the light affects his eyes as a result of the head injury."   (PageID.4606).

Petitioner reported that his wife "had reconstructive surgery as a result of her foot being crushed by an ATV."   (PageID.4607).   Petitioner stated that he and Juanita "had gone along the trail from Miner's Castle towards Sand Point, and they went to that area to have a picnic." (PageID.4607).   Petitioner further indicated that "he had been having some illness from dietary changes during the trip, so he had to use the restroom, so he left and went back to Miner's Castle to use the restroom."   (PageID.4607-08).   When Petitioner returned, "his wife wasn't there." (PageID.4608).   Petitioner then "looked over the edge and saw a white sweatshirt she had just changed into" at which point Petitioner "ran to Miner's Castle for help."   (PageID.4609).

16

Hughes later asked Petitioner if he would like to call his children or if he would like somebody else contact them on his behalf.   (PageID.4610-11).   Petitioner declined, saying that he could not recall their cell phone numbers.   (PageID.4611).   Later in the interview, Petitioner provided his workplace telephone number from memory.   (PageID.4614-15).   Petitioner was also able to recall the details of their itinerary.   (PageID.4619-21).   At one point, Petitioner was given some milk.   (PageID.4611-12).   When "pouring the milk, [Petitioner] was shaking considerably.   But when he went to drink the milk he stopped shaking and seemed to drink it fine."   (PageID.4612).

Petitioner reported that "aside from typical arguments, [he and Juanita] had a good relationship."   (PageID.4618).   Petitioner also reported that Juanita "has been known to lean out over edges to take pictures, do things like that."   (PageID.4618).   Petitioner reported that Juanita worked as the secretary to a high school athletic director and that "a[n] athlete recently committed suicide at that school and that [Juanita] was taking it very hard."   (PageID.4618-19).   Petitioner remained calm during this interview and never "express[ed] any distress" concerning what happened to his wife.   (PageID.4621-22).

**Greg Bruff**

As of June 22, 2006, Bruff was employed as the "Program Manager for Heritage Education" at Pictured Rocks National Lakeshore.   (Trial Transcript, March 6, 2008, at PageID.4702).   Bruff also served as the park's "unofficial photographer."   (PageID.4702).   On this date, Bruff accompanied Shaun Hughes to the location where Juanita Richardson fell and took photographs of this location and surrounding area.   (PageID.4702-13).

17

**Matthew Waldron**

As of June 22, 2006, Waldron was employed as an Alger County Deputy Sheriff. (Trial Transcript, March 6, 2008, at PageID.4717).   At approximately 6:20 that evening, Waldron was dispatched to assist with a search of Petitioner's vehicle.  (PageID.4717-18).   During this search, officers recovered two cell phones, one of which belonged to Petitioner.   (PageID.4718-20).   Waldron subsequently "had a lot of contact" with Petitioner at the county jail. (PageID.4727).   At the jail, Petitioner initially wore his sunglasses "all the time," but subsequently discontinued wearing them.   (PageID.4728).

**Steve Blank**

As of June 22, 2006, Blank was employed as an Alger County Deputy Sheriff. (Trial Transcript, March 6, 2008, at PageID.4739).   In response to a report that somebody "fell off the cliff," Blank "was directed to put the Sheriff's Department boat in the water and respond by water."  (PageID.4739).   After recovering Juanita Richardson's body, Blank returned to the dock where Richardson's body was transferred to an ambulance for transport to the hospital. (PageID.4739-40).   Blank was later dispatched to Munising Memorial Hospital to assist in the investigation concerning Juanita Richardson's death.   (PageID.4740).

Blank later joined the interview of Petitioner being conducted by Steve Webber and Shaun Hughes.   (PageID.4741-44).   Petitioner reported that he and Juanita were "walking down the trail and their feet were sore.   So they decided to find what they used to call their honeymoon spot."   (PageID.4744).   Petitioner indicated that upon reaching this location, Juanita "took some pictures."   (PageID.4744).   Petitioner stated that Juanita "was a risk taker" and "that at times she would actually hang onto a piece of bark and hang over a cliff and snap some photos."   (PageID.4744).   Petitioner reported that he then "had an upset stomach" and "felt

like he was going to crap his pants," so he decided to "hike back out to Miner's Castle and use the restroom." (PageID.4744). Petitioner indicated that when he returned to the location, "he didn't notice his wife anywhere." (PageID.4745). Petitioner then "looked over [the edge of the cliff] and saw something white" at which point he ran back to Miner's Castle to report that his wife "had fallen off the cliff." (PageID.4745).

Petitioner related the events in a "very matter of fact" manner and never equivocated or alleged experiencing any lapse in memory or loss of consciousness. (PageID.4745-46). Petitioner indicated that he began "cramping up" after he ran to the Miner's Castle Visitor Center. (PageID.4751-52). Petitioner reported that Kari Farkas "was helping him rub out his cramps." (PageID.4751-52). Petitioner "joked and laughed" about this and said Farkas "did a good job, too" which struck Blank as "a little strange, given what took place." (PageID.4752). Petitioner never asked any questions about his wife or where her body would be taken. (PageID.4752). A pastor later met with Petitioner for approximately 90 minutes after which Blank resumed speaking with Petitioner. (PageID.4747-53).

When Blank asked Petitioner "how they were financially," Petitioner responded that he and his wife jointly earned in excess of $100,000 annually and did not have any debts. (PageID.4753-54). This response differed from what Blank had learned from Sheriff Bosscher. (PageID.4754). When asked about his relationship with Juanita, Petitioner stated that "they had a terrific marriage" and that "their sex life was terrific." (PageID.4754-56). Petitioner did note, however, that approximately six years previously he and Juanita were separated and were both involved with other people. (PageID.4755-56).

Later in the conversation, Petitioner stated that when Juanita woke up that morning she "had a very large lump on the side of her breast." (PageID.4765). Petitioner stated that the

19

lump was so large "you could actually see it through some of the shirts that she wears." (PageID.4766).   Petitioner also alleged that Juanita was depressed because she was experiencing "empty nest syndrome."   (PageID.4766-67).   Petitioner then reiterated that Juanita was a "risk taker" who earlier that day "tried to walk around a barrier and – out at the falls and take a photo." (PageID.4767).   According to Petitioner, he "had stopped her from doing that because he didn't want her to fall."   (PageID.4767).

Blank later informed Petitioner of some information that he had learned from Sheriff Bosscher.   (PageID.4768-69).   Specifically, Blank informed Petitioner that he had learned that Petitioner and his wife "were having some financial troubles."   (PageID.4769). Blank also related that "there was a possible embezzlement at the McBain school that possibly could have involved Juanita."   (PageID.4769).

Petitioner thereafter offered a different version of Juanita's death, asserting that she committed "suicide."   (PageID.4771-72).   According to Petitioner, when he returned to their honeymoon spot, after using the bathroom, Juanita "was standing at the cliff edge" waiting for Petitioner to return.   (PageID.4772).   When Juanita saw Petitioner, she "made eye contact with [Petitioner]. . .[and] turned and jumped."   (PageID.4772).   When asked why he had now changed his story, Petitioner stated that he "wanted to protect Juanita" and "didn't want the kids to find out that Juanita committed suicide."   (PageID.4773).   Petitioner was permitted to "come and go as he wanted" during his conversation with Blank.   (PageID.4756-57).   Throughout the conversation, Petitioner would "kind of put his hands down, sob a little bit, go to wipe his eyes, and then come back up," but Blank "didn't see any tears."   (PageID.4761).

The following morning, Petitioner offered yet another version of the events in question.   (PageID.4789-90).   This time, Petitioner stated that when he returned from going to

the bathroom, Juanita "was standing there, made eye contact with him, and just kind of fell." (PageID.4790).   When asked to elaborate, Petitioner "wouldn't say that she jumped and wouldn't say that she fell, just kind of fell over is how he put it."   (PageID.4790).   When Blank asked Petitioner "about, you know, the suicide story?", Petitioner again responded that Juanita "just kind of fell."   (PageID.4790).   When Blank challenged Petitioner that he had again changed his story, Petitioner "stuck to that she just kind of fell."   (PageID.4791).   Shortly thereafter, Petitioner returned home.   (PageID.4791-92).   Before departing, however, Petitioner never asked about the disposition of Juanita's body.   (PageID.4792).

**Dr. William Grace**

Dr. Grace, a family practice physician, began treating Juanita Richardson in February 2000.   (Trial Transcript, March 10, 2008, at PageID.4940-44).   On her initial visit with Dr. Grace, Richardson reported that she was experiencing depression.   (PageID.4944).   The "primary component" related to Richardson's depression was "marriage problems." (PageID.4945).   Richardson reported that Petitioner was "seeing other women."   (PageID.4949). Richardson also reported that she was suffering post-traumatic stress disorder related to a "previous abuse problem" as well as "female sexual disorder problems."   (PageID.4945-49).

Dr. Grace diagnosed Richardson with "moderate" depression, for which he prescribed Effexor, an antidepressant.   (PageID.4946-71).   Subsequent examinations revealed that Richardson was "doing well" on her prescribed medication.   (PageID.4971-73).   Richardson continued taking Effexor for several months, but discontinued such in late 2000.   (PageID.4973-74).   In March 2003, Richardson reported that her depression had returned at which point her Effexor prescription was resumed.   (PageID.4974-78).   Dr. Grace next examined Richardson in June 2003, at which point Richardson's depression was "markedly improved."   (PageID.4979).

The doctor also noted that Richardson was experiencing "arthritic pain in her left foot from [a] previous injury with degenerative arthritic changes and swelling on the top of her foot."  (PageID.4982).   Richardson nevertheless exhibited "appropriate" gait and balance. (PageID.4984).   Dr. Grace also noted that Richardson suffered from fibrocystic breast disease, a condition in which "normal breast tissue. . .intermittently swells."  (PageID.4986-87).   The doctor noted that this condition neither increases the risk of developing breast cancer nor produces "lumps that are visible to other people."  (PageID.4987-88).   The doctor further noted that there was nothing in Richardson's medical history "that would support an assertion or belief that she was terminally ill with breast cancer."  (PageID.5000-05).

Dr. Grace examined Richardson in March 2006, at which point he noted that Richardson was "doing fine" and "functioning well."  (PageID.4997-98).   Dr. Grace last examined Richardson on June 15, 2006, at which point Richardson exhibited no limitations or difficulties related to mobility.  (PageID.5005-06).   The doctor indicated that Richardson was "in pretty good health" and was working to improve her health and lifestyle.  (PageID.5007-08). Richardson acted like "an individual that wants to live longer."  (PageID.5008).

**Thomas Beckman**

As of June 21, 2006, Beckman was employed as the manager of the photo lab at the Walmart Super Center in Marquette, Michigan.  (Trial Transcript, March 11, 2008, at PageID.5123).   One of the services that every Walmart photo lab offered was "downloading of photographs from digital cameras to CD's."  (PageID.5123-25).   The machines that accomplished this task were "read-only machines" which meant that transferring photographs from a digital camera to a CD did not (and could not) delete the photographs in question from the camera in question.  (PageID.5124).

**Robert Hughes**

As of June 22, 2006, Hughes was employed as the Alger County Undersheriff. (Trial Transcript, March 11, 2008, at PageID.5135-36).   On this date, Hughes participated in the recovery of Juanita Richardson's body.   (PageID.5136).   Later that afternoon, Hughes was instructed to proceed to Munising Memorial Hospital.   (PageID.5138).   When Hughes arrived at the hospital, he met with Larry Hach who indicated that "there was some suspicious circumstances surrounding this incident and that possibly they were looking at a felony in the form of a homicide."   (PageID.5138-39).   Hach requested that the Alger County Sheriff's Office "take over the investigation because of some jurisdictional problems with the Park Service." (PageID.5139).

Hughes later examined the photographs stored on Petitioner's camera. (PageID.5139-41).   Eleven photographs were stored on the camera, all of which were taken on June 22, 2006, in the vicinity of Miner's Castle.   (PageID.5140-48).   The last of these photographs was of Petitioner taken "at the cliff site" at 10:55 a.m.   (PageID.5148).   Later that afternoon, Hughes assisted with the search of Petitioner's vehicle.   (PageID.5150-51).

Later that evening, Hughes returned to the hospital and joined the interview that Deputy Blank was conducting with Petitioner.   (PageID.5157-58).   Initially, Hughes just sat and listened.   (PageID.5158-59).   Petitioner "was repeating what happened in previous interviews about how he had gone to the bathroom at Miner's Castle and how when he returned, his wife was gone, and how – how he looked over the cliff and saw something white."   (PageID.5159). Petitioner looked Blank "straight in the eye" and repeated this version 3 or 4 times. (PageID.5161-63).   Petitioner was "very certain" about this version of events.   (PageID.5161-62).   Petitioner never indicated that he experienced any lapses in memory or loss of

consciousness.   (PageID.5161-62).   However, when Deputy Blank asked Petitioner if he could "have touched her which caused the fall?", Petitioner "would look down and his eyes would go off away from Deputy Blank as if he was thinking of an answer."  (PageID.5163).  Petitioner reported that his "marriage was good, that their love life was good, that there was really no issues between them."  (PageID.5163).  Petitioner also reported that Juanita "was worried about a lump in her breast."  (PageID.5164).

At a later point in the interview, as Petitioner was again relating how he became sick and had to use the bathroom, Hughes "made the suggestion" to Petitioner that "you were sick when you saw your wife fall from the cliff."  (PageID.5165).  Petitioner responded, "yes, it made me sick to see my wife fall."  (PageID.5166).  Hughes then asked Petitioner, "so you did see your wife fall?"  (PageID.5166).  Petitioner "hesitated and thought, and then [said], no, it made me sick to see that she had fallen."  (PageID.5166).  When confronted that he had said that he actually saw Juanita fall off the cliff, Petitioner became "fairly dramatic" and proclaimed that his wife had committed suicide.  (PageID.5166-69).  Petitioner than offered a completely different version of events.  (PageID.5169).  Specifically, Petitioner asserted that when he returned from the bathroom to the cliff, "Juanita was standing at the edge of the cliff facing the trail, as if she was watching for him, facing the trail."  (PageID.5170).  Petitioner continued that "as he approached the cliff site, their eyes met, she said something about – about God, and turned and jumped off of the cliff."  (PageID.5170).  Petitioner repeated this version of events multiple times.  (PageID.5171).  When asked why he did not report this version of events initially, Petitioner stated that he did not want their children to know that Juanita committed suicide. (PageID.5171-72).

Shortly thereafter, Blank gave Hughes a consent form, which Hughes understood as a request by Blank to try to obtain from Petitioner a written statement.   (PageID.5174).   Blank then exited the room, at which point Hughes asked Petitioner if he would be willing to put his story in writing.   (PageID.5174).   Petitioner agreed and began reading the Miranda rights printed at the top of the form.   (PageID.5174-75).   After reading the Miranda rights, however, Petitioner declined, stating "I'm not sure if I want to write this down."   (PageID.5175).   Hughes told Petitioner, "that's okay."   (PageID.5175).   Hughes then asked Petitioner if he would demonstrate "how Juanita jumped from the top of the cliff."   (PageID.5175).   Petitioner agreed and proceeded to act out this version of events.   (PageID.5175-78).

**Anthony Grahovac**

As of June 22, 2006, Grahovac was employed as a Sergeant for the Alger County Sheriff's Department.   (Trial Transcript, March 11, 2008, at PageID.5260).   On this date, Grahovac assisted in the recovery of Juanita Richardson's body from the lakeshore. (PageID.5260-61).   The following morning, Grahovac accompanied Deputy Blank to pick up Petitioner from his motel after which the group proceeded to the Sheriff's Department (PageID.5261-65).

After making several phone calls, Petitioner agreed to speak with Blank and Grahovac to "go over the story one more time."   (PageID.5265-67).   Regarding how his wife perished, Petitioner stated that when he returned to the cliff site, Juanita "was standing at the edge of the cliff" and then "just kind of fell over."   (PageID.5267-69).   Petitioner denied that he pushed his wife or that she slipped or accidentally fell.   (PageID.5270).   Petitioner then reiterated that Juanita "was standing on the – by the edge of the cliff, and she just kind of like collapsed over."   (PageID.5270).   When asked, "was it like she had a heart attack or something like that

where she just fell like that?", Petitioner responded, "yeah, something like that."   (PageID.5270).

Petitioner did not report experiencing any doubts or uncertainties about his then current version of

events.   (PageID.5273).   Petitioner also did not report experiencing any lapses in memory.

(PageID.5273).

**Richard Cruz**

As of June 22, 2006, Cruz was employed as a Detective Sergeant with the Michigan

State Police Computer Crimes Unit.   (Trial Transcript, March 11, 2008, at PageID.5314-15,

5323).   As part of the investigation into Juanita Richardson's death, Cruz examined a computer

belonging to Petitioner to determine whether Petitioner used the computer in question to research

how to kill his wife.   (PageID.5314-16).   Cruz's examination of this particular computer revealed

"nothing of interest."   (PageID.5316-17).

**Dr. Walter Loope**

Dr. Loope was a research ecologist employed by the United States Geological

Survey.   (Trial Transcript, March 11, 2008, at PageID.5327).   Dr. Loope previously worked as a

Resources Management Specialist at Pictured Rocks.   (PageID.5327).   The Pictured Rocks cliffs

are formed by "one of the hardest rocks" and the various rock layers are "very stable."

(PageID.5329-30).   A "couple of weeks" after Juanita Richardson's death, Dr. Loope examined

the location from where Richardson fell to determine if there was any evidence of "a very sudden

rock fall."   (PageID.5327-28, 5331).   There was no evidence that the cliff location where

Richardson was killed "had failed or given way."   (PageID.5331).

**Leon Pratt**

In June 2007, Pratt, a Media Production Specialist for the Michigan State Police, returned to the scene of Juanita Richardson's death to take various photographs and recordings in an attempt to recreate for the jurors the location in question.  (Trial Transcript, March 12, 2008, at PageID.5388-5463).

**John Bruno**

In May 2007, Bruno, a Traffic Crash Reconstructionist Specialist, with the Michigan State Police, participated in an effort to recreate Juanita Richardson's fall using a crash cart dummy.  (Trial Transcript, March 12, 2008, at PageID.5464-65, 5470-74).   The dummy was dropped from the cliff three times.  (PageID.5473).   The initial drop was a test to determine where to place the recording equipment.  (PageID.5473).   On the second drop, the dummy was "simply allowed to fall over the cliff."   (PageID.5474).   On the final drop, the dummy was placed on a backboard and "more forcefully pushed off of the cliff."   (PageID.5474).   On the final drop, the dummy impacted further down the cliff and came to rest closer to where Juanita Richardson's body was recovered.  (PageID.5499-500).   Bruno conceded that his testing could not determine Juanita Richardson's horizontal momentum as she fell from the cliff or what amount of force, if any, caused her to fall off the cliff.   (PageID.5529-31).   Bruno further conceded that he was not offering any opinion as to the cause of Richardson's death.   (PageID.5531).

**Mary Beth Hill**

Hill and Juanita Richardson were best friends growing up in McBain, Michigan. (Trial Transcript, March 12, 2008, at PageID.5535-36).   Hill moved away following high school, after which the pair did not see each other for a number of years.   (PageID.5536-37).   Hill

returned to McBain in 1997, at which point the two renewed their friendship.   (PageID.5536-37). In 2000, the pair began working at the same school which enabled them to visit daily. (PageID.5537-39).

Hill and her husband socialized with Petitioner and Juanita Richardson. (PageID.5539).   Petitioner was "cocky and sarcastic, very nasty to Juanita, hard to be around." (PageID.5539).   Petitioner was "very demeaning" to Juanita and "belittled her every time [the group was] together."   (PageID.5540-41).   Petitioner would call Juanita names such as "dumb ass, fat ass, stupid bitch, fucking cunt."   (PageID.5541).   Petitioner acted in this manner "right out loud in front of everybody" and "he didn't care if he made a scene."   (PageID.5541). Moreover, Petitioner "was always commenting on other women" occasionally in "very vulgar" terms.   (PageID.5540-43).

Juanita acted "like she accepted" this type of treatment from Petitioner. (PageID.5543).   To Hill, this "just seemed to be the nature of their relationship."   (PageID.5543-44).   When asked if she ever witnessed Petitioner "compliment [Juanita] or show her affection, or speak well of her," Hill responded, "no, not – not really."   (PageID.5544).   As a result, Hill and her husband began "avoiding interacting with them as couples."   (PageID.5544).   Juanita "didn't complain a lot," but "she did say that [Petitioner] was very demanding sexually and that nothing was – no matter how much she gave to him, it was never enough."   (PageID.5546).   Juanita "tr[ied] to do whatever she could to make [Petitioner] happy, whether it was to do with their house or their lives or their kids."   (PageID.5546).

In or around 2000, Petitioner and Juanita separated because Petitioner "had a girlfriend."   (PageID.5547).   They were going to get divorced, but Juanita "allowed [Petitioner] to come back home and they patched things up and they were going to stay together."

(PageID.5547).    Juanita reconciled with Petitioner "for the kids and financially."    (PageID.5547-48).    Shortly before Juanita and Petitioner departed for their final vacation, Juanita stated that Petitioner had "been ragging on" her to "get a will."    (PageID.5548-50).

Juanita never complained about foot or ankle pain and never exhibited mobility difficulties.    (PageID.5552-53).    Juanita "was always on the go" and did a lot of walking both as part of her job and as recreation.    (PageID.5552-54).    Juanita "did most of everything at home," including "very physical" chores and activities.    (PageID.5554).    Juanita did not exhibit "empty nest" syndrome or sadness about her children leaving home.    (PageID.5555).    Juanita "was very upbeat" and "excited about the kids and the way – the direction their lives were taking." (PageID.5555-56).    Juanita was not a "daredevil" or risk taker, but was instead "responsible" and "reliable."    (PageID.5558-59).

Juanita Richardson's funeral was "a show."    (PageID.5567).    Because there "was no casket," there were "lots of pictures" displayed, including "a large picture of Juanita." (PageID.5567).    "Just before the service started, [Petitioner] got up and walked up to the picture, and it was like he was caressing Juanita's face, and fell down on his knees and was just sobbing." (PageID.5567).    Hill observed no evidence, however, that Petitioner was actually crying or shedding tears.    (PageID.5567-68).    Petitioner did "a lot of shoulder shaking," but "it just all seemed very fake, all for show."    (PageID.5568).    Immediately after the funeral, however, Petitioner's mood changed and he acted like "it could have been at a wedding reception, just like any other day."    (PageID.5568-69).

Hill was aware that Petitioner claimed to have previously "fell and hit his head." (PageID.5574).    While Petitioner alleged that he experienced memory problems as a result of his head injury, Hill "never saw evidence of it."    (PageID.5574-75).    Petitioner's memory appeared

"normal" and he "could certainly remember a lot of details of something that was interesting to him." (PageID.5575). Also, before Juanita Richardson's death, Hill never observed Petitioner wearing sunglasses indoors, after dark, or on cloudy days. (PageID.5575).

**Stephen Hill**

Stephen Hill is Mary Beth Hill's husband. (Trial Transcript, March 13, 2008, at PageID.5592-93). Hill and his wife were friends with Petitioner and Juanita Richardson for many years and socialized together regularly. (PageID.5593-94). Petitioner treated Juanita "poor[ly]" and subjected her to "verbal abuse." (PageID.5596-97). Petitioner "never, never had anything good to say about or to her, never." (PageID.5597). Petitioner would call Juanita "horrible names" like "stupid bitch, stupid cunt." (PageID.5597). Petitioner was an "extremely controlling" person who "controlled everything in the house." (PageID.5601).

Juanita "never said a word" in response. (PageID,5597-98). When Hill would ask Juanita "why she put up with it," Juanita responded "oh, that's just Tom." (PageID.5598). Hill concluded that Juanita "don't think she felt she deserved anything better than [Petitioner]." (PageID.5598-99). Hill also believed that "the kids were most [of] the reason" Juanita remained married to Petitioner. (PageID.5599). Hill never heard Petitioner offer any compliments or affection to Juanita. (PageID.5599). Juanita was a "lovely" person who "tried to please [Petitioner] however she could." (PageID.5599-600).

Petitioner would "often" initiate conversations with Hill about his marriage describing Juanita as "just the stupid bitch that didn't know nothing." (PageID.5601). Petitioner also related that Juanita "never wanted to have sex" and that he was "sick and tired of it." (PageID.5601-02). Petitioner also spoke about "some woman named Betty that he was with. . .during the time [he and Juanita] were separated." (PageID.5602). Petitioner spoke "very"

favorably of Betty and stated that "Betty is a woman that knows how to treat a man." (PageID.5602).   Petitioner expressed regret that he reconciled with Juanita and indicated "that he would have rather been with Betty."   (PageID.5602).

When Hill encountered Juanita a few weeks before her death, she seemed "fine" and exhibited "nothing out of the ordinary."   (PageID.5603-04).   Juanita never exhibited any difficulties with gait, balance, or coordination.   (PageID.5604-05).   With respect to physical activity, Juanita engaged in "anything and everything. . .from building to landscaping, she wasn't afraid to tackle anything."   (PageID.5605).   Juanita never complained of pain or difficulties with her feet, knees, or ankles.   (PageID.5606).

Hill spoke with Petitioner two days after Juanita died.   (PageID.5606-08). Petitioner acknowledged telling the police "two different stories."   (PageID.5607-08).   Petitioner asserted that Juanita "slipped and he tried to save her, but he told [the police] that he was gone because if he thought if he told them that he was there when it happened, they'd think that he had something to do with it."   (PageID.5608).

Hill was aware that Petitioner fell and hit his head "quite a few years ago." (PageID.5611).   Petitioner claimed that this injury affected his memory, but Hill never observed any indication that Petitioner experienced any difficulties with his memory.   (PageID.5611-12). Prior to Juanita's death, Petitioner never wore sunglasses indoors or after dark.   (PageID.5612). At Juanita's funeral, Petitioner "made a scene in front of the church" and "then after the service, he was fine."   (PageID.5619).   Approximately three weeks after Juanita's death, Hill again spoke with Petitioner.   (PageID.5613).   Petitioner initially complained about financial difficulties. (PageID.5613-14).   Petitioner then indicated that he was "a man of needs" and inquired how long he should wait "to be with another woman."   (PageID.5613-16).

**Joel Bronkema**

Bronkema was the Student Services Director at McBain High School.  (Trial Transcript, March 13, 2008, at PageID.5640-41).   Juanita served as Bronkema's secretary for the four years prior to her death.  (PageID.5641).   During this time, Bronkema and Richardson became "very close."  (PageID.5641-42).   Juanita "loved [Petitioner] dearly" and "was a very, very loyal wife."  (PageID.5643).   Juanita nevertheless expressed that she and Petitioner were not always "on the same page" with respect to issues like "the building of their house and their finances and the decisions that the kids were going to – going to make and do."   (PageID.5643).

Bronkema observed Petitioner and Juanita interact and considered "the quality of their interaction" to be "very normal" and "very positive."  (PageID.5643-44).   Shortly before her death, Juanita "claimed that she thought she had a broken toe, and she was limping some, but she was also wearing [an] open-soled shoe because it was enough of – of pain that she – she didn't have a closed shoe on at that time."   (PageID.5645).   Bronkema, however, never observed Juanita exhibit difficulties with gait, balance, or coordination.  (PageID.5646-47).   Juanita was "upbeat" and "enjoyed life."  (PageID.5647).   With respect to the fact that her youngest child was preparing to leave home, Juanita was "very comfortable" with the situation and believed that it "was going to offer some different opportunities for her."  (PageID.5647-48).   Bronkema insisted that Juanita was neither a daredevil nor a risk taker.   (PageID.5648).

Bronkema spoke with Petitioner a few days after Juanita's death.  (PageID.5648-50).   Petitioner recounted that he initially told the police that he had left Juanita at the cliff to use the bathroom and that when he returned "she was missing and had fallen off the cliff."  (PageID.5650).   Petitioner indicated, however, that he later "recanted that story and, in turn, told the authorities that he did indeed see her fall off the cliff."  (PageID.5650).   Petitioner stated that

he provided the police with two different stories because "he didn't want anyone to think that Juanita had committed suicide and jumped off the cliff."  (PageID.5650).  Bronkema could not think of any reason why Juanita would be sad or depressed.  (PageID.5663-64).

**Harvey Lucas**

From approximately 1996-2006, Lucas worked with Juanita Richardson at McBain High School.  (Trial Transcript, March 13, 2008, at PageID.5666-67).  Lucas and Richardson were friends who spoke often.  (PageID.5667-68).  Richardson was "very mellow, very even-keeled."  (PageID.5668).  Lucas never observed Richardson limping or exhibiting difficulties with her gait or balance.  (PageID.5669).  Lucas never heard Richardson express sadness about her youngest child leaving home.  (PageID.5669).  Lucas encountered Richardson shortly before her death and found her to be "very, very positive."  (PageID.5669).

Lucas spoke with Petitioner a few days after Juanita's death.  (PageID.5670-71).  Petitioner stated that he "had gone to the restroom" and when he returned, Juanita "turned 180 degrees, fell over the edge, and said, oh, my God, and then screamed."  (PageID.5678).  Petitioner did not acknowledge providing the police with any alternative versions of the relevant events.  (PageID.5680).  Petitioner did not exhibit any unusual "memory lapses or breaks of conversation" when relating this version of events.  (PageID.5682-83).

**Dawn Boonstra**

Boonstra and Juanita Richardson were "good friends" who worked together during the eight years preceding Richardson's death.  (Trial Transcript, March 13, 2008, at PageID.5690-91).  Richardson was "very mellow, very caring, [and] very outgoing."  (PageID.5692).  Boonstra never observed Richardson exhibit mobility or gait difficulties.  (PageID.5693-94).

Richardson was "energetic," "physically active," and her emotional health was "fine." (PageID.5693-96).

A couple days after Richardson's death, Boonstra travelled to Petitioner's residence to express her condolences. (PageID.5697-98). At one point, Petitioner approached a group of people and asked, "so do you want to know what really happened?" (PageID.5698). Petitioner stated that "he came walking up and Juanita was standing there, and she was looking out at the scenery." (PageID.5698). According to Petitioner, Juanita then "turned around. . .and she had this look on her face, and it was the most beautiful look he had ever seen" and "the next thing he knew, she just fell." (PageID.5698-99). Petitioner related this story with "no emotion, just – just like normal people carrying on a conversation." (PageID.5699).

Boonstra and her husband attended Richardson's funeral. (PageID.5701). Prior to the service, Petitioner "had gotten up and was on his knees and grabbing the side of the picture, and he was shaking like he was sobbing." (PageID.5701). Boonstra thought Petitioner was simply seeking attention. (PageID.5701).

**Thurman Mullins**

Mullins met Petitioner when the two worked as truck drivers for FedEx. (Trial Transcript, March 13, 2008, at PageID.5711). Mullins considered Petitioner a spiritual mentor of sorts because he was so knowledgeable about the bible. (PageID.5712-13).

Following Juanita Richardson's funeral, Petitioner attended a gathering at Mullins' home. (PageID.5715-16). At one point, Petitioner described how Juanita died. (PageID.5716-17). Petitioner stated that he and Juanita were picnicking when he had to use the bathroom. (PageID.5717). According to Petitioner, when he returned, "he didn't know where she was, he couldn't find her." (PageID.5717). Petitioner then "looked over the edge" and "saw something

34

down there" at which point he "ran back to the Visitor's Center."   (PageID.5717).   Petitioner was certain that this is what happened and he did not report experiencing any lapses in memory or loss of consciousness.   (PageID.5717).

Approximately one hour later, Petitioner volunteered a completely different version of events.   (PageID.5718).   In this second version, Petitioner reported that as he returned, he saw Juanita who was "looking at him as though she had something to – to tell him."   (PageID.5718). According to Petitioner, Juanita then simply turned back toward the water "and he saw her go over."   (PageID.5718).   Petitioner stated that he "didn't know if [Juanita] had jumped or not," but "he was trying to protect her reputation."   (PageID.5719).   Petitioner also described his treatment by the police following Juanita's death.   (PageID.5722-23).   Petitioner was "very upset" that the police had scratched his car.   (PageID.5722-23).   Petitioner "was much more emotional" talking about the damage to his car than anything else.   (PageID.5723).

After Juanita's death, Petitioner told Mullins that his marriage "had problems." (PageID.5724).   Petitioner reported that he and Juanita had participated in marriage counseling, but it was unsuccessful because Juanita "hadn't put any – any effort in it at all."   (PageID.5725-26).   Petitioner also complained that he "never could get enough sexual relations" and Juanita "wasn't as adventurous sexually as he would like."   (PageID.5725-27).

A "couple months" after Juanita's passing, Petitioner began asking Mullins if he knew of any "hot single moms" he could "set him up with."   (PageID.5729).   Petitioner told Mullins that he had "needs and – and urges."   (PageID.5730).   Mullins soon thereafter learned that Petitioner was "seeing" a woman named Tammy.   (PageID.5730-31).   Mullins also described an incident where Petitioner joined Mullins, his wife, Danielle, and his wife's sister,

Diana, for dinner.   (PageID.5737).   After dinner, Petitioner repeatedly told Mullins that Diana's "fingernails were making him horny."   (PageID.5737-38).

Petitioner also spoke with Mullins about his alleged head injury.   (PageID.5733). Petitioner described it as a "severe" injury that forced him to undergo "a lot of rehabilitation" and "relearn a lot of things" such as "pronunciation of words."   (PageID.5734).   Petitioner also reported that he "had memory problems a lot," but Mullins never saw any indication that Petitioner suffered any memory impairment.   (PageID.5734-35).

**Danielle Mullins**

Danielle Mullins is married to Thurman Mullins.   (Trial Transcript, March 13, 2008, at PageID.5767).   Following Juanita Richardson's funeral, Petitioner attended a gathering at Mullins' home.   (PageID.5768-69).   While at this gathering, Petitioner stated that Juanita "had breast cancer" when she died.   (PageID.5770, 5774).   Petitioner offered two different versions of what happened to Juanita.   (PageID.5771-72).   Initially, Petitioner stated that Juanita "was gone" when he returned from using the bathroom at which point he "ran to the rescue center." (PageID.5771).   Petitioner later asserted that "when he came back from the bathroom, [Juanita] looked at him" and then "she went over as she jumped."   (PageID.5772).   Petitioner displayed "no emotions at all" when describing the events in question.   (PageID.5775).   Petitioner did not report experiencing any lapses in memory or loss of consciousness.   (PageID.5775-76).

Approximately two weeks after Juanita's death, Petitioner began asking Thurman Mullins if he knew "any single moms/friends that [he] could hook [Petitioner] up with?" (PageID.5777-78).   In August 2006, Petitioner attended a gathering at Mullins' residence at which one of Mullins' sisters, Diana, was also present.   (PageID.5778).   Diana "kept tapping her nails on [her] chair" in response to which Petitioner stated, "nails never really turn me on, but your nails

36

are really turning me on." (PageID.5778-79). Later, after Petitioner learned that Diana was planning to go to Pictured Rocks, he asked her, "well, while you're up there, will you pick up my wife's ashes?" (PageID.5779). Mullins did not perceive Petitioner's question as a joke. (PageID.5779).

Petitioner claimed to have suffered a head injury, but never exhibited any "speech or memory problems." (PageID.5779-81). Petitioner did not begin wearing sunglasses at "unusual" times until after Juanita's death. (PageID.5780). Petitioner also reported that, following Juanita's death, the police "scratched his car" which made him more upset than anything. (PageID.5781).

**Julie Bonham**

Bonham and her husband lived "across the road" from Petitioner and Juanita Richardson. (Trial Transcript, March 13, 2008, at PageID.5793). The group would socialize "once in a while." (PageID.5794). Bonham and her husband attended Juanita's funeral and observed that Petitioner did not appear to be particularly upset. (PageID.5800). Less than two months later, Bonham's husband suffered a heart attack and passed away. (PageID.5795). Petitioner later visited Bonham at her residence. (PageID.5796). Petitioner did not comment on Bonham's loss, but instead launched into a "rehearsed" and lengthy "spiel" about how he was "depressed and lonely," how he had suffered a previous head injury, and that Juanita had been molested as a child. (PageID.5798-800).

**Tim Baker**

Baker and his wife, Nancy, lived approximately one mile from Petitioner and Juanita Richardson. (Trial Transcript, March 17, 2008, at PageID.5954-55). The group became

friends in 2003 and began to regularly socialize.   (PageID.5955-56).   Juanita was "very happy, very bubbly" whereas Petitioner was "a type-A personality" who "liked to be in charge of the situation."   (PageID.5957).   As time went on, Baker realized that Petitioner "didn't respect his wife, he didn't like his wife, and he appeared to. . .emotionally abuse his wife."   (PageID.5958). Petitioner "quite often" talked about his sex life with Juanita, stating that "sex was either never good enough or often enough" and that "the fat cow would never put out."   (PageID.5958, 5960-64).   Petitioner was "angry" about this circumstance and indicated that he "wished he could change it."   (PageID.5964).

Petitioner referred to Juanita as a "lazy bitch" or a "lazy cow."   (PageID.5958-59). Petitioner indicated that Juanita "never did enough work around the house" and "never allowed him to go out and have fun with guys."   (PageID.5960).   Petitioner referred to Juanita as "fat," "stupid," and "lazy."   (PageID.5960).   In response, Juanita would get "very quiet" and "would never stand up for herself."   (PageID.5961).   Petitioner also made reference to "an old girlfriend," stating that "he'd lived with another woman and talked about how great the sex was and then how lousy it is at home, how he wished he was still with her, how he wished Juanita would lighten up, but yet how she never did enough at home, such as mowing the yard or cleaning the windows."   (PageID.5962).

In January 2005, Baker and his wife attended a New Year's Eve party at Petitioner's residence.   (PageID.5964-65).   Also, in attendance was Steve Vanderwall, one of Petitioner's co-workers.   (PageID.5964-65).   Vanderwall's wife had recently died, in response to which Petitioner stated "ain't he the lucky one?"   (PageID.5965).

Baker and his wife remained friends with Petitioner and Juanita because "Juanita was just a joy to be around" and because Juanita and Nancy Baker, who had just moved to the

area, "were becoming such good friends."    (PageID.5967).    Nancy Baker, who had previously

been in an abusive marriage, "recognized traits in Juanita that she herself had gone through."

(PageID.5967).    Juanita was "very athletic" and never reported experiencing pain or weakness in

her lower extremities.    (PageID.5969-70).    Juanita was "not abnormally sad" about her youngest

son leaving home to attend college.    (PageID.5971).    Juanita was excited that her son had

"received a great job at college. . .and she was excited for his future."    (PageID.5971-72).

Baker and his wife went to Petitioner's residence a couple days after Juanita's

death.    (PageID.5972-74).    When they arrived, Nancy Baker asked Petitioner if there was

anything she could do, to which Petitioner responded, "yeah, you can clean the house."

(PageID.5975).    Petitioner "didn't appear to be joking."    (PageID.5975).    Petitioner later

volunteered two accounts of what happened to Juanita.    (PageID.5975-79).

Initially, Petitioner offered a "fairly vague" account that "he had gone off to the

bathroom, and he came back and didn't know what happened."    (PageID.5975).    Petitioner

subsequently stated that when he returned from the bathroom, "he saw a sandal or a flip-flop on

the trail" which prompted him to "look over the edge of the cliff."    (PageID.5979).    Petitioner

claimed that he "passed out a couple times" and that "when he came to, he ran for help."

(PageID.5979).    Baker later observed Petitioner describe this version to others.    (PageID.5980-

81).    In this subsequent re-telling, Petitioner "cried in the same place, the adjectives were the

same, the facts were the same."    (PageID.5981).    Baker likened it to "seeing a matinee and then

coming back for the evening performance."    (PageID.5981).    Petitioner never stated to Baker that

he saw Juanita fall off the cliff.    (PageID.5980).

At Juanita's funeral, Petitioner acted "dramatic" and "over the top."

(PageID.5978).    His conduct appeared "staged" and "not genuine."    (PageID.5978-79).    After

Juanita's death, Petitioner would claim to have forgotten things because of his "traumatic brain injury." (PageID.5983-85). After Juanita's death, Petitioner also began wearing sunglasses at unusual times. (PageID.5984-85). Baker observed no evidence that Petitioner was experiencing cognitive or memory impairment. (PageID.5983-85). After Juanita's death, Petitioner also stated that he "was afraid of heights." (PageID.5985-86). This struck Baker as odd given that Petitioner had recently helped Baker "roof his house" without any fear or apprehension. (PageID.5986-87).

Approximately one month after Juanita's death, Petitioner told Baker that he "had needs" and that "it was time he got out and started seeing other women." (PageID.5990). Petitioner asked Baker if one of Nancy Baker's friends, Margo, was available for "recreational companionship." (PageID.5989-90). Margo was unavailable, but Baker was soon thereafter approached by Agent Robert Birdsong who asked Baker if he would be willing to introduce Petitioner to a state trooper who would be acting in an "undercover capacity." (PageID.5990-91). Baker agreed and introduced Petitioner to "Sue Mullins." (PageID.5990-93).

**Nancy Baker**

Baker and her husband moved near Petitioner and Juanita Richardson in May 2004 after which the couples began socializing. (Trial Transcript, March 17, 2008, at PageID.6017-18). Juanita was "gentle and soft-spoken" and "extremely thoughtful of other people" whereas Petitioner "always wanted people to think he was smarter than what he was" and "always wanted people to think that he was a big deal in the neighborhood." (PageID.6019-20).

Whenever Baker saw Petitioner and Juanita together, Petitioner "humiliate[d]" and "degraded" his wife. (PageID.6020). Baker chose not to intervene because she felt that "from personal experience" any intervention on her part would simply cause the situation to "escalate."

40

(PageID.6022).   Petitioner intimidated and controlled Juanita and never complimented or showed affection toward her.   (PageID.6023).   Baker "had to put up with that to be [Juanita's] friend." (PageID.6023-24).   Juanita "always made. . .excuses for [Petitioner]" and was afraid to divorce Petitioner for financial reasons and also out of a concern for how that would impact her children. (PageID.6024-25).

Juanita was "very" active and "always outside."   (PageID.6027).   Baker saw Juanita a "couple days" before her death and observed no indication that she was in any discomfort or experiencing gait or mobility difficulties.   (PageID.6026-27).   As for Juanita's mental status, she appeared "bubbly" and was excited for the summer.   (PageID.6027-28).   Baker was aware of the breast lump that Juanita had experienced.   (PageID.6028).   After her second mammogram, however, Juanita contacted Baker and told her that it was "no big deal," just a benign fatty tumor. (PageID.6028-29).

A couple days after Juanita's death, Baker and her husband visited Petitioner at his residence.   (PageID.6032-33).   When Baker asked Petitioner if there was anything she could do to help, Petitioner responded, "someone could clean the house."   (PageID.6033).   Petitioner later described what happened to Juanita.   (PageID.6034).   Petitioner indicated that when he returned from the bathroom he "saw her sandal laying there, and he – he knew something bad had happened" at which point he "was just so distraught with the possibility of what happened" that he passed out.   (PageID.6034-35).   According to Petitioner, after he regained consciousness he "crawl[ed] to the edge of the cliff," saw Juanita's white jacket, and "passed out again." (PageID.6035).   Petitioner was certain about this version of events and did not indicate that he had experienced any lapse in memory.   (PageID.6035).   Later that day, Baker overheard

41

Petitioner again describe how Juanita died.  (PageID.6036-37).  Petitioner related the story "exactly the same way" and "cried in the same spots."  (PageID.6037).

Following Juanita's death, Petitioner "wanted everybody to know that he couldn't remember and – and he couldn't see real well" because of his alleged head injury.  (PageID.6038-39).  Petitioner asserted that his brain injury caused him to tell the police "different stories" about Juanita's death, however, Petitioner never exhibited any memory or cognitive difficulties prior to Juanita's death.  (PageID.6039-40).  Following Juanita's death, Petitioner also began wearing sunglasses "all the time."  (PageID.6039-40).

Approximately one month after Juanita's death, Petitioner indicated that he "was ready for some recreational companionship."  (PageID.6040-41).  Petitioner was especially interested in one of Baker's friends who was unavailable.  (PageID.6040-41).  Soon thereafter, Baker's husband indicated that "the police had wanted to know if [they] would set [Petitioner] up with an undercover officer."  (PageID.6041).  It was "kind of scary," but Baker concluded that "if it brings out the truth about Juanita's death, great."  (PageID.6041).  She and her husband subsequently introduced Petitioner to "Sue Mullins."  (PageID.6042).

**Dan Dahlstrom**

Dahlstrom is married to Petitioner's sister.  (Trial Transcript, March 17, 2008, at PageID.6060).  Dahlstrom met with Petitioner the day after Juanita's death.  (PageID.6062-66).  Petitioner told Dahlstrom that Juanita "had fallen off the cliff."  (PageID.6066).  According to Petitioner, when he returned from the bathroom, Juanita was "standing there looking at him." (PageID.6066-67).  Juanita then allegedly "smiled, and. . .just twirled around and fell over." (PageID.6067).  Petitioner indicated that he "might have passed out a couple times." (PageID.6067).  Petitioner acknowledged telling the police multiple versions of events, but

42

asserted that he provided multiple stories "to preserve [Juanita's] dignity in case she had jumped."
(PageID.6067-68).

**Laura Mulder**

Mulder was a co-worker of Dan Dahlstrom.   (Trial Transcript, March 17, 2008, at
PageID.6094-95).   The Monday following Juanita's death, Dahlstrom volunteered what Petitioner
had told him about Juanita's death.   (PageID.6095).   According to Dahlstrom, Petitioner
mentioned "that he had seen flip-flops in a tree, and that that was what led him to believe that she
had fallen off the edge."   (PageID.6095-96).   Dahlstrom later indicated that Petitioner had
characterized Juanita's death as a suicide and that Juanita had been "goofing around" at the edge
of the cliff before she fell.   (PageID.6096-97).

**Lisa Kennedy**

Kennedy was a co-worker of Dan Dahlstrom.   (Trial Transcript, March 17, 2008,
at PageID.6111-12).   A couple days after Juanita's death, Dahlstrom volunteered Petitioner's
version of events.   (PageID.6113-14).   According to Dahlstrom, Petitioner indicated that when
he returned from the bathroom, Juanita was "on the edge twirling or like a ballerina and then she
fell off."   (PageID.6114-15).   Dahlstrom then stated that Petitioner later offered a different
version of events.   (PageID.6116).   According to this second version, when Petitioner returned
from the bathroom he "came up behind Juanita, and she turned around and was so startled that she
fell."   (PageID.6116).

**Meredith Richardson**

Meredith Richardson is Petitioner's mother.   (Trial Transcript, March 17, 2008, at
PageID.6137).   Richardson went to visit Petitioner as soon as he returned home from Pictured

Rocks.   (PageID.6139).   According to Petitioner, he and Juanita stopped at their "favorite spot" to eat lunch when Petitioner left to use the bathroom.   (PageID.6140-41).   Petitioner stated that when he returned, Juanita "was standing in the path just looking at him," then she "kind of turned and pointed" and then "she started falling."   (PageID.6140-41).

**Donna Sikes**

Sikes met Meredith Richardson at her church in January 2008.   (Trial Transcript, March 17, 2008, at PageID.6149-50).   When Sikes met Richardson, she knew nothing "about this case."   (PageID.6150).   Richardson looked sad and upset, so Sikes asked her "if something was wrong."   (PageID.6150).   Richardson responded that her son "was in jail. . .without bail for a long time."   (PageID.6150).   Richardson later shared with Sikes what Petitioner had told her about Juanita's death.   (PageID.6150-51).

**Dave Cross**

Cross and his wife socialized occasionally with Petitioner and Juanita Richardson. (Trial Transcript, March 17, 2008, at PageID.6165-66).   Petitioner and Cross also communicated via CB radio when the pair worked driving trucks.   (PageID.6166-67).   Petitioner told Cross that he regretted reconciling with Juanita after they separated.   (PageID.6170).   Petitioner also complained that he and Juanita did not have sex often enough.   (PageID.6171-72).   A "couple days" after Juanita's death, Cross spoke with Petitioner.   (PageID.6173).   Petitioner initially asserted that Juanita committed suicide, but he later asserted that Juanita "slipped and fell" because "he didn't want anybody to think that Juanita had committed suicide."   (PageID.6174-75).   Later that year, Cross learned that Petitioner was involved with Kelli Brophy.   (PageID.6179).

**Kimberly Schroeder**

Schroeder and her husband occasionally socialized with Petitioner and Juanita Richardson.  (Trial Transcript, March 17, 2008, at PageID.6186-87).   Schroeder learned of Juanita's death from Chery Campbell.  (PageID.6187).   A couple of days after Juanita's death, Schroeder telephoned Petitioner to express her condolences.  (PageID.6187-89).   Petitioner told Schroeder that he and Juanita were visiting their "honeymoon spot" when he experienced an upset stomach.  (PageID.6189-90).   Petitioner left to use the restroom and "when he returned, she was gone."  (PageID.6190).   Petitioner never indicated to Schroeder that he observed Juanita fall. (PageID.6190-91).   Petitioner never described losing consciousness or experiencing a lapse in memory.  (PageID.6191-92).   Schroeder never observed Petitioner exhibit any speech or memory difficulties.  (PageID.6192).

**Carol Johnson**

Johnson was a second cousin to Juanita Richardson.   (Trial Transcript, March 17, 2008, at PageID.6199-200).   Following Juanita's funeral, Petitioner travelled to Johnson's home. (PageID.6200).   Petitioner told Johnson that he and Juanita were visiting their "honeymoon spot" when he had to leave to use the bathroom.   (PageID.6201).   When Petitioner returned to the area, Juanita was "standing there looking. . .as if she wanted to tell him something."  (PageID.6201-02).   Juanita then "turned around and then she went over."  (PageID.6202).   Petitioner theorized that Juanita "could have possibly tripped or got hung up on her flip-flop."  (PageID.6202). Petitioner did not describe experiencing any lapses in memory.  (PageID.6203).   Approximately one month later, Johnson again encountered Petitioner who again told the story of how Juanita died, but this time he indicated that after Juanita fell he "crawled on his belly to the edge of the

45

cliff and looked over and seen her down there, and he passed out."   (PageID.6203-04).   Petitioner

also reported that he "passed out again" as he was "going back down to get help."   (PageID.6204).

## Kari Comstock

On October 26, 2006, Petitioner met with Comstock, who worked for Chemical

Bank Corporation, to discuss refinancing his mortgage.   (Trial Transcript, March 17, 2008, at

PageID.6211-14).   Unprompted, Petitioner "launched into" the events surrounding his wife's

death.   (PageID.6214-15).   Petitioner stated that he and Juanita were "at their honeymoon spot,

and that he had to use the restroom."   (PageID.6215).   When Petitioner returned, he began

walking towards Juanita who "just looked at [Petitioner] and had a smile on her face and put her

hand up in somewhat of a waving motion, she turned, and fell."   (PageID.6215).   Petitioner

"thought" that he then blacked out after which he "crawled to the cliff's edge and saw her down

there, and then ran to the [Visitor's Center]."   (PageID.6217).   Petitioner acknowledged that he

told the police conflicting stories of the relevant events, but he attributed this to the effects of his

head injury.   (PageID.6218-19).   Comstock observed no evidence that Petitioner was suffering

the effects of a head injury.   (PageID.6219).

## Robert Campbell

Campbell and Petitioner were long time acquaintances.   (Trial Transcript, March

17, 2008, at PageID.6224-25).   At some point following Juanita's death, Campbell and his wife,

Chery, encountered Petitioner.   (PageID.6226).   Petitioner volunteered that he "had seen

[Juanita] fall."   (PageID.6226-27).   Petitioner also reported that due to a head injury "light

bothered his eyes, and. . .he had trouble remembering things."   (PageID.6229).

**Chery Campbell**

Campbell had known Petitioner and Juanita Richardson for many years.  (Trial Transcript, March 17, 2008, at PageID.6233-34).  While the group had not socialized in some time, Campbell recalled an incident where Petitioner and Juanita began fighting and "it got physical" and her husband "literally had to tear the two of them apart."  (PageID.6240).

**Duane Ellens**

Ellens is married to Juanita Richardson's sister, Janette.  (Trial Transcript, March 18, 2008, at PageID.6252).  Until a "family feud" occurred in June 2005, Ellens and his wife associated with Petitioner and Juanita Richardson "on a fairly regular basis."  (PageID.6253).  Juanita was "very active" and she never exhibited evidence of gait, mobility, or balance impairment.  (PageID.6262-63).

Petitioner "complained about most everything that [Juanita] did or wanted to do." (PageID.6255).  Petitioner "never" exhibited affection toward Juanita or told her that he loved her.  (PageID.6255).  Petitioner also complained about the lack of sex with Juanita. (PageID.6270).  Petitioner's behavior at Juanita's funeral was a "put on" and "a lot of fake." (PageID.6264-65).  Following Juanita's death, Petitioner began talking about his "brain injury" and how badly it was affecting his memory and speech abilities.  (PageID.6266-69).  Ellens never observed any evidence that Petitioner suffered a brain injury.  (PageID.6267).

**Charles Carlington**

Carlington and Petitioner both worked as truck drivers for FedEx.  (Trial Transcript, March 18, 2008, at PageID.6300-01).  Carlington and Petitioner had "a pretty good relationship in the beginning," but "over time" Carlington's opinion of Petitioner changed.

(PageID.6303-04).   Petitioner was "extremely proud of his possession things."   (PageID.6304).

Petitioner showed Carlington photographs of his possessions, but never showed him photos of

Juanita.   (PageID.6304).   Carlington never heard Petitioner say anything positive about Juanita

and also complained that "their sex life sucked."   (PageID.6305-07).

       A couple days after Juanita's death, Carlington telephoned Petitioner to offer his

condolences.   (PageID.6316-17).   Petitioner did not offer any information about Juanita's death,

but he did tell Carlington that he "screwed up up north talking to the cops."   (PageID.6317-18).

Petitioner stated, "I don't really remember what I said. . .but. . .I said conflicting things that's going

to probably hurt me."   (PageID.6318).   Petitioner attributed this to his "head injury."

(PageID.6317-18).   Petitioner alleged that his injury caused him to suffer "80 percent memory

loss."   (PageID.6317).   Carlington never saw any indication that Petitioner experienced memory

or cognitive impairment, however.   (PageID.6317-18).   During this conversation, Petitioner

repeatedly emphasized that he and Juanita had "a great relationship" and had not fought in years.

(PageID.6319-20).   Petitioner "was really trying to drive this point home."   (PageID.6319).

       Shortly after Petitioner returned to work, Carlington told Petitioner that he was

"praying for the truth."   (PageID.6322-23).   Petitioner responded, "I don't give a fuck about the

truth. . .I just want this shit over."   (PageID.6323).

**Kevin VanDrie**

       VanDrie works as the Service Center Manager for FedEx Freight in Cadillac,

Michigan.   (Trial Transcript, March 18, 2008, at PageID.6354).   Petitioner began working for

FedEx in June 2004.   (PageID.6355).   As part of the hiring process, Petitioner, like all potential

employees, had to undergo a physical examination.   (PageID.6355-59).   Working as a truck

driver is "actually a really tough job" that requires "good physical health."   (PageID.6360).

Drivers must possess good memory as well as the ability to concentrate and pay attention. (PageID.6360-63). Drivers also must possess gross and fine motor skills as well as hand/eye coordination. (PageID.6363).

Petitioner disclosed that he had suffered a prior head injury, but he never claimed to experience any residual symptoms from such. (PageID.6363-64, 6387-88). Petitioner passed his initial physical examination as well as a subsequent physical examination performed in May 2006. (PageID.6373-75). As part of the application process, Petitioner was also required to take a written test which he passed without difficulty. (PageID.6364-67). Petitioner never exhibited "any problems with memory, concentration, [or] attention." (PageID.6369).

**Timothy Maday**

Maday began working as a truck driver for FedEx in approximately 1998. (Trial Transcript, March 18, 2008, at PageID.6399). Maday would occasionally observe Petitioner associating with women at truck stops, especially a woman named Kelli who worked at Quality Dairy in Charlotte, Michigan. (PageID.6401). Following Juanita Richardson's death it became "common knowledge" that Petitioner "had changed his original story." (PageID.6402-03). At one point, Maday asked Petitioner, "since you seen it, was it an accident or was it suicide?" (PageID.6403). Petitioner did not provide a specific answer. (PageID.6403). Petitioner later told Maday that he changed his story to the police "because he didn't want his family to think that [Juanita] committed suicide." (PageID.6404). Petitioner nevertheless told Maday that "he wouldn't have been surprised" if Juanita did commit suicide because she was depressed. (PageID.6404-05).

**Kerry Woiteshek**

Woiteshek became acquainted with Petitioner when the two worked as truck drivers for FedEx. (Trial Transcript, March 18, 2008, at PageID.6411). In August 2006, Woiteshek was part of a group that went to Petitioner's residence to ride four-wheelers. (PageID.6412-13). Later that day, Petitioner offered to explain how Juanita died. (PageID.6414). Petitioner reported that "he had gone into the woods to – to relieve himself, and then when he came back out, Juanita wasn't there." (PageID.6414). Petitioner then "approached the edge" and "saw [Juanita] at the bottom" at which point he "went to get help." (PageID.6414-15). Petitioner stated that he approached the edge of the cliff on his hands and knees because he was "afraid of heights." (PageID.6415-16). Petitioner never indicated that he observed Juanita fall from the cliff. (PageID.6419-20). Petitioner also reported that because of his previous "closed head injury," he became "confused" when he was later interviewed by the police. (PageID.6417). Woiteshek saw no indication that Petitioner's memory was impaired. (PageID.6418-19).

**Bill Coker**

Coker began working as a truck driver for FedEx in August 2004. (Trial Transcript, March 18, 2008, at PageID.6424). Petitioner acknowledged telling the police "conflicting stories" to the police regarding Juanita's death. (PageID.6427-29). Petitioner explained that his "memory loss problem was why there was different stories or versions." (PageID.6429). Coker never observed evidence that Petitioner experienced memory difficulties. (PageID.6425-26). Petitioner also complained that the police questioned him for "36 hours" before informing him that Juanita had died. (PageID.6429-30).

**Rick Myers**

Myers began working for FedEx in October 2005.  (Trial Transcript, March 18, 2008, at PageID.6438-39).   Prior to Juanita Richardson's death, Petitioner never mentioned suffering a head injury, however, after Juanita's death, Petitioner stated that "he had slipped and fell and had to relearn some memory and writing and things like that."   (PageID.6439-40).  Myers never witnessed any evidence that Petitioner suffered from memory difficulties, but instead considered Petitioner to possess a "pretty good memory" based upon their many conversations. (PageID.6439-40).   In September 2006, Petitioner told Myers that he had become "very close" with a woman who worked at the Quality Dairy in Charlotte.   (PageID.6441-43).

**Michael Pettengill**

Pettengill was a co-worked of Petitioner from approximately 1987-1990.  (Trial Transcript, March 18, 2008, at PageID.6446-47).   During this time, Pettengill socialized with Petitioner and Juanita Richardson.  (PageID.6447-49).   Juanita was a "really nice lady," the "underdog in the relationship for sure" because Petitioner "was the demanding, ruling husband." (PageID.6449).   Petitioner would refer to Juanita as "stupid cunt, dumb bitch, stuff like that." (PageID.6449).   On one occasion, Petitioner acknowledged hitting Juanita and giving her a black eye.  (PageID.6450-52).

Petitioner also complained about his sex life with Juanita, stating that "it was just plain jane type of thing, you know, and he was looking for more."  (PageID.6453).   Petitioner began having sexual relationships with various women at their workplace.  (PageID.6454-55).  Petitioner "ha[d] a way with words, and women liked him."  (PageID.6455).   Petitioner "didn't have a hard time picking them up," but "later that relationship would always turn sour and the

women would then have a bad problem with him once they figured out who and what they were dealing with."   (PageID.6455).

It "was a shock" to Pettengill to learn that Petitioner claimed to be afraid of heights because Petitioner once told him about an incident with a friend "who changes the blinking red lights in the top of towers."   (PageID.6457).   Petitioner stated that he "climbed the pole a ways and was amazed that his buddy could go that high and change bulbs in these towers." (PageID.6457).   Petitioner also worked side jobs, including a "pyramid deal" selling life insurance in which Pettengill participated.   (PageID.6458).   As part of this endeavor, Petitioner once stated, "you know, you can just get this insurance, pump it up there to a high amount of money, and off the wife and get the money."   (PageID.6458-59).   Pettengill "certainly hop[ed]" that Petitioner was joking when he made this statement.   (PageID.6459).

**Lisa Dykgraaf**

In 1988, Dykgraaf and Petitioner both worked at Four Winns Boats.   (Trial Transcript, March 18, 2008, at PageID.6463-67).   Petitioner flirted with other women at the plant. (PageID.6467).   Petitioner often stated that women were "only good for cleaning and being home and screwing."   (PageID.6466-70).   On one occasion, Dykgraaf observed Petitioner receiving oral sex inside one of the boats.   (PageID.6467-68).

**Kelly Cater**

Cater began working at Four Winns Boats in 1996 and became the Human Resources Director in 2002.   (Trial Transcript, March 18, 2008, at PageID.6472-73).   Petitioner was employed at Four Winns from 1984-2000.   (PageID.6473-74).   During his employment with Four Winns, Petitioner was involved in 18 accidents, none of which were witnessed by another

employee.   (PageID.6477-78).   Cater considered this "very unusual" given the nature and circumstances of Petitioner's work.   (PageID.6477-82).   Cater was concerned that Petitioner's alleged injuries were an attempt to manipulate the system so that he could obtain placement in more favorable work assignments.   (PageID.6477-82).   Many of Petitioner's jobs at Four Winns required him to work at heights which he did without difficulty or complaint.   (PageID.6495-96).

**William Kruger**

Kruger is the Senior Technical Specialist for Four Winns Boats.   (Trial Transcript, March 18, 2008, at PageID.6516).   Petitioner worked under Kruger from 1991 through 1999 during which time Kruger served as the Warranty Manager.   (PageID.6516).   During this time, Petitioner's primary duties involved fiberglass repair of boats.   (PageID.6517).   One of the functions of the warranty repair team is to perform boat repairs.   (PageID.6517).

On one occasion, Kruger sent Petitioner to Wisconsin to perform a "fairly easy" boat repair.   (PageID.6517).   The repair in question should have taken, including travel time, two and one-half days.   (PageID.6517).   It took Petitioner four days to perform the repair. (PageID.6517).   Petitioner also submitted a reimbursement request in the amount of $55 for a haircut.   (PageID.6517).   Petitioner alleged that he had to get a haircut because "he had gotten some epoxy in his hair."   (PageID.6517).   Kruger spoke with the customer who indicated that Petitioner's haircut instead "must have had something to do with the gal in the red dress he met that night."   (PageID.6518).   When working in a group, Petitioner "wanted to be the leader" and "had a real problem" when he was not in a leadership role.   (PageID.6518-22).   Petitioner also exhibited difficulty working with women.   (PageID.6518-22).   Petitioner routinely worked at heights of 10-12 feet without difficulty.   (PageID.6523).

**Barbara Scholten**

Scholten has served as the registered nurse at Four Winns Boats since 1999.   (Trial Transcript, March 18, 2008, at PageID.6528).   During Petitioner's employment with Four Winns, he experienced 18 injuries.   (PageID.6529).   Petitioner had "his own ideas" about how his injuries should be treated and "would come in with the diagnosis usually in hand." (PageID.6530).   Petitioner let Scholten know that "he wanted to run the show."   (PageID.6530-31).   Scholten perceived that Petitioner was attempting to manipulate the system to obtain reassignment to more favorable positions.   (PageID.6531).

**Joseph Perrin**

Perrin, an employee at Four Winns Boats since 1982, supervised Petitioner during "the latter part of 2000."   (Trial Transcript, March 18, 2008, at PageID.6535-36).   Petitioner was "very difficult to work with" because "he had an ego and an arrogance about him." (PageID.6536).   Petitioner never expressed a fear of heights.   (PageID.6540).

**Craig Hewitt**

Hewitt supervised Petitioner at Four Winns Boats from January 1999 through January 2000.   (Trial Transcript, March 19, 2008, at PageID.6546-47).   Petitioner was "very meticulous about his work," but his moods were unpredictable and he did not take criticism well. (PageID.6548-49).   At one point, Petitioner told Hewitt that he was "tired of being in a loveless marriage."   (PageID.6551).   Soon thereafter, Hewitt learned that Petitioner had moved out of his house and was involved with another woman.   (PageID.6551-55).

In October 2006, Petitioner appeared at the Four Winns facility.   (PageID.6560-61).   Petitioner asked Hewitt if "the authorities" had been speaking with him.   (PageID.6562).

When Hewitt responded in the affirmative, Petitioner asked, "well, did they ask you any unusual questions like maybe about my head injury or – or anything like that?"  (PageID.6562).   Hewitt indicated that he had been asked if he was aware that Petitioner had a head injury and was sensitive to light.   (PageID.6562).   Hewitt informed Petitioner that he told the police that he "wasn't aware of any of that."   (PageID.6562-63).   Petitioner then proceeded to explain to Hewitt that he had suffered a head injury that required him "to go through speech therapy" and "learn how to read all over again."   (PageID.6563).   Petitioner further asserted that his head injury caused him to suffer "temporary memory loss."   (PageID.6563).

With respect to the events surrounding Juanita Richardson's death, Petitioner stated that "he had gone to the bathroom, and – and he came back and she was – she was gone."  (PageID.6564).   According to Petitioner, he then "recalled six hours later that he actually did – did see her fall."   (PageID.6564).   Petitioner explained that his story to the police changed because "he suddenly remembered. . .that he actually did see her fall."   (PageID.6565).

**Betty Mitchell**

In July 1999, Mitchell employed Petitioner to repair her boat.   (Trial Transcript, March 19, 2008, at PageID.6594-95).   Petitioner immediately expressed interest in Mitchell and began buying her flowers and cards and engaging in various other "romantic" gestures.  (PageID.6596).   Within 3-4 weeks, the two began a sexual relationship.   (PageID.6597).  Petitioner told Mitchell that he was going to leave his wife because "it was not a good marriage" and his wife could not satisfy him sexually.   (PageID.6597).   Petitioner also complained that his wife "controlled their financial status."   (PageID.6598).

Petitioner and Mitchell did not appear together publicly because Petitioner was concerned about his image.   (PageID.6599-600).   Petitioner told Mitchell that he "was a very

55

religious man" and "had such dignity and integrity to uphold in the community because he was some type of a leader in the church and he worked with the youth, and he just was so well known that, heaven forbid, he be seen with someone else."   (PageID.6599-600).

        Petitioner told Mitchell that he "wanted to get married" and considered divorce, but "didn't like" the thought of paying child support because "he didn't have any money to begin with."   (PageID.6602-06).   Petitioner's desire to not pay child support was "a determining factor" in his decision to reconcile with Juanita.   (PageID.6606).   Petitioner nevertheless wanted to continue seeing Mitchell, but she refused.   (PageID.6606).

**Michael Downy**

        From approximately 1998 through 2000, Downy worked with Petitioner at Four Winns Boats.   (Trial Transcript, March 19, 2008, at PageID.6633-34).   At some point, Downy recommended to Betty Mitchell that she employ Petitioner to repair her boat.   (PageID.6635-38).   At the time, Downy had recently been dating Mitchell.   (PageID.6636).   Very soon thereafter, Downy realized that Mitchell and Petitioner were involved in a sexual relationship. (PageID.6638).   Downy confronted Petitioner about the matter and "figured out that [Petitioner] genuinely had interest in [Mitchell] and we had brief conversation about his family and that things just weren't good at home and this might be the right direction for [Petitioner], I said you know what, this is a good time for me to just step back and I'm not going to interfere."   (PageID.6639).

**Steven Herweyer**

        When Petitioner began working for Country Fresh as a milk delivery driver, Herweyer was involved in his training.   (Trial Transcript, March 19, 2008, at PageID.6653-55). The pair were working together the day that Petitioner claimed to have fallen and suffered a head

injury.   (PageID.6656-59).   Petitioner claimed that he "slipped and fell" on the ramp leading into a delivery location.   (PageID.6659).   Petitioner did not miss any work as a result of this incident. (PageID.6663).   Petitioner subsequently complained that he was experiencing headaches and memory loss.   (PageID.6661-66).   Herweyer did not observe any indication that Petitioner suffered any memory difficulties.   (PageID.6666).

**Jeffrey Sowa**

When Petitioner began working at Country Fresh, Sowa participated in his training. (Trial Transcript, March 19, 2008, at PageID.6671-72).   Petitioner told Sowa that he was not happy with his sex life with his wife.   (PageID.6672).   Petitioner also told Sowa that he had previously left his wife and began dating another woman, but that he eventually "went back to Juanita because of the kids."   (PageID.6672-73).   Petitioner indicated that he was still in love with this other woman, however.   (PageID.6673).   Sowa never observed evidence that Petitioner experienced any memory impairment.   (PageID.6681).

**Dale Laarman**

Laarman and Petitioner worked together at Country Fresh.   (Trial Transcript, March 19, 2008, at PageID.6687).   The pair would "ride routes once in a while in the wintertime together when it got slow."   (PageID.6687).   Petitioner told Laarman that "there wasn't enough sexual activity" in his marriage.   (PageID.6687-88).   Petitioner acknowledged that he had a "girlfriend" at one point, but that he reconciled with his wife "for the kids' sake."   (PageID.6688-89).   Petitioner also stated, however, that he "would go back to Betty in a heartbeat." (PageID.6688).   Laarman was aware that Petitioner claimed to have suffered an accident at work

that caused him to experience memory loss, but Laarman never witnessed any evidence of such. (PageID.6690-91).

**Keith Ebels**

Ebels was employed as the Branch Manager for Country Fresh during Petitioner's tenure with the organization.   (Trial Transcript, March 19, 2008, at PageID.6693-94).   Petitioner began working for Country Fresh in March 2001.   (PageID.6695-96).   Petitioner did not receive particularly favorable performance reviews, scoring lowest in the areas of productivity and teamwork.  (PageID.6696-704).   Petitioner was unhappy with his work schedule, at one point stating, "you're running my ass into the ground until I get so tired and ticked off I could rip somebody's head off."   (PageID.6705).   With respect to Petitioner's work accident, Ebels did not perceive that Petitioner suffered any sort of injury that required treatment.   (PageID.6701-11).

**Aldyne Ebels**

Ebels was employed at Country Fresh during Petitioner's tenure with the company. (Trial Transcript, March 19, 2008, at PageID.6726-27).   Petitioner "always had a complaint about something."   (PageID.6730).   Petitioner would regularly leave "nasty" notes on the office door detailing his various complaints.   (PageID.6728-30).   In February 2002, Petitioner reported his alleged head injury.   (PageID.6731).   Ebels was immediately suspicious of Petitioner's claim because it allegedly occurred when the other driver "was in making a delivery" and Petitioner "was showing no signs whatsoever of any kind of head injury."   (PageID.6732-41).   Going forward, whenever Petitioner would experience problems performing his job, "he would blame everything [on] his closed head injury."   (PageID.6738).   Ebels never observed anything that supported Petitioner's contention that he was experiencing memory impairment.   (PageID.6739-40).

**Robert Jordan**

Jordan occasionally socialized with Petitioner and Juanita Richardson. (Trial Transcript, March 20, 2008, at PageID.6770-71). Jordan telephoned Petitioner a couple days after Juanita's death to offer his condolences. (PageID.6771). With respect to Juanita's death, Petitioner indicated that he and Juanita were hiking and that he left to use the bathroom. (PageID.6772). According to Petitioner, when he returned, "Juanita was standing at the edge with her back towards the water facing him and that she gestured as if to say look at this" and then "she turned. . .and went over the edge." (PageID.6772-73). Petitioner theorized that Juanita "caught her sandal on some brush" causing her to fall. (PageID.6772-73). Jordan characterized Petitioner's behavior at Juanita's funeral as "theatrical." (PageID.6774-75).

**Kyle Ellens**

Juanita Richardson was Ellens' aunt. (Trial Transcript, March 20, 2008, at PageID.6778-79). At some point following Juanita's funeral, Ellens encountered Petitioner. (PageID.6779-80). Petitioner told Ellens that Juanita "stumbled and fell" off the cliff. (PageID.6780-81). According to Petitioner, he then "passed out" and when he later "crawled" to the cliff edge and observed Juanita's body below, he "passed out again." (PageID.6781-82). Petitioner also stated that "the police were giving him a hard time, and that was making his brain injury go full throttle." (PageID.6783). Ellens was not aware that Petitioner suffered from a brain injury. (PageID.6783).

**Jerry Bowers**

Bowers and Petitioner worked together at Four Winns Boats "in the mid-80's." (Trial Transcript, March 20, 2008, at PageID.6785-86). The day following Juanita's death,

Bowers telephoned Petitioner to offer his condolences.   (PageID.6786).   With respect to Juanita's death, Petitioner stated that "he had went to the bathroom; and when he come back, she was gone."   (PageID.6787).   Petitioner then stated, "since I've had my accident with my memory loss and stuff. . .who knows what the hell I told [the police]."   (PageID.6787-88).   Petitioner did not indicate to Bowers that he saw Juanita fall from the cliff.   (PageID.6787).

Approximately one year prior to Juanita's death, Bowers and his wife encountered Petitioner and Juanita at a school function.   (PageID.6788).   Petitioner apologized to Bowers' wife for not recognizing her when he encountered her recently.   (PageID.6788).   Petitioner blamed his inability to recognize Bowers' wife on his head injury and resulting memory loss. (PageID.6788-89).   Bowers indicated, however, that his wife had changed her hair style prior to the encounter in question, cutting her "long curly hair. . .right up to where it was short, not a whole lot longer than what [Bowers wore his hair]."   (PageID.6801).   Petitioner recognized Bowers at this school function.   (PageID.6789).   When Bowers contacted Petitioner following Juanita's death, Petitioner "recognized [his] voice on the phone. . .before [he] even told [Petitioner] who it was."   (PageID.6789).   At Juanita's funeral, Petitioner "seemed like he was acting" and "it didn't seem like he was grieving at all."   (PageID.6802).

**Amy Paulson**

From 1998-2002, Paulson worked intermittently at the Interlochen Center for the Arts.   (Trial Transcript, March 20, 2008, at PageID.6803-04).   During this period of time, Petitioner "would come and deliver the milk."   (PageID.6804-05).   After meeting Paulson, Petitioner, who was not wearing his wedding ring, began pursuing Paulson.   (PageID.6805-06).

While working at Interlochen, Paulson lived on site in a cabin or trailer. (PageID.6807).   On one particular day, Paulson and others were in her trailer when Petitioner "all

of a sudden. . .pulled up with a truck and a boat and wanted to know if we wanted to go out boating." (PageID.6806).  Paulson declined.  (PageID.6806).  Paulson did not understand how Petitioner located her trailer because she had never indicated to him where she resided. (PageID.6807-08).

On another occasion, Petitioner appeared at Interlochen with his Corvette and asked Paulson if she wanted to take a ride.  (PageID.6808).  Paulson agreed and while they were driving, Paulson asked Petitioner if he was married.  (PageID.6809).  Petitioner responded that he was married, but that "it wasn't going all that well" and that he remained in the marriage for their kids.  (PageID.6809-11).  Paulson responded that she did not date married men. (PageID.6809).  Petitioner was not affected by Paulson's response and began leaving notes and cards for Paulson.  (PageID.6812-15).

On yet another occasion, Paulson remained in her cabin because she "wasn't feeling well."  (PageID.6813).  While resting in her cabin, she received a telephone call from Petitioner who inquired whether she "needed anything."  (PageID.6813).  This disturbed Paulson because she "never told anybody where [she] lived when [she] had the cabin."  (PageID.6813).  Paulson thereafter "would leave" whenever Petitioner arrived to deliver milk.  (PageID.6816).

**Nancy Tinsley**

Tinsley, a Speech Language Pathologist with 20 years of experience, earned a Master's Degree in Communication Disorders.  (Trial Transcript, March 20, 2008, at PageID.6818-19).  Tinsley treats patients with various impairments, including memory deficits, swallowing disorders, aphasia, voice disorders, closed head injuries, and strokes.  (PageID.6819-20).  Tinsley treated Petitioner from January 21, 2004, through July 20, 2004.  (PageID.6825).

The doctor who referred Petitioner to Tinsley characterized Petitioner's injury as "a head injury initially and memory loss." (PageID.6827). The referring doctor did not indicate the severity of Petitioner's injury. (PageID.6827-28). Tinsley considered it "unusual" to be treating somebody 18 months after the alleged injury because difficulties in functioning "usually" occur "immediately after the injury." (PageID.6826-27).

Petitioner reported that "memory was – was a significant issue, that he had some word finding difficulties, and that he had some writing difficulties, with memory being significant enough that he was concerned that he might lose his job at [Country Fresh] at that point in time." (PageID.6825-26). Petitioner also reported experiencing "difficulty processing new incoming information" and "visual difficulties." (PageID.6851). Petitioner alleged that his memory difficulties were so severe that "he couldn't remember his kids' names." (PageID.6852).

As part of her initial assessment, Tinsley administered a battery of baseline "memory assessments" to "identify the – the difficulties, the deficits initially." (PageID.6852-53). Petitioner scored in the 19th percentile on this testing which suggested an inability to perform even the most basic daily tasks. (PageID.6854). Petitioner's performance on this testing was "very inconsistent" with Tinsley's observations. (PageID.6854-55). Tinsley "typically" works with "head-injured folks three times a week for six to eight weeks," but Petitioner "only wanted to come once a week." (PageID.6857). After treating Petitioner for five months, Tinsley administered another memory assessment. (PageID.6857-60). Petitioner scored in the 100th percentile on this assessment which is what Tinsley expected in light of her experience working with Petitioner. (PageID.6860).

With respect to the fact that Petitioner progressed from scoring in the 19th percentile to scoring in the 100th percentile in such a short period of time, Tinsley concluded that

Petitioner's initial baseline assessment was "inconsistent" with the severity of his impairment. (PageID.6861). Tinsley indicated that "I wouldn't have expected somebody at 19 percentile, based on my 21 years of experience, in five months time to go from 19 percent to 100 percent." (PageID.6861). She emphasized that Petitioner's final score in the 100th percentile was consistent with her experience with Petitioner. (PageID.6861). She further indicated that, based on her experience with Petitioner, she did not expect that Petitioner would, going forward, experience "any regression" in ability. (PageID.6861).

**Steven Vanderwall**

Vanderwall met Petitioner when the pair worked as truck drivers for FedEx and the pair quickly became "very good friends." (Trial Transcript, March 20, 2008, at PageID.6894). When the pair met, Vanderwall's wife was ill from breast cancer and later passed away from the disease. (PageID.6897-98).

In 1997, Vanderwall suffered a closed head injury in an automobile accident. (PageID.6895). He was hospitalized for "nearly two weeks" and thereafter experienced "short-term memory problems" and "a little bit of a speech impediment." (PageID.6895). In his conversations with Petitioner, Vanderwall would "from time to time" mention his closed head injury and memory problems. (PageID.6896-97).

Petitioner shared with Vanderwall that he had previously separated from his wife and had been seeing another woman. (PageID.6899-900). Petitioner told Vanderwall that reconciling with his wife "was the worst decision of his life" and that he and Juanita "argued quite a bit." (PageID.6900). Petitioner also complained about his sex life with Juanita and that his sex life with his former girlfriend "was great." (PageID.6903).

63

Petitioner also indicated that his finances "were tight and there was no money to spare." (PageID.6907-08). Vanderwall surmised that Petitioner's financial difficulties were because he had purchased a lot of expensive possessions and was living beyond his means. (PageID.6908-09). With respect to his own finances, Vanderwall explained to Petitioner that "if things went right with the – between the insurance money and the sale of one house" he would be "100 percent debt free." (PageID.6909).

After Vanderwall's wife died, but before Juanita Richardson's death, Vanderwall resumed dating and his offers "were starting to stack up." (PageID.6910). Petitioner was envious of Vanderwall's circumstance and commented that Vanderwall was "lucky." (PageID.6910). Vanderwall eventually began dating Lorraine Neuberger exclusively. (PageID.6911). Vanderwall was aware of Petitioner's relationship with Kelli Brophy, noting that the two "talked a lot" and "there seemed to be a spark." (PageID.6911-13).

At some point following Juanita's death, Petitioner explained to Vanderwall how Juanita died. (PageID.6923). According to Petitioner, he "had to go to the bathroom, had to go back to the [Visitor's Center]" and "when he came back, it – he could see her, it looked like she was looking at him, maybe even like trying to say something to him, and she just fell right over." (PageID.6928-29). Petitioner stated that he "tried to get to the edge of the cliff and because of his fear of heights, he – he couldn't just go up to the edge." (PageID.6929). Petitioner indicated that he "got down on the ground and peeked over and saw that she was all the way down at the bottom" at which point he ran to the Visitor's Center for help. (PageID.6929).

Petitioner claimed that he "temporarily. . .blacked out" and "didn't remember." (PageID.6929). Petitioner also indicated that he had told the police "a couple different stories" which Petitioner attributed to "trouble remembering, and that he was trying to protect Juanita."

(PageID.6930-31).   Petitioner alleged that with respect to Juanita's death, "things were all fuzzy" and "it was hard to remember all of it because of his memory problems."   (PageID.6932).

After Juanita's death, Petitioner mentioned to Vanderwall that Juanita might have been suffering from breast cancer when she died.   (PageID.6933-34).   Following Juanita's death, Petitioner began describing his marriage to Juanita as "the most wonderful, wonderful thing" which struck Vanderwall as odd because Petitioner "didn't seem to feel it was that wonderful before."   (PageID.6937-38).   Petitioner also spoke about his head injury much more often following Juanita's death.   (PageID.6938-39).   Petitioner "just referred to it a lot more often, referred to memory problems more than he did before, referred to having issues with light a lot more, [and] started wearing sunglasses all the time."   (PageID.6939).

## Lorraine Neuberger

In May 2006, Neuberger began dating Steven Vanderwall.   (Trial Transcript, March 24, 2008, at PageID.7015).   In June 2006, before Juanita Richardson's death, Vanderwall and Neuberger travelled to Petitioner's residence for Levi Richardson's open house. (PageID.7015).   Petitioner was "very critical" of Juanita in an "arrogant and chauvinistic" manner.   (PageID.7017).   Petitioner also mentioned his head injury, telling Neuberger that "it was a lot like Steve's."   (PageID.7019).

A couple days after Juanita's death, Neuberger and Vanderwall travelled to Petitioner's residence.   (PageID.7024-25).   With respect to the events surrounding Juanita's death, Petitioner indicated that he "had gone to the bathroom and came back and she was gone." (PageID.7025-27).   Petitioner never stated that he saw Juanita fall.   (PageID.7027).   At Juanita's memorial service, Neuberger expressed to Petitioner that "this is not the way this is supposed to

be, we were supposed to as couples do things," to which Petitioner responded, "I'm going to fix that, we still will do that."   (PageID.7028-29).

**Dr. Tania LeBaron**

Dr. LeBaron performed physical examinations of Petitioner in 2004 and 2006 for the Department of Transportation to assess Petitioner's fitness to work as a truck driver.   (Trial Transcript, March 24, 2008, at PageID.7042-47).   The results of both examinations were "normal" and with respect to Petitioner's previous head injury, Dr. LeBaron concluded that Petitioner suffered nothing more than a "mild concussion."   (PageID.7047-63, 7070-71).

**Levi Richardson**

Richardson is the son of Petitioner and Juanita Richardson.   (Trial Transcript, March 24, 2008, at PageID.7073-74).   Richardson graduated high school in 2006 and his graduation open house was held at his parents' residence on June 4, 2006.   (PageID.7074).

Richardson was aware that several years earlier, Petitioner "was having an affair and he moved out."   (PageID.7076).   Richardson spoke with Petitioner at the time and was told that "there was a divorce in process."   (PageID.7076-78).   Richardson did not believe that his mother committed suicide.   (PageID.7081-82).   Richardson also was not open to the possibility that his father had anything to do with his mother's death.   (PageID.7086).

Regarding his mother's death, Petitioner stated that "he went to the bathroom, came back out to the cliff, and she was standing on the edge of the cliff, she – like she wanted to show him something, and she turned like she was going to point at something, and spun around and fell." (PageID.7087).   Petitioner acknowledged telling the police three different stories about Juanita's death.   (PageID.7090-91).   The three stories were "all the same except for one he saw her fall,

66

one he didn't, and one she jumped." (PageID.7090-91). Petitioner indicated that he told the police conflicting stories because he "didn't want it to be viewed as a suicide" and cause Juanita to "lose status in the community." (PageID.7092-93). Prior to Juanita's death, Petitioner spoke about Kelli Brophy. (PageID.7101). Petitioner described their relationship as being "prayer partners." (PageID.7101).

**Lindsey Richardson**

Richardson is the daughter of Petitioner and Juanita Richardson. (Trial Transcript, March 24, 2008, at PageID.7186). Richardson graduated high school in 2004 and then moved to Central Michigan University to attend college. (PageID.7186). Richardson was 13 or 14 years of age when her parents separated. (PageID.7187). Richardson "didn't really know" the reason for the separation, but "thought [Petitioner] was going through mid-life crisis." (PageID.7187). She only later learned that Petitioner was seeing another woman. (PageID.7187).

Richardson acknowledged that she previously stated that her mother "would never commit suicide," but now reconsidered, observing that she "saw some warning signs." (PageID.7193-95). Richardson never listened to Petitioner recount the events surrounding her mother's death because she "wanted to know, but [she] didn't want to know." (PageID.7199-202). Richardson "just trust[s]" that Petitioner is telling the truth. (PageID.7200-07). As for why Petitioner "has changed his stories," Richardson surmised that "maybe, you know, he wasn't thinking clearly" because "he had just gone through a tragic time." (PageID.7201).

Richardson spoke with her mother the day before her death. (PageID.7202). According to Richardson, her mother complained "that her foot had been sore." (PageID.7202). Richardson did not recall ever hearing Petitioner speak about Kelli Brophy before Juanita's death,

but she accepted Petitioner's assertion that Brophy was merely "one of his prayer partners." (PageID.7206).

**Jane Sinkel**

From "approximately the mid-80's to the early 90's" Petitioner and Juanita Richardson lived in Manton, Michigan.   (Trial Transcript, March 25, 2008, at PageID.7290). During this time, Petitioner and Juanita attended the same church as Sinkel.   (PageID.7290). Petitioner and Juanita were also involved in church activities with Sinkel and her husband. (PageID.7290-91).   Petitioner would "occasionally" make "negative" remarks about Juanita's weight or intellectual ability.   (PageID.7292-93).   In September 2007, Sinkel and her husband visited the location where Juanita died.   (PageID.7296-98).   After visiting the site, Sinkel concluded that because Juanita "was not a huge risk taker," she "couldn't imagine [Juanita] goofing around on the edge of a cliff."   (PageID.7298).

**Betty Keen**

In 1997, Keen worked as an Emergency Medical Technician (EMT).   (Trial Transcript, March 25, 2008, at PageID.7307-08).   Sometime during that year, Keen and her partner, James Winkel, were dispatched to Petitioner's residence after Juanita fell from her horse and "crushed her pelvic bone."   (PageID.7308-09, 7314).   After Juanita was transported to the hospital, she telephoned Petitioner.   (PageID.7310-11).   Petitioner "didn't seem to be interested in how [Juanita] was feeling at all.   All [Petitioner] was concerned about was the money and the horse and she wouldn't be able to work.   He – he didn't have any feelings for her at all." (PageID.7311-13).   Petitioner later arrived at the hospital and was "very upset."   (PageID.7321). He initially asked if the horse was okay and then "mentioned again about the insurance and that

[Juanita] wouldn't be able to work." (PageID.7321). Petitioner never asked Juanita "how she was or where she was injured." (PageID.7321).

**James Winkel**

Winkel, an EMT, accompanied Betty Keen on the 1997 dispatch to treat Juanita Richardson after she fell from her horse. (Trial Transcript, March 25, 2008, at PageID.7331). After Juanita arrived at the hospital, she telephoned Petitioner. (PageID.7332). Petitioner wanted to talk about the horse and how they were going to pay the hospital bill. (PageID.7333-35). Juanita kept asking Petitioner if they could talk about those matters later, a request which Petitioner did not seem to respect. (PageID.7333-35).

**Jane Meadows**

From 2000-2006, Meadows worked at the McBain Co-Op. (Trial Transcript, March 25, 2008, at PageID.7343-44). When Petitioner would "occasionally" visit the Co-Op he would "hit on" Meadows which gave her "the creeps." (PageID.7344).

**Linda Caruso**

In approximately 2002, Caruso's husband began building a house for Petitioner and Juanita. (Trial Transcript, March 25, 2008, at PageID.7356-57). Initially, Caruso would accompany her husband to Petitioner's property, but she discontinued this practice after witnessing how Petitioner treated Juanita. (PageID.7357-58). Petitioner called Juanita a "dumb bitch" and whenever Juanita "would start talking about something, [Petitioner] would just shut her up." (PageID.7358).

69

**Jenny Nederhoed**

   Nederhoed and Lindsey Richardson were acquaintances during high school and took at least one class together.  (Trial Transcript, March 25, 2008, at PageID.7371).   In the spring of 2003, Lindsey told Nederhoed that the previous evening her parents had gotten into "a really bad fight" during which Petitioner "was chasing [Juanita] with a bat" and threatening to kill her.  (PageID.7372-74).   Approximately one month after Juanita Richardson's death, Nederhoed, who was working at Soaring Eagle Casino, observed Petitioner at the casino with a woman.  (PageID.7380-82).   The pair were "arm in arm around each other, hand in the butt pockets."  (PageID.7382).   The pair looked "happy to be together. . .like a new couple in love."  (PageID.7383).

**Chelsea Smith**

   Smith was friends with Lindsey Richardson during middle school and high school.  (Trial Transcript, March 25, 2008, at PageID.7397-98).   On several occasions, Richardson arrived at school "upset" because her parents were fighting.  (PageID.7399-400).   Richardson did not share any details of these fights with Smith.   (PageID.7399).

**Ashley Quist**

   During their high school years, Quist and Lindsey Richardson worked together at a local restaurant.   (Trial Transcript, March 25, 2008, at PageID.7404).   On one occasion, Richardson came to work "really upset" because "her dad had been chasing her mom around the house with a baseball bat, saying that he was going to kill her."   (PageID.7405).   Richardson also told Quist that Petitioner "cheated on her mom quite a few times."   (PageID.7406).

**Jessica Pearson**

Pearson and Lindsey Richardson were "best friends" throughout high school. (Trial Transcript, March 25, 2008, at PageID.7410-11).   During their high school years, Richardson would occasionally be upset because her parents had been fighting.   (PageID.7412-14).   On one occasion, Richardson indicated that during one of these fights Petitioner had been chasing her mother with a baseball bat.   (PageID.7414-15).

**Stephanie Meekhof**

Meekhof and Lindsey Richardson were "best friends" throughout high school. (Trial Transcript, March 25, 2008, at PageID.7425).   During this time, Meekhof would visit Richardson's house 3-4 times weekly.   (PageID.7426).   Meekhof did not observe any affection between Petitioner and Juanita Richardson, instead it was a "just stay together for the kids" relationship.   (PageID.7427-28).   Meekhof did not expect the marriage to last once their children completed high school.   (PageID.7427-28).   Petitioner never exhibited any speech or memory problems.   (PageID.7429).   Petitioner maintained photo albums containing photographs of himself "helping them roof the house, and those type of things."   (PageID.7429-30).

**Elizabeth Banda**

Banda dated Petitioner's son, Levi, from 2004-2005.   (Trial Transcript, March 25, 2008, at PageID.7436-37).   During this time, Banda visited Petitioner's residence "a couple times a week" and "went on a few vacations" with Petitioner and his family.   (PageID.7437-38). Petitioner often said "moderately offensive" things to his wife about such things as her driving and cooking.   (PageID.7438-42).   Petitioner did not exhibit speech, memory, or vocabulary

difficulties. (PageID.7442-43).   Juanita Richardson was "relatively active" and never exhibited mobility difficulties.   (PageID.7446-47).

**Robert Westfall**

Through his trucking business, Westfall became acquainted with Petitioner and Juanita Richardson in 1986.   (Trial Transcript, March 25, 2008, at PageID.7462-64).   At the time Westfall was a single parent raising two daughters.   (PageID.7464-65).   Juanita, aware of Westfall's circumstance, "had a lot of questions about – about being a single parent and – and how hard it was or, you know, what – just how I handled [things] with two girls."   (PageID.7465). When the group got together again a couple years later, Juanita again questioned Westfall about "the single parent situation."   (PageID.7466).   According to Westfall, "it was kind of like I'd read the book and [Juanita] was wondering what the next chapters were going to be in single parenthood."   (PageID.7466-67).

Juanita later expressed that she was experiencing "abuse" in her marriage, but that she "had an obligation to her family."   (PageID.7469-70).   Westfall last visited with Petitioner and Juanita in March 2006.   (PageID.7470-71).   During this visit, Petitioner became upset about something Juanita was doing and responded by engaging in a "very distasteful" "tantrum."   Later that day, when Westfall and Juanita were alone, Westfall indicated to Juanita that it appeared that she was still enduring abuse from Petitioner.   (PageID.7471-72).   Juanita responded by noting that her youngest child graduated from high school in June and that "after June there won't be any more" abuse.   (PageID.7472).   With respect to the interaction between Petitioner and Juanita, Petitioner "always blamed Juanita for anything that he could find."   (PageID.7467-68).

**Diane Bazuin**

Bazuin lived in McBain, Michigan until August 2004, during which time Bazuin and Juanita Richardson "were acquaintances through [their] daughters."  (Trial Transcript, March 25, 2008, at PageID.7481-82).  In the summer of 2004, Juanita and Bazuin attended orientation at Central Michigan University with their daughters.  (PageID.7482-83).  During the course of their conversation, Bazuin "explain[ed] the terms of [her] divorce to" Juanita.  (PageID.7483).  Bazuin explained that she was "moving out to Colorado Springs," but that she had waited until her daughter graduated high school to do so, "that way [she] didn't have to remove the kids from the home or change schools with them."  (PageID.7483).

Juanita later told Bazuin that she "was very unhappy" and that "she was leaving as soon as the last child was out of school."  (PageID.7484).  Juanita complained about Petitioner's "many affairs."  (PageID.7484).  Juanita also indicated that Petitioner had a cabin on their property and that "there were days, weeks that would go by, he would live in that cabin, he wouldn't come up to the house, she hardly saw him during that time."  (PageID.7484).  Juanita was "excited" about her plans and "seemed determined."  (PageID.7484-85).  Juanita had not shared her plans with Petitioner or her children.  (PageID.7485-86).

**Katherine Koetje**

Koetje and Juanita Richardson were acquaintances.  (Trial Transcript, March 25, 2008, at PageID.7488-89).  Koetje last visited Juanita in fall 2005 and during this conversation, Juanita told Koetje that "she had made up her mind that when Levi graduated from high school, that [she and Petitioner] were going to get divorced."  (PageID.7492-93).

**Judy Banda**

Judy Banda is Elizabeth Banda's mother.  (Trial Transcript, March 25, 2008, at PageID.7496-97).   Banda and Juanita Richardson became friends during the time their children dated.    (PageID.7497).    Juanita expressed to Banda "her fears of being divorced."  (PageID.7499).    Juanita shared the marital difficulties she and Petitioner had previously experienced, but indicated that "she was happy that the marriage was back together and that she had her family together."  (PageID.7499).   During their time together, Juanita "did a fair amount of walking" and did not exhibit any mobility problems.   (PageID.7500).

**Ruth Nederhoed**

Nederhoed and Juanita Richardson worked together at McBain Public School.  (Trial Transcript, March 25, 2008, at PageID.7504).   In the spring of 2006, Juanita shared her belief that Petitioner was then having an extramarital affair.   (PageID.7509-10).   Nederhoed last saw Juanita in June 2006, at which time Juanita was "happy" and "excited."   (PageID.7511-12).

**John Vangphasouk**

Vangphasouk and Juanita Richardson worked together at McBain Public School.  (Trial Transcript, March 25, 2008, at PageID.7513-14).   In May 2006, Juanita indicated that during a recent argument, Petitioner "raise[d] a fist at her."   (PageID.7516-17).

**Brenda Reeves**

One or two days before Juanita Richardson's death, Petitioner and Juanita visited the restaurant where Reeves then worked.  (Trial Transcript, March 25, 2008, at PageID.7519-23).   Petitioner told Reeves that she had a "nice ass for an older woman."   (PageID.7521).

Petitioner also engaged in other "obnoxious conversation" concerning the "female anatomy." (PageID.7522).

**Jeannie Culver**

Jeannie Culver is Juanita Richardson's mother.   (Trial Transcript, March 25, 2008, at PageID.7525).   Culver "didn't have a real good relationship" with Petitioner because Petitioner's "attitude was not good" and "he was very obnoxious toward Juanita."   (PageID.7525). Culver never observed Petitioner "compliment [Juanita] or show her affection."   (PageID.7526). Several years before her daughter's death, Culver suggested to Juanita that she "leave the marriage."   (PageID.7526-27).   Juanita declined, indicating that "she wanted to be there for the kids."   (PageID.7526-27).

With respect to the location where Juanita died, Culver indicated that she had never heard of that location referred to as Petitioner and Juanita's "honeymoon spot" because the pair spent their honeymoon in Grand Rapids.   (PageID.7527).

Culver last visited with her daughter on June 4, 2006, at which time Juanita was in "very good" health and exhibited no walking, balance, or coordination difficulties. (PageID.7527-29).   Juanita was "excited" that her youngest child was preparing to leave home for college.   (PageID.7530).   Later in the evening, Juanita approached her mother and stated that Petitioner had, earlier in the day, asked her whether she wanted to be buried or cremated when she died.   (PageID.7535-36).   Juanita "didn't know what to say" because she had "a lot to live for." (PageID.7536).

Petitioner's behavior at Juanita's funeral was "fake."   (PageID.7538).   Prior to Juanita's death, Culver never heard any mention of Petitioner's alleged head injury and never

observed any indication that Petitioner experienced speech or memory difficulties. (PageID.7538).   Petitioner never offered Culver an account of Juanita's death.   (PageID.7535).

**William Vos**

Vos, a Federal Bureau of Investigation (FBI) financial analyst, performed an analysis of Petitioner and Juanita Richardson's financial circumstances for the time period January 2005 through June 2006.   (Trial Transcript, March 26, 2008, at PageID.7562).   For the year 2005, Petitioner earned $68,022 and Juanita Richardson earned $25,445.   (PageID.7564-65).   The couple's house and property was valued at approximately $415,000.   (PageID.7569-70).   There existed several policies insuring Juanita's life cumulatively valued at "roughly $243,000." (PageID.7570-71).   As of June 2006, the couple's debt totaled "roughly $235,000." (PageID.7565-71).

**Connie Shaarda**

Shaarda owns a salon and styled Juanita Richardson's hair "every six weeks." (Trial Transcript, March 26, 2008, at PageID.7581).   On June 7, 2006, Juanita visited Shaarda's salon.   (PageID.7582).   Audrey VanAlst, an attorney, was also present in the salon. (PageID.7582).   Juanita asked VanAlst if she drafted wills.   (PageID.7582-83).   Juanita explained that Petitioner was "in a big yank to get a will done" before they traveled to the Upper Peninsula.   (PageID.7582-83).

**Audrey VanAlst**

On June 7, 2006, VanAlst spoke with Juanita Richardson while visiting Connie Shaarda's salon.   (Trial Transcript, March 26, 2008, at PageID.7593).   Juanita asked VanAlst if she prepared wills.   (PageID.7593).   Juanita explained that "she and her husband were going on

a trip and wanted to have wills done before they went." (PageID.7593-94). Juanita made "clear" that it was Petitioner's idea to have wills drafted. (PageID.7594). VanAlst informed Juanita that it would be possible to prepare their wills before they left for vacation. (PageID.7596).

VanAlst then mailed to Juanita "a will information sheet" that she and Petitioner would need to complete to facilitate the process. (PageID.7596-97). VanAlst instructed Juanita to complete and return the information sheet at which point an appointment could be scheduled. (PageID.7596). Prior to receiving the completed information sheet, VanAlst received a message from Petitioner requesting a weekend appointment. (PageID.7597-98). VanAlst informed Petitioner that she needed to receive the completed information sheet before scheduling a meeting. (PageID.7598-99). Petitioner never returned the information sheet to VanAlst. (PageID.7599).

**Anthony Badovinac**

Badovinac is an attorney whose practice included estate planning. (Trial Transcript, March 26, 2008, at PageID.7606-08). On June 13, 2006, Petitioner contacted Badovinac's assistant, Amy Schmid, indicating that he "wanted a will in the worst way, was very urgent about it." (PageID.7608-09). Schmid scheduled an appointment for Petitioner and Juanita Richardson to meet with Badovinac later that day. (PageID.7609).

Petitioner expressed to Badovinac that he "was really concerned about what would happen to their estate. . .if one of them died." (PageID.7611-12). Petitioner "expressed concern that he didn't want the estate tied up in probate." (PageID.7612). Petitioner was "excessively adamant" about having wills drafted immediately. (PageID.7612-16). Badovinac explained to Petitioner that if he and Juanita owned their property jointly, a will was not necessary to avoid probate because ownership of the property would automatically transfer to the surviving spouse should one of them die. (PageID.7612-21). Petitioner responded that he was "pretty darn sure"

that their property was jointly owned.   (PageID.7619).   Once he realized that a will was unnecessary to avoid probate, Petitioner's insistence on having wills drafted immediately "completely dissipated."   (PageID.7619-21).

Badovinac did explain to Petitioner, however, that he should consider establishing trusts for their children to ensure that their property would be distributed appropriately to their children in the event both he and Juanita died.   (PageID.7617-23).   While Petitioner appeared to be considering the idea, his primary concern was making sure that his property did not end up in probate in the event he or Juanita died.   (PageID.7617-24).   The children were "a very, very secondary concern" to Petitioner.   (PageID.7624).

**Amy Schmid**

As of June 13, 2006, Schmid was working as Anthony Badovinac's legal assistant. (Trial Transcript, March 26, 2008, at PageID.7654-55).   Petitioner contacted Schmid that morning and "insisted that he was in a hurry to get a will done and wanted to come in yet that day because they were leaving for vacation the following Sunday, and he wanted to have a will done before they left."   (PageID.7655-56).

Petitioner and Juanita Richardson arrived at Badovinac's office later that afternoon. (PageID.7656-57).   Petitioner was "rude" and "made some inappropriate comments about how he was tired that day because bill collectors were calling the house" because Juanita had not paid the bills.   (PageID.7657).   At the outset of their meeting, Petitioner was "very adamant" about having wills drafted immediately.   (PageID.7658-59).   Once Petitioner learned that a will was likely unnecessary to avoid probate, however, he became "much more relaxed."   (PageID.7658-59). Badovinac did explain to Petitioner, however, that he should instead consider establishing trusts for his children to ensure that in the event that Petitioner and Juanita both died that their property

would be distributed to their children as they desired. (PageID.7659). Petitioner agreed to a subsequent meeting, but his "primary concern" was ensuring that his property not "be tied up in probate" in the event he or Juanita died. (PageID.7659-60).

On June 30, 2006, Petitioner traveled to Badovinac's office and spoke with Schmid. (PageID.7664-65). Petitioner asked Schmid if she had been contacted by "the investigators." (PageID.7665-66). When Schmid responded in the negative, Petitioner stated that he had told the investigators "the only reason we were here was to – to make plans if her and I died together, that the kids would be taken care of." (PageID.7666). Petitioner repeated this three times. (PageID.7666).

**Helen Lefler**

Lefler was Petitioner's supervisor at FedEx. (Trial Transcript, March 26, 2008, at PageID.7692-94). Prior to Juanita Richardson's death, Petitioner never discussed his head injury or alleged experiencing any memory deficits, but after Juanita's death, Petitioner "would discuss his memory problems more and more." (PageID.7702). In Lefler's experience, however, Petitioner exhibited "pretty good" memory. (PageID.7702). Following Juanita Richardson's death, Petitioner took 6-8 weeks off work. (PageID.7695). After returning to work, Petitioner told Lefler "that he knew he was going to be in trouble. . . because he had told his Bible study friend on the phone that his wife had terminal cancer and she would be dead by Christmas and he wanted to pursue a relationship with her." (PageID.7695-96).

**Earl Ellenbaas**

Ellenbaas was acquainted with Petitioner in the 1990s before joining the Navy and moving away. (Trial Transcript, March 26, 2008, at PageID.7710-12). Ellenbaas returned to

Michigan shortly after Juanita Richardson's death to attend a friend's funeral.   (PageID.7713-14). While in Michigan, Ellenbaas visited Petitioner.   (PageID.7714-15).

With respect to Juanita's death, Petitioner indicated that "when he came back from the bathroom, that he didn't see Juanita, and he looked down [and] saw her face down." (PageID.7716).   Petitioner then asserted that "if it wasn't for the kids, that he would have been down there with her."   (PageID.7716).   Petitioner also indicated that his "memory was sketchy" because of his head injury.   (PageID.7718-19).   Ellenbaas observed no evidence that Petitioner's memory was faulty.   (PageID.7719).

Petitioner then began telling Ellenbaas about Kelli, his "Bible buddy." (PageID.7720-21).   Petitioner explained that Kelli "was on his route" and that "there was fellowship and Bible study whenever they would meet."   (PageID.7721).   Petitioner acknowledged having a conversation with Kelli, prior to Juanita's death, in which he told Kelli, "if anything ever happens to Juanita, I'll put a ring on your finger."   (PageID.7722).   Petitioner also noted that Kelli was no longer returning his telephone calls, leading him to speculate that "the FBI had – had gotten to her or had turned her against him."   (PageID.7724-25).

**Rebecca Grant**

Grant, an intelligence analyst for the Michigan State Police, "assist[ed] in the investigation in analyzing the telephone records."   (Trial Transcript, March 26, 2008, at PageID.7736-38).   The first call between the cell phone numbers associated with Petitioner and Kelli Brophy occurred on September 26, 2005.   (PageID.7738-44).   Between this date and the date of Juanita Richardson's death, "there were a total of 383 calls" between these two phone numbers.   (PageID.7744).   Of these 383 calls, excluding any calls less than two minutes in duration, the average length of these calls was seventeen minutes.   (PageID.7748-49).   The day

before Juanita Richardson's death, Petitioner's cell phone called Brophy's cell phone for a call that lasted 13 minutes.   (PageID.7768-69).   From the date of Juanita Richardson's death through July 31, 2006, there were 52 calls between the phone numbers associated with Petitioner and Kelli Brophy.   (PageID.7751).   On July 31, 2006, Kelli Brophy received a telephone call from Petitioner's attorney.   (PageID.7751-52).

**Kelli Brophy**

Brophy began working at the Quality Dairy convenience store in Charlotte, Michigan in approximately December 2004.   (Trial Transcript, March 27, 2008, at PageID.7779-81).   Quality Dairy was a popular location with trucker drivers.   (PageID.7781-82).   Soon after she began working at Quality Dairy, Brophy became acquainted with Petitioner who would stop at Quality Dairy "maybe every other night."   (PageID.7782-84).   At some point in 2005, the pair began communicating over the telephone.   (PageID.7785).   The two spoke on the telephone "probably every night," usually before or after Brophy began her work shift.   (PageID.7787-88). The purpose of these telephone calls was to both help Petitioner stay awake while he drove and also to discuss "the bible or scriptures."   (PageID.7788).

Brophy was unsure if Petitioner wore a wedding ring, but she knew he was married because Petitioner would talk about Juanita.   (PageID.7789-90).   Brophy assumed that Juanita Richardson was aware of her friendship with Petitioner "because [they] weren't hiding nothing." (PageID.7794).   Brophy did not consider Petitioner to be anything more than a friend. (PageID.7795-96).   For Christmas 2005, Petitioner purchased Brophy a pair of earrings. (PageID.7803-04).   At approximately this same time, Brophy met Ron Boling, who was also married.   (PageID.7853-57, 7877-81).   Boling desired a "serious" relationship with Brophy and

wanted her not to make a lot of phone calls to [Petitioner]."   (PageID.7853-57, 7877-78).   The cost of Brophy's cell phone was paid by Boling.   (PageID.7785-86, 7883).

When speaking about his marriage, Petitioner never acknowledged his past infidelity, but instead accused Juanita of having an extramarital affair.   (PageID.7799-800). Petitioner told Brophy that Juanita had attempted to commit suicide while they were separated and that was why he agreed to reconcile with her.   (PageID.7800).   Petitioner told Brophy that he did not believe in divorce because "in God's eyes they're supposed to stay married."   (PageID.7801). Petitioner told Brophy that "death" was the only circumstance in which divorce was justified. (PageID.7802).

At some point in their relationship, Petitioner asked Brophy what she was looking for in a relationship.   (PageID.7802-03).   Brophy told Petitioner that she "don't want the person to have any baggage, have any ex-wives."   (PageID.7804-05).   Brophy clarified to Petitioner that this meant that "the ex-wife couldn't be alive."   (PageID.7805-06).   Petitioner indicated that Juanita was "not feeling good and always going to the doctors."   (PageID.7874).   Petitioner later predicted that Juanita was "going to be dead by Christmas" because she had breast cancer. (PageID.7808-10).   Petitioner asked Brophy if she would "wait for him" and, moreover, expressed the desire to "take care of" Brophy.   (PageID.7806-07, 7813).   Brophy found this possibility appealing because she considered Petitioner to be "well off financially." (PageID.7813-14).   Brophy, however, did not expect to have a future with Petitioner and never communicated to Petitioner that she was "romantically interested" in him.   (PageID.7879). Moreover, at some point, Brophy informed Petitioner that she "met a friend" and "wasn't making no choices."   (PageID.7854).

When Brophy learned that Juanita Richardson did not die from natural causes, she was "surprised, concerned," but the thought never crossed her mind that Petitioner had acted to "become the man [she] wanted."   (PageID.7821).    At some point after Juanita's funeral, Petitioner appeared uninvited at Brophy's residence.   (PageID.7822-23).    Petitioner brought Brophy a plant from Juanita's funeral.   (PageID.7823).    Brophy was "upset" that Petitioner "show[ed] up unexpectedly" because she was "getting ready for [the] fair."   (PageID.7826). Brophy subsequently attended the fair with Ron Boling.   (PageID.7836).

Petitioner indicated that he was a suspect in Juanita's death and acknowledged making "conflicting statements to the police."   (PageID.7827-28).    Petitioner also told Brophy that she should expect to receive a telephone call from his attorney.   (PageID.7831).    On July 31, 2006, Petitioner's attorney contacted Brophy.   (PageID.7842-45).    The attorney instructed Brophy to no longer communicate with Petitioner and, moreover, to not talk with the police. (PageID.7843-44).    Petitioner's attorney warned Brophy that she "could be a suspect" and that if she spoke with the police she "could go to prison and lose [her] kids."   (PageID.7844).

Brophy owned a "great big huge dog," Carmel, that "don't like people" and is "very protective."   (PageID.7834).    Petitioner knew about Carmel from his conversations with Brophy. (PageID.7834, 7883).    When Petitioner visited Brophy at her residence, he brought Carmel "some kind of bone" after which Carmel began "acting strange."   (PageID.7834, 7883-84).    Brophy's daughter believed that Carmel had been "drugged."   (PageID.7884).    Shortly after Petitioner's visit, Brophy's residence was burglarized.   (PageID.7832-35, 7884-87).    The burglar stole various items, including several pieces of jewelry, but not the earrings that Petitioner had given Brophy.   (PageID.7833-34, 7885-87).    Immediately following the burglary, Brophy observed

that Carmel was unusually "laid back" and "different," just like he had been on the day Petitioner visited.   (PageID.7835).

**Jeff Fellows**

As of July 9, 2006, Fellows was employed as an Eaton County Deputy Sheriff. (Trial Transcript, March 27, 2008, at PageID.7939).   On this date, Fellows was dispatched to Kelli Brophy's residence to investigate a breaking and entering.   (PageID.7939-40).   Fellows initially considered the matter to be "a typical breaking and entering," but after investigating the matter further concluded that the burglary "didn't seem normal."   (PageID.7943).   The residence "wasn't completely ransacked" and while some jewelry and coins had been stolen, there were other items that the burglar unexpectedly neglected to steal, such as a computer.   (PageID.7943).   The burglar also stole photographs, CDs, and a pair of shoes.   (PageID.7943).   Brophy also believed that her dog, which was acting "abnormal[ly]," had been "drugged."   (PageID.7943).

**Judy Owens**

As of July 2006, Owens and Kelli Brophy both had children participating in 4-H. (Trial Transcript, March 27, 2008, at PageID.7952).   Owens and Brophy both attended the Eaton County Fair that month.   (PageID.7952-53).   Brophy attended the fair with a "male friend" who Brophy said was "from McBain."   (PageID.7953-54).   Brophy and her friend appeared to be "a couple" and "would walk through the fairgrounds holding hands."   (PageID.7954-55).[2]

---

2  Owens was not asked to identify Petitioner nor was she asked whether Petitioner was the man to whom she was introduced.   The parties subsequently stipulated that Owens was unable to identify the man to whom she was introduced.   (Trial Transcript, April 8, 2008, at PageID.9040-44).

**Autumn Brophy**

Autumn Brophy, age seventeen at the time of Petitioner's trial, is Kelli Brophy's daughter.  (Trial Transcript, March 28, 2008, at PageID.7993).  Autumn often visited Quality Dairy when her mother was working.  (PageID.7994-95).  A "good month. . .or so" before Juanita Richardson died, Autumn encountered Petitioner at Quality Dairy.  (PageID.7995). Petitioner and Kelli Brophy flirted with each other and referred to each other as "Sweetheart" and "Hon."  (PageID.7995-96).  Petitioner once told Autumn that his wife "was terminally ill." (PageID.8001-03).  Kelli once stated to Autumn that Petitioner "could take care of us financially." (PageID.8005).

Following Juanita's death, Petitioner appeared unannounced at the Brophy residence which Autumn "didn't think was right."  (PageID.8007-08).  Petitioner and Kelli "were still flirtatious."  (PageID.8011).  At the time of Petitioner's visit, Ron Boling was Kelli's "boyfriend."  (PageID.8006-08).  When Petitioner arrived he gave "a big size bone" to their dog after which the dog became "really calm."  (PageID.8009-10).  Autumn later observed Petitioner and her mother "walking around" the fair.  (PageID.8013-14).

Shortly after Petitioner's visit, the Brophy residence was burglarized. (PageID.8011-12).  When the burglary was discovered, Autumn also noticed that their dog "was just laying around like something was wrong with him."  (PageID.8012).

**Elwood Ronald Boling**

Boling met Kelli Brophy in December 2005, at which time Boling was still married. (Trial Transcript, March 28, 2008, at PageID.8035-36).  Brophy nevertheless suggested that she and Boling become "friends."  (PageID.8036-37).  Boling was agreeable, but emphasized that he

was unwilling to date Brophy until his then pending divorce became final.   (PageID.8037).   At some point, Boling provided Brophy with a cell phone for which he paid the bill.   (PageID.8040).

When Boling learned of Brophy's relationship with Petitioner, he became "uncomfortable" because Brophy had "a little bit of interest" in him.   (PageID.8041).   Boling also did not like that Petitioner, who was married, was discussing his sex life with Brophy. (PageID.8041).   Boling told Brophy, "I wanted to do what was morally right and I wanted a moral woman in my life and that I did not feel that a woman who was talking to a married man about the subject matter they were talking about especially was something that I wanted in my life." (PageID.8042).   Brophy subsequently told Boling that "everything [with Petitioner] was over." (PageID.8042-44).   Boling sensed, however, that Petitioner and Brophy "had such a strong relationship."   (PageID.8049-50).   Petitioner was also "very persistent" and "was not taking no for an answer" and continued contacting Brophy.   (PageID.8044).

Brophy often told Boling about the issues Petitioner was experiencing in his marriage and that "if she had a – a man, how that she would take care of that man and he wouldn't have those issues."   (PageID.8045).   Brophy made clear to Boling her criteria in a partner: Christian, "financially stable," and "no ex-wives."   (PageID.8051-52).   With respect to ex-wives, Brophy stated "she wanted them dead."   (PageID.8052).   Boling related an incident with Brophy in which he gave Brophy an apple, commenting that "it's a beautiful apple. . .but there is some flaws."   (PageID.8052).   Brophy responded, "it's got a dead stem; that's your ex-wife. . .for me to accept the apple, the stem has to be dead."   (PageID.8052).

Boling knew that Brophy would be attending the fair that year, but Brophy told Boling she "didn't want [him] at the fair" because "she would be meeting some friends there that might upset [him]."   (PageID.8056).   At the conclusion of the fair, Brophy "acted kind of distant

from" Boling.   (PageID.8056-57).   Boling responded by "just stay[ing] away and [having] very little contact" with Brophy.   (PageID.8057).   Soon thereafter, Brophy told Boling that she "was just trying to weigh things out between [him] and [Petitioner]."   (PageID.8057).   Brophy later told Boling that he was "a spiritual man and a spiritual leader" and she wanted to be with him.   (PageID.8057).   Boling and Brophy thereafter "fell in love with each other."   (PageID.8057).

After Juanita Richardson died, Brophy expressed to Boling that she "led [Petitioner] on" and "felt responsible for what had happened."   (PageID.8059-60).   Brophy also told Boling that "she has information that she has not shared with anyone" and that "she wasn't going to tell [the police] everything."   (PageID.8066).   Boling's divorce became final in October 2006, at which point Boling and Brophy "started to date."   (PageID.8037-38).   Several weeks later, Brophy shared with Boling that she had received an email from Petitioner and that she "missed him."   (PageID.8066-67).   Brophy also commented to Boling that "with [Petitioner] she wouldn't have any financial issues" and that "she was just going to move up north and marry [Petitioner] and live up there with him."   (PageID.8067-69).   After Petitioner was arrested, Brophy saw a photograph of Petitioner "in his jail clothing" and stated that she could not stand seeing Petitioner "go through this."   (PageID.8067-68).   Boling nevertheless asserted that he and Brophy are "quite close" and will "hopefully get married."   (PageID.8034-35).

**Tammy Jugovich**

In June 2005, Jugovich began working with Kelli Brophy at Quality Dairy.   (Trial Transcript, March 31, 2008, at PageID.8125-26).   Petitioner visited Brophy several times each week during which time the pair were "definitely friendly."   (PageID.8127-29).   Brophy was always happy to see Petitioner and treated him better than any other trucker.   (PageID.8129-30).   Brophy always made fresh coffee for Petitioner and "made a point to be out, you know, out to

where he could walk up to her and talk to her and spend time chatting."   (PageID.8130).   As time passed, the intensity of the relationship between Petitioner and Brophy "increased." (PageID.8138).

Brophy stated that she felt "admiration for" Petitioner because "he was willing to move back into a miserable situation and do such an honorable thing for his wife," and Brophy just thought "it was very admirable of [Petitioner] to do that."   (PageID.8133-34).   Brophy's feelings on this particular subject were "very intense."   (PageID.8135).   Brophy indicated that "she could see herself spending time with someone like [Petitioner]."   (PageID.8135).   Brophy believed that Juanita Richardson was suffering from cancer and was going to die "like around Christmastime."   (PageID.8136, 8165).

**Gary Gabry**

Gabry is an attorney whose practice includes criminal defense.   (Trial Transcript, March 31, 2008, at PageID.8174).   In late July 2006, Ron Boling contacted Gabry out of concern for Kelli Brophy and her involvement with Petitioner.   (PageID.8174-76, 8181).   Based on what Boling told him, Gabry concluded that Brophy should consult with an attorney "so that the proper course could be – could be charted."   (PageID.8176-77).   Boling did not share with Gabry anything that caused Gabry to conclude that Brophy was involved in Juanita Richardson's death, but Gabry did believe that Brophy possessed knowledge of the relevant events.   (PageID.8187-88).   Gabry never spoke with Brophy, however.   (PageID.8178).

**Donna Weaver**

As of July 2006, Weaver was employed as the Branch Manager of the Citizen's Bank branch in Cadillac, Michigan.   (Trial Transcript, March 31, 2008, at PageID.8218-19).   In

mid-July, several weeks after Juanita Richardson's death, Petitioner approached Weaver and asked for her help "negotiating memorial fund checks that he had received." (PageID.8219-23). Petitioner also explained that he needed assistance balancing his checkbook. (PageID.8221-23).

Petitioner, without any prompting, then proceeded to describe to Weaver the events surrounding Juanita's death. (PageID.8223). According to Petitioner, "he had went to the restroom and then he had come back from the restroom and she was gone." (PageID.8223). Petitioner stated that "several hours later he recalled actually watching her fall, that she had a big smile on her face and she fell." (PageID.8223-24). Petitioner stated that he then "passed out" which was the result of a closed head injury. (PageID.8224-25).

Weaver commented to Petitioner that "must feel so horrible" because if he had not passed out he might have been able to save Juanita. (PageID.8224). Petitioner responded to this comment, "oh, well, you fall at x-amount of feet per second, so she hit the rock in three seconds." (PageID.8224). Throughout this discussion, Petitioner's demeanor remained "matter of fact." (PageID.8224-25). Petitioner then complained about the treatment he received from the police following Juanita's death. (PageID.8225-26). Based on Petitioner's comments, Weaver concluded that Petitioner was "much more disturbed about how his treatment was by police than by the actual event of his wife falling from the cliff." (PageID.8225-26). Petitioner also told Weaver that he was a "great husband" and that "several people were jealous of how. . .[Juanita] was treated." (PageID.8227-28).

Petitioner's behavior made Weaver feel "very uncomfortable." (PageID.8228). Weaver was eventually able to end her conversation with Petitioner and direct him out of her office, but as Petitioner was exiting, he asked Weaver, "do you think we can go to dinner sometime?" (PageID.8228-29). Weaver declined Petitioner's offer. (PageID.8229-30).

Approximately two weeks later, Petitioner sent Weaver a card thanking her "for letting [him] down so easily," but also providing his telephone number in the event Weaver ever changed her mind. (PageID.8230-33).

**Ruth Baas**

Baas worked with Donna Weaver at Citizen's Bank.    (Trial Transcript, March 31, 2008, at PageID.8247-48).    Prior to speaking with Donna Weaver, Petitioner approached Baas because he "wanted to cash" some checks "made out to a memorial fund."    (PageID.8248-49). Baas informed Petitioner that such checks "couldn't just be cashed, they needed to go into a memorial fund set up specific for that."    (PageID.8249).    Petitioner indicated that he would "just do it later," but to Baas' knowledge, Petitioner never did so.    (PageID.8250-54).

**Natalie Torres**

As of the date of Juanita Richardson's death, Torres was employed as a Michigan State Police Trooper.    (Trial Transcript, March 31, 2008, at PageID.8259-60).    At some point thereafter, Torres was assigned to perform "undercover work" as part of the investigation into Richardson's death.    (PageID.8260).    Specifically, Torres posed as "Sue Mullin," a friend of Nancy Baker.    (PageID.8260-61).

On August 21, 2006, Torres accompanied Tim and Nancy Baker to a restaurant where she met Petitioner.    (PageID.8261-63).    During this initial encounter, Torres indicated that Sue Mullin "was looking to establish a base of friends in the Cadillac area" because she would be moving to that area in the near future.    (PageID.8264).    Petitioner responded that he "had a cabin next to his house" and Torres was "welcome to stay there at any time."    (PageID.8264-65).

Petitioner and Torres exchanged contact information and began communicating, primarily by email.  (PageID.8265-67).  Petitioner later sent a handwritten letter to Torres in which "he indicated that he believed that his e-mails were being read and that his phone was tapped."  (PageID.8268).  At the outset, Petitioner did not offer "any information about the circumstances" surrounding Juanita Richardson's death, but did make repeated references to his "closed head injury."  (PageID.8269).  Torres, however, never observed any indication that Petitioner experienced speech, language, or memory difficulties.  (PageID.8269-70).

Petitioner exhibited a "high" level of interest in Torres and "regularly" suggested that the two meet and spend time together.  (PageID.8270-71).  On October 25, 2006, Torres informed Petitioner that she would be in the Cadillac area in the coming days and that she would be available to meet.  (PageID.8274-75).  The pair arranged to meet on a particular night before Petitioner began his work shift.  (PageID.8275).  The pair agreed to meet in a Walmart parking lot.  (PageID.8275-76).  The two met for approximately 40 minutes during which time Petitioner related "his account of what happened" to his wife.  (PageID.8276-78).  This conversation was recorded.[3]  (PageID.8278).  Shortly after this encounter, Torres sent an email to Petitioner terminating their relationship.  (PageID.8286-87).

**Tammy Sian**

Sian met Petitioner on or about August 1, 2006.  (Trial Transcript, April 1, 2008, at PageID.8358-60).  The two began a relationship and within "two or three" weeks, the pair was talking with each other daily.  (PageID.8361-62).  Petitioner and Sian also "did things together" and "hung out a lot."  (PageID.8362).  Sian told Petitioner that she wanted a relationship with

---

3  The recording of this conversation was played for the jury.  (PageID.8285).  A transcript of the conversation does not, however, appear in the record.

him, but Sian knew that Petitioner "didn't want a commitment."   (PageID.8365).   Petitioner soon began to regularly spend the night with Sian.  (PageID.8365-80).   Petitioner told Sian that the last five years of his marriage to Juanita were "awesome" and the "best" years of their marriage. (PageID.8372).   Petitioner would often cry when speaking about Juanita.   (PageID.8398-99).

**Dylan Bonevelle**

In March and April 2007, Bonevelle was housed in the Alger County Jail after being charged with larceny.   (Trial Transcript, April 1, 2008, at PageID.8423-27).   During this time, Bonevelle was housed in a cell with Petitioner.  (PageID.8426-29).   Petitioner believed that "he was being railroaded" by the prosecuting attorney and stated that she would "be the next bitch to go off a cliff."  (PageID.8432-35).   Petitioner offered Bonevelle "a boat and a Corvette" to "take care of" the prosecuting attorney.   (PageID.8433).   When Petitioner made these statements "there was no laughing or joking involved."   (PageID.8434).

After hearing these comments, Bonevelle spoke with Michigan State Trooper Craig Michelin.   (PageID.8435-36).   After speaking with Michelin, Bonevelle agreed to wear a recording device and attempt to engage Petitioner in conversation "about a plot against" the prosecutor.   (PageID.8436-38).   During the pair's subsequent recorded conversations, Petitioner "wouldn't say to kill the prosecutor," but instead "he'd say take care of the Ice Queen and things like that."  (PageID.8438-39).   Bonevelle later rummaged through Petitioner's belongings and read his "legal documents."  (PageID.8440-41, 8452).   Bonevelle did not do this at the suggestion or behest of anybody else, but instead was simply "curious as to what the facts really were" in light of the "conflicting stuff" Petitioner was telling him.   (PageID.8440-41).

**Benjamin Borowski**

In April 2007, Borowski spent four days in the Alger County Jail for an "unpaid fine."  (Trial Transcript, April 1, 2008, at PageID.8466-67).   Borowski was housed in a cell with Petitioner and Dylan Bonevelle.  (PageID.8467).   On one occasion, Petitioner expressed his hostility toward the prosecuting attorney, indicating that she "would be the next bitch to go off the cliff."   (PageID.8468-69).   Petitioner was "angry" when he made this statement. (PageID.8469).   Petitioner offered to give Borowski a boat and a Corvette if he killed the prosecuting attorney.   (PageID.8470-71).

**Steve Blank**

As of the time of Petitioner's trial, Blank was employed as an Alger County Deputy Sheriff.  (Trial Transcript, April 1, 2008, at PageID.8487).   Blank examined the records of the Alger County Jail to determine the dates of confinement for Dylan Bonevelle and Benjamin Borowski.  (PageID.8487).   Bonevelle was housed in the Alger County Jail on the following dates: (1) February 17, 2007, through February 18, 2007; (2) March 20, 2007, through April 3, 2007; and (3) April 16, 2007, through an unknown date in December 2007.   (PageID.8488). Borowski was housed in the Alger County Jail from March 25, 2007, through March 30, 2007. (PageID.8488).   Petitioner was housed in the Alger County Jail from February 6, 2007, through the date of his trial.   (PageID.8488-89).

**Craig Michelin**

As of 2006, Michelin was employed as a Detective Trooper assigned to the Upper Peninsula Substance Enforcement Team.   (Trial Transcript, April 1, 2008, at PageID.8495-96). As of late 2006, Michelin was utilizing Dylan Bonevelle as a confidential informant.

(PageID.8495-96).   At that point in time, Bonevelle participated "in narcotics investigations out in the field [and] performed very well."   (PageID.8496).   Bonevelle was subsequently jailed on larceny charges.   (PageID.8496).   On March 27, 2007, Michelin spoke with Bonevelle and learned that Petitioner had made threats against the prosecuting attorney.   (PageID.8497-98). Michelin then provided Bonevelle with a hidden recording device and instructed him to "reinitiate talks" with Petitioner on the subject of his threats against the prosecuting attorney.   (PageID.8497-99).   However, because of the acoustics and environment in the jail, the quality of the subsequent recordings was "very poor."   (PageID.8499).

**Timothy Mozader**

For approximately one month, Mozader shared a cell in the Alger County Jail with Petitioner.   (Trial Transcript, April 1, 2008, at PageID.8511-12).   Mozader shared with Petitioner that he was having marital difficulties and was separated from his wife.   (PageID.8512-13). Petitioner responded by instructing Mozader "not to let the wife push you around" and to "put women in their place."   (PageID.8513-14).   Mozader conceded, however, that Petitioner counseled reconciliation between Mozader and his wife.   (PageID.8521-22).

**Robert Lanning**

Lanning has served as Pastor of the Christian Fellowship Church in Manton, Michigan since 1984.   (Trial Transcript, April 1, 2008, at PageID.8531).   From approximately 1986-1991, Petitioner and Juanita Richardson regularly attended services at Lanning's church. (PageID.8532).   In March or April 2006, Petitioner and Juanita again began attending services at Lanning's church.   (PageID.8532-33).

Two days after Juanita's death, Lanning met with Petitioner at his residence. (PageID.8533-35).   Petitioner did not provide for Lanning an account of Juanita's death. (PageID.8535).   Shortly after Juanita's funeral, however, Petitioner described for Lanning the events leading to Juanita's death.   (PageID.8535-36).   According to Petitioner, he "had to go back to the bathroom," but "Juanita could not come with him because of her ankle injury." (PageID.8536-37).   Petitioner indicated that he "had fallen and he had blanked out, kind of lost consciousness, and then kind of crawled to the edge a little bit and – and – but was in and out of consciousness quite a bit."  (PageID.8536-37).   Petitioner later asserted that he had witnessed Juanita fall from the cliff.   (PageID.8537-38).   According to Petitioner, Juanita "was motioning that he come to see something, like some beautiful sight" and "then as she turned, somehow she – she fell."   (PageID.8538).

**Ross Meyering**

On June 23, 2006, Meyering, who operated a funeral home in McBain, spoke with Petitioner concerning the final arrangements for Juanita Richardson's body.   (Trial Transcript, April 1, 2008 at PageID.8553-55).   Petitioner indicated that he wanted Juanita's body cremated. (PageID.8555-56).   Meyering asked Petitioner whether he was interested in having a visitation and services prior to cremation or whether he simply wanted a cremation followed by a memorial service.   (PageID.8556-57).   Meyering explained to Petitioner that having a visitation or viewing prior to cremation can assist friends and loved ones obtain closure, but it "didn't seem that [this concern] was of real importance to [Petitioner]."   (PageID.8558-59).

**Keith Burkholder**

Burkholder works as the mortician at Ross Meyering's funeral home in McBain. (Trial Transcript, April 1, 2008 at PageID.8566).   On June 24, 2006, Burkholder met with Petitioner, his and Juanita Richardson's children, and Juanita's parents.   (PageID.8566-67). Petitioner indicated that he wanted Juanita cremated, a decision Juanita's parents "were not happy with" as "burial was a tradition" with their family.   (PageID.8567-68).   Petitioner was insistent that Juanita wanted to be cremated and was not willing to discuss the matter.   (PageID.8568). Petitioner arrived at the funeral home on August 1, 2006, to recover Juanita's remains. (PageID.8570-71).   Burkholder carried the remains to Petitoner's car.   (PageID.8572-75). Petitioner did not place the remains in the front seat of his car, but instead he "literally kind of pitched them" into the hatchback of his Corvette.   (PageID.8574-75).

**Dr. Randolph Smith**

As of June 23, 2006, Dr. Smith, an expert in anatomic and clinical pathology, served as the Marquette County Medical Examiner.   (Trial Transcript, April 2, 2008 at PageID.8620-22). On this date, Dr. Smith performed the autopsy on Juanita Richardson's body.   (PageID.8622-23).

Richardson suffered a variety of injuries any of which could have individually, or in combination with other injuries, caused Richardson's death.   (PageID.8623-25).   While Richardson's injuries were consistent with her falling from a cliff, Dr. Smith was unable to determine "why she fell off the cliff."   (PageID.8626).   Richardson's injuries were "equally consistent with a[n] accidental, suicidal, or homicidal fall."   (PageID.8626).   Accordingly, the doctor identified Richardson's cause of death as "indeterminate."   (PageID.8625-26).   As part of the autopsy, Dr. Smith was instructed to "look for a breast lump," but discovered "no breast masses of significance."   (PageID.8627).   The doctor also discovered no evidence of "any specific toe

injury." (PageID.8627). The results of a toxicology examination were "negative." (PageID.8627).

Dr. Smith discerned "no evidence of an altercation or struggle prior to [Richardson's] fall," but "a push" would not necessarily leave "any mark or injury" on the person being pushed. (PageID.8626-28). Likewise, the application of a choke hold would not necessarily leave "a mark or injury" on the body of the person being choked. (PageID.8629-30). An examination of "the upper part of the back of [Richardson's] thighs and her lower buttocks" revealed the presence of two bruises consistent with having been caused by a strike with "a firm elongated object, like a rod or a stick or a protruding linear root or something." (PageID.8632-33). This particular type of injury is often referred to as "a night stick type of injury." (PageID.8633). The bruises in question were inflicted "at or around the time of the fall." (PageID.8634).

At a later date, investigators asked Dr. Smith "whether or not an injury on [Richardson's] foot was sustained while the sandal was on her foot, while the sandal was not on her foot, or whether or not [he] could tell." (PageID.8636). Dr. Smith concluded that "based on the pattern of injury and the evaluation in association with the sandal, [the doctor] thought it likely that the abrasions on the toes of the left foot occurred when the sandal was on the foot." (PageID.8637).

**Douglas Kehl**

From approximately 1985-87, Kehl, a martial arts instructor, participated in karate training with Petitioner. (Trial Transcript, April 2, 2008 at PageID.8655-56). Petitioner was "gung ho" about this training. (PageID.8657-58). As part of this training, Petitioner learned

several choke holds.  (PageID.8660-61).  Stick fighting was also taught, but Kehl was unsure whether Petitioner participated in such training.   (PageID.8660).

## Cheryl Howe

From 1983-1989, Howe worked with Petitioner at Four Winns Boats.  (Trial Transcript, April 2, 2008 at PageID.8676-78).   Approximately once or twice weekly, Petitioner, who was married, asked Howe if she "wanted to go out in the parking lot and have sex with him." (PageID.8671-72).   Howe declined and made clear to Petitioner that his advances were not welcome.  (PageID.8671-75).   Howe later obtained a second job as an exotic dancer, after which Petitioner's behavior toward her became "more aggressive."  (PageID.8672).   Petitioner would walk near Howe and say, "bitch, give me a blow job" or refer to Howe as a "cunt." (PageID.8672).   Petitioner also stated that "women were put on this earth to cook, clean, and fuck."  (PageID.8673).

## Robert Birdsong

As of the date of Petitioner's trial, Birdsong had served as an FBI Special Agent for more than 19 years.  (Trial Transcript, April 2, 2008 at PageID.8680-81).   Agent Birdsong became involved in the investigation of Juanita Richardson's death because there was initially a "belief by the federal authorities that the United States had jurisdiction" given that Richardson died on federal lands.  (PageID.8681-82).

Birdsong learned about Kelli Brophy from Detective Herweyer.  (PageID.8702). Birdsong first interviewed Brophy on September 7, 2006.  (PageID.8702-03).  Birdsong met with Brophy a second time the following month at which point the pair discussed the telephone call that Brophy had received from Petitioner's attorney.  (PageID.8704-05).   According to

Brophy, this telephone call had her concerned because the attorney suggested Brophy might face liability as an accomplice or accessory after the fact.   (PageID.8705-09).   Agent Birdsong did not perceive that Brophy faced any such liability.   (PageID.8709).   Birdsong nevertheless wondered why Petitioner's attorney would be concerned that Brophy might be considered an accessory after the fact.   (PageID.8709-10).   Birdsong concluded that Brophy was not sharing with them everything she knew.   (PageID.8709-10).

In September 2006, Agent Birdsong interviewed Lindsey Richardson. (PageID.8717).   Lindsey was "real positive about her mother" and "just ruled out suicide." (PageID.8717-18).   As for her mother's breast lump, Lindsey was aware of such and was, furthermore, aware that such had been determined to be benign.   (PageID.8720).

Agent Birdsong interviewed Tammy Sian in February 2007.   (PageID.8721). Sian told Birdsong that she and Petitioner had a sexual relationship, but that Petitioner stated that he did not want to be seen in public with Sian "because he was worried about police surveillance and the police following him."   (PageID.8722).   Sian also told Birdsong that in November 2006, Petitioner indicated to her that he "would consider [marriage] at some point."   (PageID.8722-23). When Birdsong informed Sian that Petitioner was involved with other women, Sian became "upset" and began "crying."   (PageID.8723).   Sian told Birdsong "about how good [Petitioner] had been for her. . .and her children."   (PageID.8724).

**Jeff Herweyer**

As of the date of Petitioner's trial, Herweyer had served as a Detective for the Michigan State Police for approximately 20 years.   (Trial Transcript, April 2, 2008 at PageID.8762).   Herweyer grew up in McBain and was acquainted with Juanita Richardson as well as many other people involved in this matter.   (PageID.8762-63).   In early July 2006, Herweyer

99

"started getting a lot of phone calls right off the bat because a lot of people knew me, knew [Juanita], telling me, you know, you need to look into this."   (PageID.8763).   Herweyer relayed this information to the officials in Alger County who were conducting the investigation. (PageID.8763).   The investigation eventually shifted "towards the Cadillac area" at which point Herweyer was "officially requested to assist."   (PageID.8764).

**Don Culver**

Culver is Juanita Richardson's father.   (Trial Transcript, April 2, 2008 at PageID.8789-90).   Petitioner and Juanita Richardson "had to get married" because Juanita became pregnant.   (PageID.8791).   The pair "argued" and their marriage "didn't seem like a pleasant marriage."   (PageID.8791).   At one point "early in their marriage," Culver observed that Juanita "had some bruises" on her face and arm.   (PageID.8791-92).   Juanita told her father that Petitioner "hit her" and "grabbed her arm."   (PageID.8792-93).

Petitioner treated Juanita in a "demeaning" manner, often telling her to "get [her] head out of [her] ass" or referring to her as "stupid."   (PageID.8794).   Culver "never" observed "any positive interaction" between Petitioner and his daughter.   (PageID.8795).   When Petitioner and Juanita separated, Culver told his daughter that "she should get out of that marriage." (PageID.8798).   Juanita "didn't disagree" with her father, but nevertheless reconciled with Petitioner.   (PageID.8798).   Juanita told her father she reconciled with Petitioner because "the kids needed a father as well as a mother."   (PageID.8798).

Prior to their final trip together to the Upper Peninsula, Petitioner and Juanita were visiting Juanita's parents.   (PageID.8799-800).   Petitioner commented that their upcoming trip "was going to be their second honeymoon" at which point Juanita stated, in a serious tone, "what

are you talking about?"   (PageID.8800).   With respect to the location where Juanita fell from the cliff, Culver had never heard it referred to as a "honeymoon spot."   (PageID.8800).

Juanita Richardson was "very physical active" and was in good physical health prior to her death.   (PageID.8800-01).   Juanita's "spirits" were "excellent" and "she was happy." (PageID.8803-04).   Petitioner did not contact Culver until three days after Juanita's death. (PageID.8806).   Petitioner claimed that he was unable to make contact sooner because "they wouldn't let him use the phone."   (PageID.8806).   Petitioner never offered to provide Culver with an account of the events leading to Juanita's death.   (PageID.8807).   Petitioner's behavior at Juanita's funeral was "just total theatrics."   (PageID.8808).   Prior to Juanita's death, Culver was unaware of Petitioner's alleged head injury.   (PageID.8808).   Juanita was "never" a "risk taker or daredevil."   (PageID.8810-11).

## II.        DEFENSE WITNESSES

### David Boersma

Boersma first met Petitioner when he dated Petitioner's sister and the two later worked together at Four Winns Boats.   (Trial Transcript, April 7, 2008, at PageID.8823-25). Boersma and Petitioner "just get along really well."   (PageID.8825).   Petitioner "got along great" with his co-workers and was "dedicated" to his job and "took a lot of pride in what he did." (PageID.8826-28).   Petitioner has "a sharp tongue," but not a "violent personality or violent temper."   (PageID.8838-39).   Petitioner is an "honest" and "caring person."   (PageID.8839). Boersma and his wife socialized with Petitioner and Juanita Richardson.   (PageID.8828-29). Petitioner and Juanita "liked to argue, but they loved to make up."   (PageID.8829).

Juanita "was a tomboy" and "could handle herself." (PageID.8831). Juanita possessed "good agility, balance, coordination, [and] strength." (PageID.8847). Juanita helped on her parent's Christmas tree farm, dragging trees, operating the tractor, and loading/unloading trees on a trailer. (PageID.8833-35). Juanita was not afraid of heights and Boersma "could very much see" Juanita eating lunch while sitting on the edge of a cliff. (PageID.8839-40).

**Keith Stutzman**

Stutzman met Petitioner when the pair worked at Four Winns Boats. (Trial Transcript, April 7, 2008, at PageID.8861-62). Petitioner "was easy to talk to" and "got along well with people." (PageID.8863). Stutzman and Petitioner also participated in a bible study church group of "guys getting together and just talking about their faith, their relationships with their kids, wives, families, just [a] general supportive sort of group." (PageID.8863-64). During these meetings, Petitioner would discuss difficulties he was experiencing with his marriage, but he did not use the meetings "as a gripe session," but instead attempted to learn what he could do to "fix" the problem. (PageID.8867). Petitioner also participated in youth activities through the church. (PageID.8867-68).

**Paul Leifker**

Leifker met Petitioner when the pair worked together at Four Winns Boats. (Trial Transcript, April 7, 2008, at PageID.8875-77). The two "hit it off pretty good right off the bat" and "became close friends." (PageID.8877). Petitioner "is a man of high integrity" and "held principles very high." (PageID.8887). Petitioner "talked about the Bible" and the pair would often go "down to the bar and have a beer and a shot and talk about Jesus." (PageID.8878).

In approximately 1987, Leifker "ended up living with [Petitioner] for just over a year," staying in "an open room at [Petitioner's] house."  (PageID.8876-77).   During this time, Leifker observed Petitioner and Juanita Richardson interact.  (PageID.8878).   Petitioner was "attentive to the needs of his children and his wife."  (PageID.8878).   Petitioner was "very passionate about – passionate about wanting to work out things that were interfering with a good relationship in the marriage."  (PageID.8883-84).   When Leifker spoke with Petitioner following Juanita's death, Petitioner was "devastated."  (PageID.8884).

**Dennis Hicks**

Hicks met Petitioner when the pair worked at Four Winns Boats.  (Trial Transcript, April 7, 2008, at PageID.8919).   Hicks and Petitioner also attended the same church and participated in regular Bible study meetings.  (PageID.8920-26).   For several years, Hicks and Petitioner's family regularly attended a particular Christian festival in central Illinois.  (PageID.8920-23).   Petitioner and Juanita Richardson "got along very well" and had a "very good marriage."  (PageID.8923, 8927-28).   Petitioner is "very honest, very caring, compassionate, concerned about people, where they were at spiritually."  (PageID.8931).   Following Juanita's death, Hicks began speaking with Petitioner regularly during which time Petitioner would speak about "spiritual" matters.  (PageID.8932-33).   With respect to Petitioner's behavior at Juanita's funeral, Hicks considered such to be "very moving and showing the respect that he had for Juanita."  (PageID.8931).

**Dave Kutzbach**

Kutzbach met Petitioner when the pair worked at Four Winns Boats.  (Trial Transcript, April 7, 2008, at PageID.8958-59).   Petitioner "kind of rubbed [co-workers] wrong

because he was – he was real meticulous" and "he wanted to turn out a good product and he took his job really serious and stuff so he would, you know, occasionally step on some toes trying to do that."  (PageID.8959).   Kutzbach and Petitioner became friends and their families socialized together.  (PageID.8960-61).   Petitioner was also very involved in his children's many activities.  (PageID.8961-62).   Kutzbach and Petitioner would often speak about spiritual matters because Petitioner "was always trying to present the gospel to somebody."  (PageID.8962).   Petitioner would often listen to Christian music at work which "offended" many of his co-workers.  (PageID.8962-63).   Petitioner was "kind of a leader" in Promise Keepers, a "Christian pep rally" intended to assist men become better fathers and husbands.  (PageID.8962-63).   Kutzbach and Petitioner also participated together in regular Bible study meetings.   (PageID.8964-65).

**Molly Bassett**

Bassett has known Petitioner since 1977.   (Trial Transcript, April 7, 2008, at PageID.9005).   From approximately 1988 through 1999, Petitioner's family and Bassett's family attended the same church and would regularly socialize following church.   (PageID.9007-08, 9014-15).   Juanita Richardson told Bassett that their family had to leave their previous church because she "had an affair. . .with a man and they had to leave the area to just get away."  (PageID.9009-10).

Petitioner and Juanita Richardson "seemed to show affection to each other, hold hands or, you know, laugh, and there were good times."   (PageID.9008).   Bassett never observed any "bickering" between Petitioner and Juanita.   (PageID.9008).   Bassett never observed Petitioner physically or verbally abuse his wife.   (PageID.9009).

In approximately 1997, Juanita told Bassett that she "wanted out of the marriage" because "she was having an affair with her boss."   (PageID.9010-12).   Bassett did not reveal this

to Petitioner.   (PageID.9017).   Bassett spoke with Juanita Richardson in spring 2006, shortly before she and Petitioner traveled to Pictured Rocks.   (PageID.9013).   Juanita "was happy" and indicated that her marriage was "doing great" and she and Petitioner "were getting along fine." (PageID.9013-14).   Juanita made no mention of wanting a divorce and instead indicated that her upcoming trip to the Upper Peninsula was "like a second honeymoon."   (PageID.9014).

**Katie Dahlstrom**

   Dahlstrom is Petitioner's niece.   (Trial Transcript, April 7, 2008, at PageID.9032). At some point during the summer of 2007, Dahlstrom accompanied her dad to Petitioner's house to "look for a prescription bottle of Effexor for Juanita Richardson."   (PageID.9032-34). Dahlstrom located the prescription in question and gave it to her mom who delivered it to Petitioner's attorney.   (PageID.9033-35).   Dahlstrom was unable to remember the date printed on the bottle's label.   (PageID.9035).

**Jose Ybarra**

   Ybarra serves as a Special Agent for the Federal Bureau of Investigation.   (Trial Transcript, April 8, 2008, at PageID.9040-41).   In this capacity, Ybarra was assigned to interview members of the 4-H club with which Brophy participated.   (PageID.9041).   Ybarra showed Petitioner's photograph to 8 or 9 people none of whom could identify, "with 100 percent certainty," that Petitioner was the man who accompanied Brophy at the Eaton County Fair.   (PageID.9044-45).   One of the people to whom Agent Ybarra presented Petitioner's photograph was Judy Owens.   (PageID.9045).

**Todd Johnston**

At some point, Johnston, a Detective with the Michigan State Police, was instructed "to look into allegations that Deputy Blank had done some improper things in regards to an inmate at the Alger County Jail." (Trial Transcript, April 8, 2008, at PageID.9049). As part of this investigation, Johnston spoke with Dylan Bonevelle. (PageID.9049-50). Detective Johnston asked Bonevelle if "he was given any chewing tobacco by the deputy?" (PageID.9050). Bonevelle responded that "he was not," which Johnston learned to be untrue after speaking with Deputy Blank. (PageID.9050-51). Detective Johnston also asked Bonevelle if he had searched Petitioner's belongings. (PageID.9051). Bonevelle denied doing so which Johnston, based upon statements by another inmate, believed to be an untrue statement. (PageID.9051).

**Steve Blank**

On July 2, 2006, Deputy Blank telephoned Petitioner. (Trial Transcript, April 8, 2008, at PageID.9052). Blank was aware of "some talk as why [Juanita Richardson's] body was still in Marquette or why it wasn't back in [the] McBain area." (PageID.9053-54). Blank also "had no information that [Petitioner] had identified" his wife's body. (PageID.9053). Accordingly, Blank asked Petitioner whether he was willing to identify his wife's body. (PageID.9052-54). With respect to the sandal that was located "just over the cliff" at the location where Juanita Richardson perished, Blank did not learn of the presence of such from Petitioner but rather learned this information from another law enforcement official. (PageID.9056-62). Deputy Blank did not share this information with Petitioner. (PageID.9059, 9065). In Deputy Blank's mind, however, the location of the sandal had no significance. (PageID.9064-65).

**Levi Richardson**

According to Richardson, his mother "wanted to be cremated." (Trial Transcript, April 8, 2008, at PageID.9075). Richardson never observed Petitioner working on the roof of their house. (PageID.9075). Richardson also participated in martial arts training, achieving the same level of proficiency as Petitioner. (PageID.9076). Richardson was never taught choke holds, however, and never observed Petitioner administering a choke hold. (PageID.9076-77).

**Dr. Julianne Kirkham**

Kirkham possesses a Ph.D. in clinical psychology and following a post-doctoral fellowship "in neuropsychology and rehab psychology," Kirkham developed a "traumatic brain injury treatment program" at Marquette General Hospital. (Trial Transcript, April 8, 2008, at PageID.9102-03). Dr. Kirkham also serves as the Director of the Marquette General Neuropsychology Clinic. (PageID.9123).

Dr. Kirkham did not treat or meet with Petitioner, but was instead retained by Petitioner to "evaluate records regarding his traumatic brain injury and offer information. . .regarding his presentation the day or two following the day of and the day after this incident." (PageID.9125). The doctor was also retained to determine if there existed "an explanation for" the inconsistent statements Petitioner made concerning his wife's death. (PageID.9129-30).

An "acute stress reaction" encompasses two things: (1) a person witnessing "a traumatic event" that is "quite out of the ordinary"; and (2) "the central nervous system's reaction to that stressful incident." (PageID.9107). Petitioner satisfied the first criteria because he witnessed "some event that caused his wife to fall." (PageID.9108-09). With respect to the second element, simply witnessing his wife fall from the cliff would be sufficient to cause Petitioner to experience "a central nervous system reaction" consisting of nausea, muscle cramps,

appearing flushed or hot, and rapid and shallow breathing  (PageID.9109).   After reviewing Kari Farkas' report and trial testimony, Dr. Kirkham concluded that Petitioner exhibited symptoms "consistent with acute stress reaction."   (PageID.9110-11).

With respect to how acute stress reaction impacts an individual's ability to remember traumatic events, the doctor indicated that "if your eyes witness a traumatic event [it is] fair to say that then one portion of your brain may block the other portion of the brain from actually remembering the event."  (PageID.9113).   Dr. Kirkham concluded that Petitioner's previous head injury was unrelated to the acute stress reaction he experienced immediately following his wife's death.  (PageID.9114).   As for Petitioner's alleged inability to remember the events surrounding his wife's death, the doctor stated that "the acute stress disorder and the attendant intermittent or transient suppression of memory is why [Petitioner] couldn't remember." (PageID.9115).   While the doctor did not attribute Petitioner's alleged memory deficiencies to his previous head injury, she did not perceive "anything unusual" about Petitioner's continued use of sunglasses because "sensitivity to light" is a head injury symptom that "persist[s] the longest." (PageID.9115-16).

With respect to Kari Farkas' testimony that Petitioner initially acted hysterically, but quickly appeared calm, Dr. Kirkham indicated that such behavior was consistent with somebody experiencing acute stress disorder.   (PageID.9119).   The doctor further indicated that a person suffering acute stress disorder may experience "peritraumatic amnesia," a circumstance in which a person experiences "partial or complete lack of memory for an event."   (PageID.9120). The doctor was unsure whether Petitioner would have subsequently recovered the memories in question, but she nevertheless concluded that "I don't think [Petitioner] would ever have had a totally clear memory of all those events."   (PageID.9121).

Dr. Kirkham conceded that her opinion was premised on the assumption that Petitioner did not cause his wife to fall from the cliff, but that he instead merely witnessed the event.  (PageID.9136-37, 9176).  The doctor further conceded that if Petitioner "expected and wanted [his wife] to die," a diagnosis of acute stress disorder would not be appropriate. (PageID.9136-37).  When the doctor was asked whether Petitioner's behavior, which she attributed to acute stress disorder, could instead have been "equally consistent with being all geeked up because he just killed someone?", the doctor indicated that she "can't answer that." (PageID.9137-38).

Dr. Kirkham was not aware that Petitioner's "original explanation for not telling police that he had witnessed the fall had nothing to do with not remembering it."   (PageID.9147). Nevertheless, the doctor concluded that this circumstance had no significance.  (PageID.9148). With respect to the evidence that Petitioner's memory skills, as assessed by a speech language pathologist, increased from the 19th percentile to the 100th percentile in a short period of time, Dr. Kirkham did not consider such to be evidence that Petitioner was malingering, but instead evidence of "extraordinarily good speech therapy."  (PageID.9151).  The doctor also conceded that in forming her opinions, she relied on Kari Farkas' report and testimony, but only reviewed "some" of the testimony and observations of the numerous other individuals that encountered and interacted with Petitioner in the 24 hours immediately following his wife's death.  (PageID.9126-29, 9143, 9156-57, 9174).

**Mike Stefani**

Stefani met Petitioner when the two worked at Four Winns Boats.  (Trial Transcript, April 9, 2008, at PageID.9186).  Petitioner was "a company-oriented man, paid good attention to detail" and "got along with everybody."  (PageID.9187-88).  Petitioner was "very

professional" and "absolutely" did not engage in any "hanky-panky."    (PageID.9188).    Petitioner and Stefani participated together in Bible study meetings and attended Promise Keeper events together.    (PageID.9188-90).    Stefani never heard Petitioner "talk negatively about his wife" even when the couple was separated.    (PageID.9191-92).

**Sandra Dieterman**

Dieterman met Petitioner and Juanita Richardson in approximately 1999 when they participated in Bible study meetings.    (Trial Transcript, April 9, 2008, at PageID.9225). Petitioner and Juanita interacted "just like a normal husband/wife" and there was no indication that "there was anything amiss."    (PageID.9226).    Petitioner was very knowledgeable about the Bible and his commitment to his faith was "very high."    (PageID.9226-27).

Dieterman's husband was killed in 2001, after which she began participating in a grief support group.    (PageID.9223-25).    Dieterman subsequently began helping others through the grief process.    (PageID.9228-29).    In the Fall of 2006, Petitioner visited Dieterman to discuss his own "grief process."    (PageID.9230-31).    Petitioner was unable, because of his work schedule, to participate in any group meetings, so instead Dieterman loaned Petitioner two videos that her group utilized.    (PageID.9231-32).

**Laceine Richardson**

Laceine is the eldest child of Petitioner and Juanita Richardson.    (Trial Transcript, April 9, 2008, at PageID.9238).    As a young child, Laceine "felt 100 percent comfortable in [their] household" and perceived her parents "to be very loving towards each other and towards [the] kids."    (PageID.9241-42).    Petitioner "was very honest," "trustworthy," and "had such good morals."    (PageID.9243).    Juanita Richardson "was very loving, compassionate, judgmental at

times, but very forgiving." (PageID.9243). Growing up, Laceine and her family were heavily involved in church activities. (PageID.9244-46). Petitioner was "very passionate about his faith and sharing it with as many people as he could." (PageID.9246).

It was difficult for Laceine when her parents separated, but Petitioner and Juanita "wanted to reconcile" and "there was something in their marriage that both of them wanted to be together." (PageID.9248-52). After Laceine's parents reconciled, "they were definitely working on rekindling their relationship." (PageID.9253). The Richardsons were "quite a fun family" and "like to pick at each other and instigate things with each other." (PageID.9259). The family also "like[d] to debate," but "in a fun way, not malicious at all." (PageID.9259). Laceine never observed her parents "interact negatively." (PageID.9259).

Juanita Richardson was not afraid of heights. (PageID.9256). On the other hand, one of Petitioner's "biggest fears" was his fear of heights. (PageID.9287). On June 4, 2006, Juanita "stubbed her toe" which made it "quite painful [for her] to be in a closed-toe shoe." (PageID.9257-58). With respect to the lump Juanita discovered on her breast shortly before her death, Laceine "never got the 100 percent confidence feeling that it was – it was nothing" despite her mother telling her that such was the case. (PageID.9288-89). As for the issue about executing wills shortly before leaving for vacation, this was something both her parents wanted to accomplish. (PageID.9289-90). Prior to her death, Juanita enlisted Laceine to hide her credit card bills from Petitioner. (PageID.9291-92). When Petitioner learned of this following Juanita's death, he "was quite shocked." (PageID.9291).

When Petitioner returned home following Juanita's death, he was "exhausted," his "eyes were puffy," and he "was having a hard time connecting sentences together." (PageID.9269). Petitioner "was sobbing and just his whole body went limp at one point, just

shaking so bad from crying that he just started to collapse."    (PageID.9269-70).    When Petitioner

later described what happened to Juanita, he exhibited "disbelief" and "seemed to be so confused

and shocked still."    (PageID.9270-71).    The decision to cremate Juanita Richardson's body was

a "joint effort" that everybody present agreed upon.    (PageID.9276-77).    At Juanita's funeral,

Petitioner was "upset" and "heart broken."    (PageID.9280).


III.                Prosecution Rebuttal Witnesses

**Robert Hughes**

When reviewing the autopsy photographs in this matter, Undersheriff Hughes

"noticed on the left foot that there appeared to be an abrasion."    (Trial Transcript, April 10, 2008,

at PageID.9360).    On June 29, 2006, Hughes visited the morgue and spoke with the Medical

Examiner about the abrasion.    (PageID.9360-61).    Hughes also "took some comparison pictures

with the sandal next to the foot and with the sandal on the foot."    (PageID.9361).


**Dr. Dorothy Kahler**

Kahler earned a Ph.D. in psychology after which she participated in a post-doctoral

fellowship in neuropsychology.    (Trial Transcript, April 10, 2008, at PageID.9363-64).    Dr.

Kahler later worked for several years at Marquette General Hospital in the neuropsychology

department performing neuropsychological evaluations.    (PageID.9366).    Dr. Kahler later

entered private practice.    (PageID.9366).    The doctor was retained by the prosecuting attorney

"because of questions that had been raised regarding the role of a mild TBI in producing deficits

in memory, in – specifically in the memory of the defendant."    (PageID.9373).    Dr. Kahler did

not treat or examine Petitioner, but instead simply reviewed the material which Dr. Kirkham

reviewed.    (PageID.9373-75, 9387).

Dr. Kahler questioned Dr. Kirkham's opinion that Petitioner experienced acute stress disorder following Juanita Richardson's death because what Petitioner actually saw, experienced, or did with respect to Juanita's death was simply unknown given Petitioner's conflicting accounts.   (PageID.9379).   The doctor also questioned Dr. Kirkham's opinion because it could not be determined whether Petitioner was malingering.   (PageID.9379-82).

One of the symptoms of acute stress disorder is dissociative amnesia. (PageID.9383-85).   With respect to evidence that Petitioner consistently related inconsistent stories, the following exchange occurred between the prosecutor and Dr. Kahler:

> Q:    Now, what's the significance to you of Mr. Richardson – I guess you need to assume this to be true as well for the purpose of this question – significance of his switching back and forth between witnessed and unwitnessed versions even after asserting that his memory had just emerged?

> A:    Again, based on my review of the research, when someone experienced dissociative amnesia, whether by itself or as part of a, you know, an acute stress reaction, once the memory returns, it returns.   It – it doesn't come and go.   It's not on and off.   So that would lead to, you know, a conclusion that telling different stories at different times is a matter of choice, not a matter of memory suddenly disappearing again.   Again, in reports of dissociative amnesia, typically once the memory returns, it's there, it's returned.   It doesn't disappear again.

(PageID.9405-06).


**Sara Newman**

As of the date of Petitioner's trial, Newman served as the Public Risk Management Specialist for the National Park Service.   (Trial Transcript, April 10, 2008, at PageID.9446). Newman's primary job responsibility is to "identify[] ways in which [the] Park Service can assist to mitigate risks that face visitors when they come to the parks."   (PageID.9446).   In this capacity, Newman compiled data regarding injuries and fatalities in National Park Service

facilities.   (PageID.9447-48).   In 2007, 27 people suffered "recreational type" fatal falls (i.e., neither suicide nor homicide) in National Park Service facilities.   (PageID.9450-53).   Given that approximately 270 million people visited National Park Service facilities in 2007, the odds, statistically speaking, of dying from an accidental fall was one in one million.   (PageID.9457-58). Newman concluded that Pictured Rocks has "an impressive safety record" especially considering that "a lot of recreational activity" occurs there.   (PageID.9457).

Following the presentation of evidence, the jury found Petitioner guilty of First Degree Murder.   (Trial Transcript, April 16, 2008, at PageID.9783).   Petitioner was sentenced to serve life in prison without the possibility of parole.   (Sentencing Transcript, May 19, 2008, at PageID.9790).   Petitioner subsequently appealed his conviction in the Michigan Court of Appeals, asserting the following claims:

I.     Defendant was denied due process when the prosecutor was permitted to introduce testimony of Mr. Richardson's actions at home and at work for over twenty years, purportedly to show motive, but really to show that he was just the kind of misogynistic, narcissistic jerk who would kill his long-suffering wife.

II.    This conviction must be reversed because the evidence was legally insufficient to prove beyond a reasonable doubt that Mr. Richardson killed his wife.

III.   Rampant prosecutorial misconduct throughout the trial proceedings deprived Mr. Richardson of his constitutional right to a fair trial.

IV.    Defendant was denied due process when the trial court compelled the attorney the Richardsons hired to prepare their wills to testify based on the crime-fraud exception to the attorney-client privilege.

V.     Mr. Richardson was deprived of his right to be present and to have counsel present during all stages of trial, and to be able to fully confront the witnesses against him as a result of the secret material witness proceedings

against Kelli Brophy and the prosecutor's subsequent failure to disclose them as required by Brady v. Maryland.

The Michigan Court of Appeals affirmed Petitioner's conviction. *People v. Richardson*, 2010 WL 4320392 (Mich. Ct. App., Nov. 2, 2010).  Raising the same issues, Petitioner appealed the matter to the Michigan Supreme Court which likewise affirmed his conviction. *People v. Richardson*, 798 N.W.2d 13 (Mich. 2011).  Petitioner subsequently moved in the trial court for relief from judgment, asserting the following issues:

I.    Appellant was prejudiced and deprived of his due process rights to a fair trial when the trial court abused its discretion by denying his reasonable request for a special jury instruction without explanation.

II.   Appellant was prejudiced and deprived of his due process right to a fair trial when, after a Walker hearing was held, the trial court clearly and erroneously ruled that his interrogations by police were non-custodial and allowed his statements to be admitted into evidence.

III.  Appellant was severely prejudiced when the trial court abused its discretion by forcing him to answer prosecutor's questions, which violated his Fifth Amendment right against self-incrimination during a Walker hearing.   This error then compromised his due process rights to a fair trial.

IV.   Appellant was prejudiced and deprived of his Fourth, Fifth, Sixth, and Fourteenth Amendment rights resulting from an illegal search of his personal legal materials, including attorney mail and work product, and also from being questioned and secretly recorded regarding his case, including in regards to his attorneys and trial strategy.

V.    Trial counsel was constitutionally ineffective, under both the United States and Michigan Constitution, for failing to call expert witness Dr. Werner Spitz to testify at trial' failing to object when the trial court refused to include a requested special jury instruction; and failing to request that the jury be instructed not to conduct experiments with the evidence.

VI.   Appellate counsel was constitutionally ineffective, under both the United States and Michigan Constitution, for failing to raise significant issues on

direct appeal, which were obvious from the trial record, and for not filing for a Ginther hearing to make an appellate record of trial counsel's ineffective representation.

VII.    Appellant was prejudiced and deprived of his due process right to a fair trial when the prosecutor presented witness testimony at trial which was obtained through an illegal and warrantless search.

VIII.   The trial court abused its discretion in its decision not to grant Defendant-Appellant's motion for a new trial and/or his request for an evidentiary hearing.

IX.     The prosecutor violated Brady v. Maryland by failing to provide police reports and other evidence including the results of the police investigation conducted via the use of the GPS tracking device.  This was a discovery violation which prejudiced the Defendant and deprived him of his due process right to a fair trial.

The trial court denied Petitioner's motion for relief.  *People v. Richardson*, Opinion and Order (Alger Cnty. Cir. Ct., May 29, 2013) (ECF No. 14-55 at PageID.9842-76). The Michigan Court of Appeals denied Petitioner leave to appeal this decision "for failure to meet the burden of establishing entitlement to relief under MCR 6.508(D)."  *People v. Richardson*, Case No. 316802, Order (Mich. Ct. App., Dec. 27, 2013).   The Michigan Supreme Court likewise denied Petitioner leave to appeal on the ground that he "failed to meet the burden of establishing entitlement to relief under MCR 6.508(D)."  *People v. Richardson*, 856 N.W.2d. 12 (Mich. 2014). On December 4, 2014, Petitioner initiated the present action asserting the fourteen (14) issues identified above.

## STANDARD OF REVIEW

Richardson's petition is subject to the provisions of the Antiterrorism and Effective Death Penalty Act (AEDPA), as it amended 28 U.S.C. § 2254.  The AEDPA amended the substantive standards for granting habeas relief under the following provisions:

> (d)    An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim —
>
> > (1)    resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States, or
> >
> > (2)    resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

The AEDPA has "modified" the role of the federal courts in habeas proceedings to "prevent federal habeas 'retrials' and to ensure that state-court convictions are given effect to the extent possible under law."  *Bell v. Cone*, 535 U.S. 685, 693 (2002).  As the Supreme Court recently emphasized, this standard is "intentionally difficult to meet."  *Woods v. Donald*, 135 S.Ct. 1372, 1376 (2015) (internal quotation omitted).

Pursuant to § 2254(d)(1), a decision is "contrary to" clearly established federal law when "the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law" or "if the state court confronts facts that are materially indistinguishable from a relevant Supreme Court precedent and arrives at an opposite result."  *Ayers v. Hudson*, 623 F.3d 301, 307 (6th Cir. 2010) (quoting *Williams v. Taylor*, 529 U.S. 362, 405 (2000)).

Prior to *Williams*, the Sixth Circuit interpreted the "unreasonable application" clause of § 2254(d)(1) as precluding habeas relief unless the state court's decision was "so clearly

incorrect that it would not be debatable among reasonable jurists." *Gordon v. Kelly*, 2000 WL 145144 at *4 (6th Cir., February 1, 2000); *see also*, *Blanton v. Elo*, 186 F.3d 712, 714-15 (6th Cir. 1999). The *Williams* Court rejected this standard, indicating that it improperly transformed the "unreasonable application" examination into a subjective inquiry turning on whether "at least one of the Nation's jurists has applied the relevant federal law in the same manner" as did the state court. *Williams*, 529 U.S. at 409.

In articulating the proper standard, the Court held that a writ may not issue simply because the reviewing court "concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly." *Williams,* 529 U.S. at 411. Rather, the Court must also find the state court's application thereof to be *objectively* unreasonable. *Bell*, 535 U.S. at 694; *Williams*, 529 U.S. at 409-12. Accordingly, a state court unreasonably applies clearly established federal law if it "identifies the correct governing legal principle from the Supreme Court's decisions but unreasonably applies that principle to the facts of the prisoner's case" or if it "either unreasonably extends or unreasonably refuses to extend a legal principle from the Supreme Court precedent to a new context." *Ayers*, 623 F.3d at 307. Furthermore, review under § 2254(d)(1) "is limited to the record that was before the state court that adjudicated the claim on the merits." *Cullen v. Pinholster*, 563 U.S. 170, 181 (2011).

Pursuant to 28 U.S.C. § 2254(d)(2), when reviewing whether the decision of the state court was based on an unreasonable determination of the facts in light of the evidence presented, the "factual determination by [the] state courts are presumed correct absent clear and convincing evidence to the contrary." *Ayers*, 623 F.3d at 308. Accordingly, a decision "adjudicated on the merits in a state court and based on a factual determination will not be

overturned on factual grounds unless objectively unreasonable in light of the evidence presented in the state-court proceeding."   While this standard is "demanding" it is "not insatiable."   *Id.*   For a writ to issue pursuant to § 2254(d)(1), the Court must find a violation of clearly established federal law "as set forth by the Supreme Court at the time the state court rendered its decision." *Stewart v. Irwin*, 503 F.3d 488, 493 (6th Cir. 2007).   This definition of "clearly established federal law" includes "only the holdings of the Supreme Court, rather than its dicta."   *Bailey v. Mitchell*, 271 F.3d 652, 655 (6th Cir. 2001).   Nevertheless, "the decisions of lower federal courts may be instructive in assessing the reasonableness of a state court's resolution of an issue."   *Stewart*, 503 F.3d at 493.

As previously noted, § 2254(d) provides that habeas relief "shall not be granted with respect to any claim that was adjudicated on the merits" unless the petitioner can satisfy the requirements of either § 2254(d)(1) or § 2254(d)(2).   This provision, however, "does not require a state court to give reasons before its decision can be deemed to have been 'adjudicated on the merits.'"   *Harrington v. Richter*, 131 S.Ct. 770, 785 (2011).   Instead, when a federal claim has been presented to a state court and the state court has denied relief, "it may be presumed that the state court adjudicated the claim on the merits."   *Id.* at 784-85.   Where such is the case, the Court must apply the deferential standard of review articulated above, rather than some other less deferential standard.

The presumption that the state court "adjudicated [a] claim on the merits" may be overcome only "when there is reason to think some other explanation for the state court's decision is more likely."   *Id.*   If this presumption is overcome, however, the Court reviews the matter de novo.   *See Wiggins v. Smith*, 539 U.S. 510, 533-35 (2003) (reviewing habeas issue *de novo* where

119

state courts had not reached the question); *see also, Maples v. Stegall*, 340 F.3d 433, 437 (6th Cir. 2003) (recognizing that *Wiggins* established *de novo* standard of review for any claim that was not addressed by the state courts).

## ANALYSIS

### I.        Procedural Default

Under the procedural default doctrine, federal habeas review is barred where a state court declined to address a petitioner's claims because of a failure to satisfy state procedural requirements.   *See Coleman v. Thompson*, 501 U.S. 722, 729-30 (1991).   Where a petitioner's claims have been procedurally defaulted, the state court judgment rests on an independent and adequate state ground precluding review by a federal court.   *See Coleman*, 501 U.S. at 750-51; *Wainwright v. Sykes*, 433 U.S. 72, 81 (1977); *Harris v. Reed*, 489 U.S. 255, 262 (1989).   If a claim has been procedurally defaulted, federal habeas review is available only if the petitioner can establish either (1) the existence of cause for his default and actual prejudice resulting therefrom, or (2) that the failure to consider the merits of the claim will result in a fundamental miscarriage of justice.   *See Williams v. Bagley*, 380 F.3d 932, 966 (6th Cir. 2004) (citing *Coleman*, 501 U.S. at 750).

Petitioner has asserted fourteen (14) claims in this matter.   (ECF No. 4).   As noted above, however, only five (5) of these claims were presented on direct appeal.   Petitioner's other nine (9) claims were first asserted in his post-conviction motion for relief from judgment. Respondent argues that a great many of the claims asserted by Petitioner in this Court have been procedurally defaulted.   (ECF No. 13 at PageID.176-77).   The Court, however, is not obligated

to address Respondent's procedural default argument and can instead simply decide Richardson's petition on the merits.  *See, e.g., Lambrix v. Singletary*, 520 U.S. 518, 525 (1997) (recognizing that "judicial economy" may justify addressing a habeas petition on the merits rather than addressing complicated procedural default questions).

   With respect to the issues asserted by Petitioner on direct appeal, the Michigan Court of Appeals determined that certain issues had been defaulted by Petitioner's failure to properly assert the issue in question in the trial court.  *Richardson*, 2010 WL 4320392 at *1-18.  The court nevertheless addressed the issues for "plain error."  *Ibid.*   In responding to Petitioner's post-conviction motion for relief from judgment, the trial court determined that Petitioner defaulted the claims in question by failing to assert such on direct appeal.  *People v. Richardson*, Opinion and Order (Alger Cnty. Cir. Ct., May 29, 2013) (ECF No. 14-55 at PageID.9842-76).  The court nevertheless examined Petitioner's claims for "plain error."  *Ibid.*   The significance or impact of the state courts reviewing Petitioner's claims for plain error, despite concluding that such were procedurally defaulted under Michigan law, is not particularly clear as two recent published decisions by the Sixth Circuit reveal.

   In *Leonard v. Warden, Ohio State Penitentiary*, 846 F.3d 832 (6th Cir. 2017), the court was faced with a circumstance in which a prisoner had asserted claims of prosecutorial misconduct which the state courts reviewed for plain error despite have found such to be procedurally defaulted under state law.  *Id.* at 850-51.   On the question of the impact of the state courts' approach to the prisoner's defaulted claim of prosecutorial misconduct, the court stated:

> As an initial matter, there is some ambiguity over whether we apply AEDPA deference to Leonard's prosecutorial misconduct claim because the Ohio Supreme Court applied plain error review and in turn considered the issue procedurally waived.   In the context of a

121

discussion of procedural default, this Court has held that plain error analysis should be "viewed as a court's right to overlook procedural defects to prevent manifest injustice, but is not equivalent to a review of the merits."    However, in *Fleming v. Metrish*, a split panel of this Court held that "none of the cases. . .decide the question of whether a claim reviewed for plain error by a state court dispenses with our obligation to apply AEDPA deference to the merits of the decision reached by that court," but "instead discuss the analytically prior question of whether a federal court is permitted to hear an issue in the first place under the doctrine of procedural default."    The Court concluded that AEDPA deference applied because of the statutory interests in comity, finality, and federalism.    At this point, we need not address this ambiguity because even if we assume, without deciding, that *de novo* review applies, Leonard still cannot prevail under this more lenient standard.

*Id.* at 851 (internal citations omitted).

A few months later, in *Stewart v. Trierweiler*, 867 F.3d 633 (6th Cir. 2017), the Sixth Circuit faced the same issue of what significance to accord the fact that a state court reviewed a petitioner's claim for plain error despite having found it procedurally defaulted under state law. In this regard, the court stated as follows:

At the outset, we must referee a dispute about whether AEDPA deference applies to these rulings given that the state court reviewed some of these claims for plain error.   Our circuit has not been a paragon of clarity about whether a state court's plain-error ruling amounts to a ruling on the merits under AEDPA.    In 2009, we held that AEDPA applies to a state court's plain-error analysis if it "conducts any reasoned elaboration of an issue under federal law." But in 2014, we said that "plain-error review is not equivalent to adjudication on the merits, which would trigger AEDPA deference."

Both rulings cannot be right, as they look in opposite directions. To resolve this Janus-like dilemma, we look to the oldest decision on point. That is Fleming. . .Confirming this conclusion is *Harrington v. Richter* [562 U.S. 86 (2011)].   It obligates us to presume that the state court adjudicated the claim on the merits in ambiguous situations.

*Id.* at 638 (internal citations omitted).

While not discounting the *Trierweiler* decision, the Court nevertheless notes that the *Trierweiler* court did not directly address or resolve the underlying dispute.   Moreover, even if it is assumed that the *Trierweiler* court resolved this dispute, relevant questions remain.   For example, what constitutes "reasoned elaboration of an issue under federal law" and what constitutes "ambiguous" analysis by a state court.   It is clear that procedural default applies where a state court simply refuses to examine a claim which was defaulted under state law.   However, this was not the case presently.   Instead, the state courts found many of Petitioner's claims procedurally defaulted under state law, but then nevertheless addressed such for plain error. Rather than attempt to navigate these questions of procedural default law, which the Sixth Circuit itself concedes are "ambiguous" and in conflict, and potentially waste scarce judicial resources should the Court's analysis of such later be found in error, the Court opts to simply address Petitioner's claims on the merits.   *See, e.g., McLemore v. Bell*, 503 Fed. Appx. 398, 404 (6th Cir., Oct. 31, 2012) (observing that when facing "the analytical morass in which procedural-default rules ensnare us," "[a]n analysis of the merits of the petitioner's substantive claims presents a more straightforward ground for decision").   The Court finds that Respondent is not prejudiced by such because even addressed on the merits, Petitioner's claims do not entitle him to relief.

## II.        Sufficiency of the Evidence

Petitioner argues that he is entitled to relief because his conviction for first degree murder is not supported by constitutionally sufficient evidence.   (ECF No. 4 at PageID.64-67). Claims challenging the sufficiency of the evidence are governed by the standard articulated in *Jackson v. Virginia*, 443 U.S. 307 (1979), pursuant to which it must be determined whether

viewing the evidence in the light most favorable to the prosecution and according the benefit of all reasonable inferences to the prosecution, any rational trier of fact could have found Petitioner guilty beyond a reasonable doubt.  *See O'Hara v. Brigano*, 499 F.3d 492, 499 (6th Cir. 2007) (citing *Jackson*, 443 U.S. at 319-26).

When determining whether there exists sufficient evidence to support a conviction the Court may not weigh the evidence, assess the credibility of the witnesses, or substitute its judgment for that of the jury.  *See United States v. Paige*, 470 F.3d 603, 608 (6th Cir. 2006). Furthermore, where the record supports conflicting inferences the Court "must presume - even if it does not affirmatively appear in the record - that the trier of fact resolved any such conflicts in favor of the prosecution, and must defer to that resolution."  *O'Hara*, 499 F.3d at 499 (quoting *Jackson*, 443 U.S. at 326).  While Petitioner complains that the case against him was premised largely on circumstantial evidence, it must be remembered that "circumstantial evidence is entitled to the same weight as direct evidence" and "circumstantial evidence alone is sufficient to sustain a conviction."  *United States v. Mack*, 808 F.3d 1074, 1080 (6th Cir. 2015).

Pursuant to Michigan law in effect as of the date of Juanita Richardson's death, an individual was guilty of first degree murder if the following elements were satisfied: (1) the defendant intentionally killed the victim, and (2) the killing was deliberate and premeditated. *People v. Wofford*, 492 N.W.2d 747, 749 (Mich. Ct. App. 1992).  To establish premeditation and deliberation, the prosecution must prove that there existed "some time span between the initial homicidal intent and ultimate action."  *People v. Gonzalez*, 664 N.W.2d 159, 163 (Mich. 2003). However, "[t]he interval between the initial thought and ultimate action" need only be long enough to "afford a reasonable person time to take a second look."  *Ibid.*  Premeditation and deliberation

"may be inferred from all the facts and circumstances, but the inferences must have support in the record and cannot be arrived at by mere speculation." *People v. Plummer*, 581 N.W.2d 753, 757 (Mich. Ct. App. 1998).

Viewing the evidence pursuant to the aforementioned standard leads inexorably to the conclusion that the evidence supporting Petitioner's guilt was simply overwhelming. Petitioner related to the police and numerous others inconsistent and conflicting accounts of the events surrounding Juanita Richardson's death which demonstrated consciousness of guilt. *See, e.g., People v. Unger*, 749 N.W.2d 272, 287 (Mich. Ct. App. 2008) ("conflicting statements tend to show a consciousness of guilt"). Petitioner's suggestion that this circumstance was the result of memory and cognitive impairments caused by a head injury suffered years previously was contradicted by an overwhelming amount of evidence. *See, e.g., United States v. Gil-Cruz*, 808 F.3d 274, 278 (5th Cir. 2015) ("an implausible story advanced by a defendant to explain his actions can provide circumstantial evidence from which a jury might infer defendant's guilty knowledge").

An overwhelming amount of evidence was presented which demonstrated that Petitioner was not particularly kind to his wife and that he found his marriage deeply unsatisfying. Moreover, there was substantial evidence that Petitioner very much regretted reconciling with Juanita following their separation a few years earlier. Throughout her marriage to Petitioner, Juanita Richardson indicated that she remained married to Petitioner for the sake of her children. Shortly before her death, however, Juanita told friends that after her youngest child graduated high school and moved away from home, she would divorce Petitioner. This evidence of marital difficulties and dissatisfaction supported Petitioner's conviction. *See, e.g., Unger*, 749 N.W.2d

at 286 (where "the proofs are circumstantial, evidence of motive is particularly relevant" and "[e]vidence of marital discord is admissible to establish motive for murder" of a spouse).

Petitioner's suggestion that Juanita Richardson was, at the time of her death, suffering physical disabilities, significant depression, and possibly terminal cancer were refuted by overwhelming evidence.   Petitioner's intense desire for himself and Juanita to execute wills on the eve of their fateful vacation, an intensity which immediately dissipated once Petitioner learned that he did not necessarily need a will to avoid probate of his wife's assets, likewise supported Petitioner's conviction.   That following Juanita Richardson's death, Petitioner mischaracterized his reasons for seeking estate planning services also supported his conviction.  *See, e.g., Unger*, 749 N.W.2d at 288 ("[a] jury may infer consciousness of guilt from evidence of lying or deception").

There was substantial evidence that in the months leading up to Juanita Richardson's death, Petitioner developed an emotional connection to Kelli Brophy.  Petitioner falsely told Brophy that Juanita was dying from terminal breast cancer and expressed to Brophy his desire to begin a relationship with her after Juanita died.   Petitioner asked Brophy if she would "wait for him" and told Brophy that he wanted to "take care of" her.   Brophy informed Petitioner that one of her requirements to be involved with a man was that his "ex-wife couldn't be alive." The amount of life insurance available in the event of Juanita Richardson's death was substantial and would have been just enough for Petitioner to retire all of his debts.   As the Michigan Court of Appeals concluded, "[t]he evidence supported a reasonable inference that defendant was motivated to kill the victim by a desire to be free from an unhappy marriage, without a divorce, so

126

that he could pursue a relationship with Brophy and other women." *People v. Richardson*, 2010 WL 4320392 at *8 (Mich. Ct. App., Nov. 2, 2010).

The denial of this claim by the Michigan courts was neither contrary to, nor involved an unreasonable application of, clearly established federal law.   Furthermore, this decision was not based on an unreasonable determination of the facts in light of the evidence presented.   Accordingly, this claim raises no issue on which habeas relief may be granted.

## III.         Evidentiary Claims

Petitioner argues that much of the evidence that was introduced against him at trial was improperly admitted and deprived him of the right to a fair trial.   (ECF No. 4 at PageID.53-63).   The challenged evidence falls into the following categories: (1) Petitioner's alleged misogyny; (2) the state of Petitioner's marriage; (3) Petitioner's work history; and (4) the unsolved break-in at Kelli Brophy's residence.

Errors by a state court on matters involving the admission or exclusion of evidence are not generally cognizable in a federal habeas proceeding.   *See Bugh v. Mitchell*, 329 F.3d 496, 512 (6th Cir. 2003).   To obtain relief, Petitioner cannot simply argue that the trial court's evidentiary ruling was incorrect, as "federal habeas corpus relief does not lie for errors of state law." *Estelle v. McGuire*, 502 U.S. 62, 67 (1991); *Swarthout v. Cooke*, 562 U.S. 216, 219 (2011) ("[w]e have stated many times that federal habeas corpus relief does not lie for errors of state law").   Rather, Petitioner must establish that his conviction violated the Constitution, laws, or treaties of the United States.   *Estelle*, 502 U.S. at 67.   In this respect, it is recognized that "[w]hen an evidentiary ruling is so egregious that it results in a denial of fundamental fairness, it may

violate due process and thus warrant habeas relief." *Bugh*, 329 F.3d at 512; *see also*, *Norris v. Schotten*, 146 F.3d 314, 328-29 (6th Cir. 1998) (citing *Estelle*, 502 U.S. at 67-68).   Fundamental fairness does not, however, "require a perfect trial," *Clemmons*, 34 F.3d at 358, and courts have defined those violations which violate fundamental fairness "very narrowly."   *Bugh*, 329 F.3d at 512.   State court evidentiary rulings do not offend due process unless they violate "some principle of justice so rooted in the traditions and conscience of our people as to be ranked as fundamental."   *Ibid.* (citations omitted).

### A.    Alleged Misogyny

As discussed above, several witnesses testified concerning Petitioner's treatment of women during the time Petitioner was employed at Four Winns Boats.   Petitioner argues that the trial court erred in admitting this evidence because it "confus[ed] run-of-the-mill sexism with misogyny."   (ECF No. 4 at PageID.55).   Petitioner seems to concede that evidence of misogyny would be admissible, but further argues that evidence of his "sexist views has absolutely nothing to do with intent to kill."   (ECF No. 4 at PageID.56).   In essence, Petitioner argues that while he may be a sexist, he is not a misogynist and, therefore, introduction of the evidence in question was improper and denied him of the right to a fair trial.

Whether the evidence in question demonstrates that Petitioner is a sexist or a misogynist is irrelevant.   As the Michigan Court of Appeals observed:

> The record discloses that the prosecutor referred to the evidence as being probative of defendant's motive, not his intent.   The prosecutor argued that defendant was motivated to kill the victim, in part, out of his extreme disrespect for women and desire not to share any of his financial resources with a woman, especially the victim, should he and the victim divorce.

128

*People v. Richardson*, 2010 WL 4320392 at \*4 (Mich. Ct. App., Nov. 2, 2010).

As previously noted, evidence of motive is "particularly relevant" where the case against a defendant is premised on circumstantial evidence. *See Unger*, 749 N.W.2d at 286. Moreover, the challenged evidence was minimal in light of the other evidence supporting Petitioner's conviction. Thus, Petitioner cannot demonstrate that consideration of this evidence denied him of the right to a fair trial. Finally, to the extent Petitioner argues that the challenged evidence constitutes inappropriate character evidence, the Supreme Court has never held that a state violates due process by permitting propensity evidence in the form of other bad acts evidence. *Bugh*, 329 F.3d at 512-13 ("there is no clearly established Supreme Court precedent which holds that a state violates due process by permitting propensity evidence in the form of other bad acts evidence").

### B.    Evidence of Marital Discord

As detailed above, a significant amount of testimony was devoted to describing the Richardson's marriage as well as the manner in which Petitioner treated his wife. Petitioner does not object to the admission of this evidence, generally, but instead argues that some of this evidence was simply too remote in time to be relevant. Specifically, Petitioner argues that "[w]hile evidence of marital discord is admissible to show motive, and 404(b) does not have a time limit, at some point the events must necessarily be so remote as to be logically irrelevant." (ECF No. 4 at PageID.58). Petitioner argues that admission of this evidence deprived him of the right to a fair trial.

As the Michigan Court of Appeals recognized, the evidence in question "was offered to show marital discord and defendant's unhappiness with his marriage that was not extinguished by his reconciliation with the victim, and was also relevant to rebut various statements by defendant regarding the state of the marriage." *People v. Richardson*, 2010 WL 4320392 at *4 (Mich. Ct. App., Nov. 2, 2010). As the court further noted, it was proper for the prosecution to attempt to "establish the long-term nature of the marital discord and defendant's discontent with the marriage in light of these purposes." *Ibid.* In sum, the challenged evidence was relevant to establishing the duration and nature of the marital difficulties between Petitioner and Juanita Richardson.[4]

C.    Petitioner's Work History

Several witnesses testified about their experience working with Petitioner and Petitioner's general work history. Petitioner argues that in light of this evidence, his trial "looked less like a murder case and more like a worker's compensation action." (ECF No. 4 at PageID.60). Petitioner argues that introduction of this evidence violated his right to a fair trial. For analytical purposes, the evidence in question should be divided into two categories: (1) evidence concerning events which occurred before Petitioner's head injury and (2) evidence concerning events which occurred after Petitioner's head injury.

The evidence falling into the latter category was clearly relevant, as the Michigan Court of Appeals recognized, to rebut Petitioner's claim that his head injury resulted in long-term

---

4 While the Court agrees with Petitioner that the testimony from Juanita Richardson's parents concerning their dislike of him was not particularly relevant to the issue of "marital discord," such did not deprive Petitioner of a fair trial. This evidence was quite minimal in light of the other evidence supporting Petitioner's conviction.

and substantial memory, cognitive, and speech difficulties.   *Richardson*, 2010 WL 4320392 at *5.

As for the evidence falling into the former category, the Court finds reasonable the assessment by

the Michigan Court of Appeals:

> We are troubled, however, that the prosecutor elicited testimony from some witnesses regarding defendant's personality traits, such as whether defendant was belligerent, had an ego, or was image conscious and self-absorbed. . .The prosecutor did not offer the challenged evidence of defendant's personality traits to rebut his character evidence, but rather to show his motive to select murder over divorce as a way to end his marriage.   The evidence of defendant's personality traits arguably lacked logical relevancy to this purpose.   But even assuming that the prosecutor should not have been permitted to introduce evidence of defendant's personality traits in the workplace or elsewhere. . .we are satisfied that defendant was not prejudiced by the evidence.   Considering the overwhelming untainted evidence that defendant had a motive to kill the victim, he cannot establish that the admission of evidence that he was belligerent, had an ego, or was image conscious and self-absorbed affected his substantial rights.

*Richardson*, 2010 WL 4320392 at *5-6 (internal citations omitted).

### D.    Burglary of Kelli Brophy's Residence

As noted above, evidence was presented regarding a burglary of Kelli Brophy's residence which occurred shortly after Petitioner's visit thereto.   Petitioner asserts that this evidence constituted improper bad acts evidence and that its introduction violated his right to a fair trial.   First, as previously noted, there does not exist clearly established federal law holding that the introduction of bad acts evidence violates a criminal defendant's right to a fair trial.   Furthermore, the Court finds reasonable the conclusion of the Michigan Court of Appeals that consideration of this evidence did not deny Petitioner of the right to a fair trial:

> Given the absence of any evidence linking defendant to the break-in, we agree that the evidence was not relevant.  For the same reason, however, the evidence did not affect defendant's substantial rights.  Because defendant was not linked to the break-in, he was not prejudiced by the evidence.

*Richardson*, 2010 WL 4320392 at *6 (internal citations omitted).

In sum, introduction of the challenged evidence did not deny Petitioner of the right to a fair trial.   Accordingly, this claim raises no issue on which habeas relief may be granted.


**IV.**          **Prosecutorial Misconduct**

Petitioner alleges that his right to a fair trial was violated by the various instances of misconduct by the prosecuting attorney.   (ECF No. 4 at PageID.68-81).   When a petitioner makes a claim of prosecutorial misconduct, "the touchstone of due process analysis...is the fairness of the trial, not the culpability of the prosecutor."   *Cockream v. Jones*, 382 Fed. Appx. 479, 484 (6th Cir., June 29, 2010) (quoting *Smith v. Phillips*, 455 U.S. 209, 219 (1982)).   The issue is whether the prosecutor's conduct "so infected the trial with unfairness as to make the resulting conviction a denial of due process."   *Gillard v. Mitchell*, 445 F.3d 883, 897 (6th Cir. 2006) (quoting *Darden v. Wainwright*, 477 U.S. 168, 181 (1986)); *see also*, *Givens v. Yukins*, 2000 WL 1828484 at *6 (6th Cir., Dec. 5, 2000) ("[t]he aim of due process is not punishment of society for the misdeeds of the prosecutor but avoidance of an unfair trial to the accused") (quoting *Phillips*, 455 U.S. at 219).   Thus, even if the challenged comments were improper, habeas relief is available only where the comments were "so flagrant as to render the entire trial fundamentally unfair."   *Gillard*, 445 F.3d at 897.   It must also be remembered that this Court "does not possess supervisory powers over state court trials" as "it is the responsibility of the state courts to police

132

their prosecutors." *Gordon v. Burt*, 2016 WL 4435355 at *11 (W.D. Mich., Aug. 23, 2016) (quoting *Byrd v. Collins*, 209 F.3d 486, 529 (6th Cir. 2000).

A.     References to 9/11

As already noted, the case against Petitioner was largely premised on circumstantial evidence. In an effort to explore whether jurors understood the nature and significance of circumstantial evidence as well as the concept of establishing guilt beyond a reasonable doubt, the prosecutor made reference during the jury selection process to the September 11, 2001, attack on the World Trade Center. (Trial Transcript, February 27, 2008, at PageID.3146-3361; Trial Transcript, February 28, 2008, at PageID.3459-3654). For example, at the early stages of jury selection, the following exchanges occurred involving the prosecutor, Karen Bahrman, Petitioner's counsel, Karl Numinen, the trial court, and several potential jurors:

> MRS. BAHRMAN:   Okay.  I also want to explore the concept of circumstantial and direct evidence, so I'm going to pick on someone with the most experience as a juror.  Ms. LeBlanc.  Let me see if you remember this jury instruction, because if selected as jurors, at some point in these proceedings you would all be subjected to this kind of sophomoric jury instruction on circumstantial evidence.  And it – it – it goes on about how if a witness testifies that he saw rain falling, that would be direct evidence that it was raining or that rain fell. While if a witness testifies that he saw a person come in from outside wearing a raincoat covered with small drops of water, that would be circumstantial evidence that rain fell.  Do you remember that one, Miss LeBlanc?
>
> JUROR LeBLANC:   Well, I – I don't remember that example.
>
> MRS. BAHRMAN:   Okay.

JUROR LeBLANC:   But I think of it when I think of – I have to write botanical analysis on projects.  So I think of effects.  So when you were saying a direct effect or an indirect effect is how I relate to that.

MRS. BAHRMAN:   Okay, but I take it you get the difference from that instruction.

JUROR LeBLANC:   Definitely.

MRS. BAHRMAN:   About the – the person who saw rain and the person wearing the raincoat.

JUROR LeBLANC:   Correct.

MRS. BAHRMAN:   Okay.  Well, if selected as a juror, you would learn that these two types of evidence stand on the same legal ground,   that – that one is not – circumstantial evidence is not defective or inferior in any way.   And yet would you agree that it tends to get a bad rap?  I mean, do you – do you often hear it said that, well, it's circumstantial or it's only circumstantial?   Have you heard that?

JUROR LeBLANC:   I can't say that I often hear it said, but I have heard it said before in the past.

MRS. BAHRMAN:   Sure, okay.   And one reason for this is that circumstantial – one piece of circumstantial evidence leaves open other possibilities.  Let me use this – this rain example.

JUROR LeBLANC:   Okay.

MRS. BAHRMAN:   It's actually pretty useful.   You know, the wet raincoat seems compelling until the defense suggest that there is a sprinkler system outside, or there is a gang of kids with super soaker squirt guns, and then the value of that goes down.   Wouldn't you agree?

JUROR LeBLANC:   Correct.

MRS. BAHRMAN:   Okay, but if we pile up the circumstantial evidence and bring in people who saw lightning and heard thunder and saw puddles all over afterwards and recognized the sound of rain on the roof, then the value goes back up.   Would you agree?

JUROR LeBLANC:   Correct.

MRS. BAHRMAN:    Okay.   Let me try you on a real example.   You know, I know that the rain is kind of a pretend thing of circumstantial evidence.   Let's say the thing we had to prove is not that rain fell, but that the planes which crashed into the World Trade Center on September 11th of 2001 were crashed on purpose rather than by accident, the same thing we'll be doing here.   Okay, the death and destruction looks exactly the same –

MR. NUMINEN:        Your Honor, may we have a sidebar, please?

                                    (Mrs. Bahrman and Mr. Numinen at bench at 11:05 a.m.)

MRS. BAHRMAN:    So the – the death and destruction looks exactly the same whether it was intentional or accidental, and there are no survivors to tell us what happened in the cockpits.   Circumstantial evidence is all there is, the fact that not one but two planes went off course, crashed into the same building within a half an hour of each other.   Did you see the – the news coverage from the beginning?

JUROR LeBLANC:    Oh, no.   I was at work.

MRS. BAHRMAN:    No?   Okay.

JUROR LeBLANC:    I saw it – Actually, I was at work when it happened.   And one of our employees came in and said they just heard that a plane crashed into the World Trade Center on the –

MRS. BAHRMAN:    Okay.

JUROR LeBLANC:    -- radio.   So I didn't see anything.   We were sent home.   Our office was shut down, being a federal office.   There was a concern that other federal offices may be at risk, so our office was shut down at noon and we were sent home.

MRS. BAHRMAN:    Okay.

JUROR LeBLANC:    And that's when I saw it after I got home.

MRS. BAHRMAN:    Okay.   Is there anyone now seated who saw – who happened to have tuned in from the very beginning? Okay, Ms. LaMuth?

JUROR LaMUTH:    Um-hmm.

135

MRS. BAHRMAN:    Did you – Did you notice that as soon as the second plane hit, all the news anchors were – were calling it an intentional act, whether it's a terrorist act, but it's definitely no longer an accident.

JUROR LaMUTH:    Yes.

MRS. BAHRMAN:    Okay.   Did you agree with that conclusion?

JURUR LaMUTH:    You assume it would be true, yes.

MRS. BAHRMAN:    Sure.   At that moment in time, did you think about the fact that you and the whole rest of the world reached that conclusion with circumstantial evidence?

JUROR LaMUTH:    I didn't, no, but we did.   Yes.

MRS. BAHRMAN:    Okay.   Anybody else who was watching?   Seems to me you indicated you were, too?

JUROR ROSEBUSH: I was in a meeting for Blue Cross in Marquette, and they came, interrupted our meeting and brought us a TV in, and we just stopped our meeting and everybody could either watch TV or go home, whatever you wanted to do.

MRS. BAHRMAN:    Okay.   Have you ever thought about it in those terms, that you – that you reached a conclusion with – with pure classic circumstantial evidence?

JUROR ROSEBUSH: Sure.

MRS. BAHRMAN:    Okay.   Had you thought about it in those terms 'til right now though?

JUROR ROSEBUSH: No.

MRS. BAHRMAN:    Okay.   Let me go back to you, Ms. LeBlanc, the experienced juror.   You know, another byproduct, I guess, of circumstantial evidence is that it leaves unanswered questions.

JUROR LeBLANC:    Um-hmm.

MRS. BAHRMAN:    So let me ask you this, going back to the whole rain thing. If the thing we – we were required to prove is that rain fell, and you are convinced beyond a reasonable doubt that it did, do you agree that it doesn't matter that we can't tell you what time the rain started,

136

the water temperature, the average size of the rain drops, what time the rain stopped, et cetera, et cetera?

JUROR LeBLANC:    So I know what the weather conditions were like that day because when I came in –

MRS. BAHRMAN:    You're talking about the day of this incident?

JUROR LeBLANC:    The day of the incident.

MRS. BAHRMAN:    Okay.

JUROR LeBLANC:    And when I came back to the office, that is when I heard that someone had fallen to their death.

MRS. BAHRMAN:    Okay.

JUROR LeBLANC:    And that had never happened before in the past, and so people were shocked by that.   And I – And I think it's because of that that I remember that day.

MRS BAHRMAN:    Because of what though?

JUROR LeBLANC:    The incident, you know, that someone had died in the park.

MRS. BAHRMAN:    Okay.

JUROR LeBLANC:    And it – it did have an effect on folks at work, so – And, no, you know, they did not know the reason why.

MRS. BAHRMAN:    Sure.

JUROR LeBLANC:    Just a person had fallen to their death.

MRS. BAHRMAN:    Okay.   I guess I started out though to try to assess if you're comfortable with there being unanswered questions so long as it doesn't pertain to what we have to prove?

JUROR LeBLANC:    (Nodding head.)

MRS. BAHRMAN:    And let me maybe use the 9/11 analogy one more time.   It – It's – really comes in handy.   If the thing we had to prove were that those two planes were crashed intentionally rather than accidentally, and you're convinced beyond a reasonable doubt that they were, do you agree that it doesn't matter that we can't answer questions about what happened in the cockpit?   Who was sitting

137

where?   Who was sitting behind the wheel?   Who said what to whom?   Who, if anyone, died before the crash?   Do you agree that those questions don't matter?

JUROR LeBLANC:   I would have to agree because you –

MRS. BAHRMAN:   Okay.

JUROR LeBLANC:   -- can't – There is no way to get that information.

MRS. BAHRMAN:   All right.   And this – This is actually important enough where I kind of what to go around and get an answer from every person, just like I did with the relationships.   So I'll start with Mr. – Mr. Loup.   Did you come in thinking that circumstantial evidence is somehow inferior to direct evidence?   Did you come in with any pre—preconceived attitude?

JUROR LOUP:       Yea, I've had – I've had – Yeah.   Yes.

MRS. BAHRMAN:   Okay.   Can you see that – that circumstantial evidence plays this hidden role in our lives, that we use it on a daily basis?

JUROR LOUP:       Right, yeah.

MRS. BAHRMAN:   Okay.   Did you reach that same conclusion about the crashes on 9/11?

JUROR LOUP:       Yes.

MRS. BAHRMAN:   Okay, and I'm focusing on the first two crashes; because after that, you know, we did get some direct evidence from the one that –

JUROR LOUP:       Right.

MRS. BAHRMAN:   -- went down in Pennsylvania.   The passengers caught on and started making calls.

JUROR LOUP:       Right.

MRS. BAHRMAN:   Okay.   And I'm just talking about the first two, classic circumstantial evidence, two planes stray off course, broad daylight, good weather, hit the same building within half an hour.   From that, the whole world concludes that it was on purpose.   Do you agree with that?

138

JUROR LOUP:          I agree.

MRS. BAHRMAN:    Okay, all right.   Have you – Have you noticed that there are – there are just as many criticisms or shortcomings associated with direct evidence that people tend to think is – is better?

JUROR LOUP:          No, I haven't.

MRS. BAHRMAN:    Okay.   Well, let me just go through a couple scenarios with you.   Would you be comfortable basing an important decision on the strength of an eyewitness identification of a total stranger seen briefly under stressful conditions?

JUROR LOUP:          No.   I was – Eyewitness identification is – can be faulty.

MRS. BAHRMAN:    Okay, so you agree that's a shortcoming of direct evidence?

JUROR LOUP:          Yeah, yeah.

MRS. BAHRMAN:    Okay.   Have you also heard situations where it's one person's word against another disparaged as being, well, it's only a he-said/she-said case?   Have you heard that phrase?

JUROR LOUP:          Yeah.

MRS. BAHRMAN:    Okay, so again another shortcoming of direct evidence?

JUROR LOUP:          (Nodding head.)

MRS. BAHRMAN:    Okay.   In situations where the witnesses are involved in the criminal enterprise, have you heard them denounced as narcs and snitches and informants?

JUROR LOUP:          (Nodding head.)

MRS. BAHRMAN:    Okay.   So again would you, and I'm just walking you through these, but in general would you agree that each type of evidence has strengths and weaknesses?

JUROR LOUP:          I would agree.

MRS BAHRMAN:     Okay, and do you think you can just look at all of the evidence and not, you know, not regard one as – as inferior to start with?

JUROR LOUP:          (Nodding head.)

139

MRS. BAHRMAN:    Okay.   Ms. Rosebush, did you have any preconceived idea about circumstantial evidence walking into this courtroom?

JUROR ROSEBUSH: Just a little maybe.

MRS. BAHRMAN:    Okay.

JUROR ROSEBUSH: Just mostly from television.

MRS. BAHRMAN:    Can you see now that it – we use it all the time?

JUROR ROSEBUSH: Sure.

MRS. BAHRMAN:    Okay.   Do you agree that both types of evidence have their strengths and weaknesses?

JUROR ROSEBUSH: Sure.

MRS. BAHRMAN:    Okay, and do you think you can just – all I'm looking for is that you can – you can evaluate all the evidence on its merits and not according to whether it's circumstantial or direct?

JUROR ROSEBUSH: Sure.

MRS. BAHRMAN:    Okay.   Same for you, Ms. LaMuth?

JUROR LaMUTH:    Yes.

MRS. BAHRMAN:    Okay.   How about you, Mr. Butchko?

JUROR BUTCHKO: Yes.

MRS. BAHRMAN:    Okay.   Do you – Can you see that we use circumstantial evidence all of the time?

JUROR BUTCHKO: Yes, I do.

MRS. BAHRMAN:    Okay.   It doesn't start out in the hole, so to speak, for you?

JUROR BUTCHKO: No.

MRS. BAHRMAN:    Okay.   Mr. Markham?

JUROR P. MARKHAM:       Regarding both sides of – both kinds of evidence, I have to infer, you know, whatever it means.

140

MRS. BAHRMAN:    Sure.

JUROR P. MARKHAM:        For either one.   So as far as I'm concerned, they're both valid.

MRS. BAHRMAN:    Okay.   They're both what?   I didn't catch your last –

JUROR P. MARKHAM:        Valid.

MRS. BAHRMAN:    Valid, okay.   Mr. Scott, did you – When you walked into the courtroom, did you have any preconceived idea about circumstantial evidence?

JUROR SCOTT:        Not really.

MRS. BAHRMAN:    Excuse me.   Can you see that both types of evidence have their shortcomings and frailties and their strengths, as well?

JUROR SCOTT:        Well, I think you've got to look at both of them equally.

MRS. BAHRMAN:    Okay.   Had you ever thought about the conclusion the whole world reached on 9/11 as being from circumstantial evidence?

JUROR SCOTT:        A little.

MRS. BAHRMAN:    Okay.   And Ms. Hamill?

JUROR HAMILL:        I didn't think anything either way as far as having to think of it being just circumstantial or whatever.

MRS. BAHRMAN:    Have you heard that –

JUIROR HAMILL:    No preconceived.

MRS. BAHRMAN:    Have you heard people kind of put it down though and say, well, it's only circumstantial?

JUROR HAMILL:    I've heard the saying.   But as far as being directly involved in anything that it would pertain to, no.

MRS. BAHRMAN:    Sure, okay.   Do you see that both types of evidence have their strengths and weaknesses?

JUROR HAMILL:        Yes.

MRS. BAHRMAN:   Okay, and you can look at all the evidence and – and not – Does circumstantial evidence start out in the hole for you?

JUROR HAMILL:     No.

MRS. BAHRMAN:   Okay.  And, Ms. Ritter, I guess I haven't asked you about this issue.  Is this – Are these concepts familiar to you as a result of your criminal justice training?

JUROR RITTER:     Yes

MRS. BAHRMAN:   They are.  So did you have any preconceived ideas about circumstantial evidence?

JUROR RITTER:     No.

MRS. BAHRMAN:   Okay.  Ms. LeBlanc, I think I've bothered you enough. Mr. Conlon, did you come in with that thinking that circumstantial evidence was inferior in some way?

JUROR CONLON:    No.

MRS. BAHRMAN:   Okay.  Can you see that it plays a role in our daily lives?

JUROR CONLON:    Yes, I can.

MRS. BAHRMAN:   Okay.  And, Mr. Brehm, had you thought about the events of 9/11 in that context before?

JUROR BREHM:     Not really.  It was just – seemed pretty obvious that it was intentional.

MRS. BAHRMAN:   Okay.  So under some – Under those circumstances, you would agree that circumstantial evidence can be very compelling?

JUROR BREHM:     Yes.

MRS. BAHRMAN:   Okay.  How about the issue of unanswered questions?  Can you tolerate there being a certain number of unanswered questions so long as it doesn't pertain to what we have to prove?

JUROR BREHM:     I think so.

MRS. BAHRMAN:   Okay.   And, Mr. Bolm, did you – coming into the courtroom did you think less of circumstantial evidence?

142

JUROR BOLM:          No, not at all.

MRS. BAHRMAN:   You did not?   Okay.   Do you recognize that both types have their strengths and weaknesses?

JUROR BOLM:          Definitely.

MRS. BAHRMAN:   Okay.   Have you ever thought about the events of 9/11 in that way?

JUROR BOLM:          No, I haven't.

MRS. BAHRMAN:   Okay.   Does that – Were you sitting there thinking, oh, yeah, that's right?

JUROR BOLM:          Exactly, yeah.

MRS. BAHRMAN:   Okay.   And Ms. McNally, were you watching on 9/11?

JUROR McNALLY:  Parts of it, yes

MRS. BAHRMAN:   Okay, and did you realize that you and the rest of the world were using circumstantial evidence to reach an important conclusion about –

JUROR McNALLY:  I hadn't really even thought of it, no.

MRS. BAHRMAN:   -- accident or on purpose?   Okay.   Does circumstantial evidence start out in the hole for you at all?

JUROR McNALLY:  In the hole?   In the hole?

MRS. BAHRMAN:   It just – Does direct evidence have a leg up for you? Running out of metaphors.

JUROR McNALLY:   I think there is means in both parts of it, you know.

MRS. BAHRMAN:   Okay, okay.   And, Ms. Rice, did you have any preconceived ideas about circumstantial evidence?

JUROR RICE:No.

MRS. BAHRMAN:   Okay, and do you recognize that both have their strengths and weaknesses?

JUROR RICE:Um-hmm.

MRS. BAHRMAN:    Okay.   And, finally, Ms. Paradise, were you – had you ever thought about the events of 9/11 in this context?

JUROR PARADISE: No, ma'am.

MRS. BAHRMAN:    Okay.   Likewise, have you been sitting there thinking, yeah, that's right, we did use circumstantial evidence?

JUROR PARADISE: Yes, ma'am.

MRS. BAHRMAN:    Okay, and do you agree that when piled up, it can be very compelling?

JUROR PARADISE: Yes.

(Trial Transcript, February 27, 2008, at PageID.3144-59).


MRS. BAHRMAN:    Okay.   Remind me again of who else has been jurors in this case, a prior juror, besides Ms. LeBlanc.   Okay, let me stick with you then, Ms. Paradise.   I take it you remember the whole concept of reasonable doubt, that we have to prove it beyond a reasonable doubt.

JUROR PARADISE: Yes.

MRS. BAHRMAN:    Okay.   Do you, first of all, clearly understand that proof beyond a reasonable doubt is not the same thing as proof beyond all doubt?

JUROR PARADISE: Yes

MRS. BAHRMAN:    Okay.   And would you agree that proof beyond all doubt is impossible unless we could put you in a time machine and take you back and let you watch?

JUROR PARADISE: Yes, ma'am.

MRS. BAHRMAN:    Okay.   Now, do you think you're the kind of person who could take mere possibilities and theories of innocence and discard them if they are too fantastic, too remote, too farfetched to create a doubt that's reasonable?   That's kind of abstract, isn't it?

JUROR PARADISE: Yeah.

144

MRS. BAHRMAN:   Let me ask it this way.  I would – You know, I would be astonished if there weren't conflicting testimony in this case.  I mean, if we were all on the same page, we wouldn't need a trial, right?

JUROR PARADISE: Yes, ma'am.

MRS. BAHRMAN:   Do you have any inclination to view the mere existence of conflicts as reasonable doubt all by itself?  Or do you expect there to be conflicts and feel like it's your job to try to resolve them?

JUROR PARADISE: I would expect there would be conflict, and we would try to resolve it.

MRS. BAHRMAN:   Okay, and, you know, I'm getting close to being done here, but this is important enough that I need to go around again.  So let me go on to Ms. Rice.  Again, would you expect there to be conflicts in the – in the course of any trial?

JUROR RICE: Yes

MRS. BAHRMAN:   Okay.   Had you been a juror before, as well?

JUROR RICE: Um-hmm.

MRS. BAHRMAN:   Okay, you did raise your hand.   So you're familiar with this whole concept, too?

JUROR RICE: Um-hmm.

MRS. BAHRMAN:   Do you agree that proof beyond a reasonable doubt is not the same thing as proof beyond all doubt?

JUROR RICE: Right.

MRS. BAHRMAN:   Okay, and do you have any inclination to view the mere existence of conflicts as reasonable doubt all by itself just because there is conflicts?  Or do you think it – that's to be expected and you need to resolve those conflicts?

JUROR RICE: That's to be expected.

MRS. BAHRMAN:   Okay.   And, Ms. McNally, had you been a juror before?

JUROR McNALLY:  No.

145

MRS. BAHRMAN:    You hadn't, okay.    Do you agree that proof beyond all doubt is impossible?

JUROR McNALLY:  Right, um-hmm.

MRS. BAHRMAN:    Okay.    Now, if – if the thing I had to prove – Would you agree with me that if the thing I had to prove was that the planes which crashed on 9/11 were crashed on purpose, would you agree that can't prove – be proven beyond all doubt either?

JUROR McNALLY:  Right.

MRS. BAHRMAN:    Okay, there will always be a doubt.

JUROR McNALLY:  Um-hmm.

MRS. BAHRMAN:    It could always have been a freak accident.

JUROR McNALLY:  Right.

MRS. BAHRMAN:    Okay.    Do you think you're the kind of person though who can take mere possibilities or theories of innocence and – and discard them, reject them, if they're too fantastic and too remote and too farfetched?

JUROR McNALLY:  Reject them?

MRS. BAHRMAN:    Yeah.    Because that's the thing, when you're resolving conflicts, that leaves another story out there.

JUROR McNALLY:  Um-hmm.

MRS. BAHRMAN:    That you have to reject.    Are you okay with that?

JUROR McNALLY:  Yeah, I suppose I could be, but –

MRS. BAHRMAN:    Okay.

JUROR McNALLY:  I think that you should hear things two different ways, too.

MRS. BAHRMAN:    Oh, of course.    And these are – these are very abstract questions.    I appreciate that.    Okay.    Mr. Bolm, do you have any inclination to view the mere existence of conflicts as reasonable doubt?    Or do you expect there to be conflicts?

JUROR BOLM:        I expect there to be conflicts.

146

MRS. BAHRMAN:    Okay.   Do you think you can use logic and common sense to –

JUROR BOLM:       Yeah.

MRS. BAHRMAN:    --resolve them?

JUROR BOLM:       Definitely.

MRS. BAHRMAN:   I've been talking too long.   Mr. Brehm, you made a comment earlier that, well, you'd hate to be wrong.   So I'm wondering about you – your comfort level with this at this point. First of all, do you – do you agree that proof beyond a reasonable doubt is not the same thing as proof beyond all doubt?

JUROR BREHM:      I agree.

MRS. BAHRMAN:    Okay, and would you agree that proof beyond all doubt is impossible?

JUROR BREHM:      Pretty much so.

MRS. BAHRMAN:    Okay, even if I was trying to prove that the planes went down on purpose?

JUROR BREHM:      Yeah.

MRS. BAHRMAN:    Okay.   Now, do you realize that when you're resolving conflicts, that leaves another story out there that you have to reject?

JUROR BREHM:      Yes.

MRS. BAHRMAN:    Okay.   Do you think you can do that?

JUROR BREHM:              I think so.

(Trial Transcript, February 27, 2008, at PageID.3160-64).

        While the prosecutor engaged in similar exchanges with different jurors throughout the jury selection process, this exchange is representative of the prosecutor's comments regarding the events of September 11, 2001.   While referencing these particular events is unnecessarily provocative, as the Michigan Court of Appeals recognized, "the prosecutor's references to the

147

World Trade Center attack during voir dire were made in the context of exploring the concepts of circumstantial evidence and reasonable doubt with prospective jurors, to determine whether they were capable of understanding and applying those concepts at trial." *Richardson*, 2010 WL 4320392 at *9. As the court further recognized, "[w]hile there are certainly less emotionally charged examples that could be used to explain circumstantial evidence and reasonable doubt, there was no apparent attempt by the prosecutor to refer to the World Trade Center attack for an inflammatory purpose." *Ibid.* Accordingly, the court concluded that the comments in question did not deprive Petitioner of a fair trial. *Ibid.*

During her opening statement and closing argument, the prosecutor also made reference to the World Trade Center attack. (Trial Transcript, March 3, 2008, at PageID.3759; Trial Transcript, April 14, 2008, at PageID.9482, 9611, 9614, 9617, 9623; Trial Transcript, April 15, 2008, at PageID.9742-44). These particular comments were brief and were intended merely to reinforce the concept of circumstantial evidence and the role that such properly played in this matter. As the prosecutor made clear to the jury, "[m]y 9/11 analogies are about the presence and the power of circumstantial evidence in our lives." (Trial Transcript, April 14, 2008, at PageID.9611). The Michigan Court of Appeals determined that these particular comments likewise did not deny Petitioner of a fair trial:

> The prosecutor's references to the World Trade Center incident during opening statement and closing argument were improper to the extent that they involved commentary on matters beyond the evidence at trial. Unlike jury voir dire, the purpose of an opening statement is to make a "full and fair statement of the prosecutor's case and the facts the prosecutor intends to prove." In addition, although a prosecutor has wide latitude during closing argument, she may not make factual statements or arguments that are not supported by the evidence. Here, however, there was no apparent purpose of using the remarks to inflame the passions of the jurors or to compare

148

> defendant to terrorists.  Examined in context, the remarks were a continuation of the prosecutor's position that the World Trade Center incident was a useful analogy for applying the concept of circumstantial evidence.  Further, the trial court instructed the jury before opening statements and again after closing arguments that the attorneys' statements and arguments are not evidence, that it was the trial court's duty to explain the applicable law, and that the jury was "not [to] let sympathy or passion influence your decision." Considering the context in which the prosecutor's remarks were made, and the instructions given by the trial court, the remarks did not affect defendant's substantial rights.

*Richardson*, 2010 WL 4320392 at *9 (internal citations omitted).

The Court agrees with the conclusion reached by the Michigan Court of Appeals. The reference to the World Trade Center attack during voir dire was a legitimate and logical, albeit unnecessarily provocative, manner of exploring the significance and use of circumstantial evidence.  While the prosecutor's reference to such during her opening statement and closing argument were perhaps improper, her comments were brief and directly tied to the aforementioned discussion during jury selection.   Considering the length of Petitioner's trial and the amount of evidence presented, it is not reasonable to conclude that the challenged comments improperly swayed the jury or denied Petitioner the right to a fair trial.   This conclusion is further strengthened when considering that the evidence of Petitioner's guilt was simply overwhelming. *See, e.g., Slagle v. Bagley*, 457 F.3d 501, 527 (6th Cir. 2006) (where there exists overwhelming evidence to support a conviction it is much less likely that the jury was influenced by improper comments by the prosecutor).[5]

---

5 This is not the first time the Michigan Court of Appeals has been presented with a claim that reference to the World Trade Center attack constituted prosecutorial misconduct.   In a previous case, apparently involving the same prosecutor, the court concluded that "the prosecutor was using a well-known example to explain to the jury how circumstantial evidence can indicate guilt where there is no way to know, based on direct observation, what happened in a given situation.   While the reference might have been in poor taste, it did not rise to the level of prosecutorial misconduct."   *People v. Johnson*, 2006 WL 1408413 at *3 (Mich. Ct. App., May 23, 2006).

This would be a much different matter if the crime in question were similar to the World Trade Center attack.   Here, however, the circumstances are so distinct from the events of September 11, 2001, that it is not reasonable to conclude that the jury considered the prosecutor's comments for any purpose other than that expressly offered.    Nevertheless, the Court wholeheartedly agrees with the Michigan Court of Appeals which "advise[d] against using such an emotionally-charged incident to explain the concepts of circumstantial evidence and reasonable doubt, considering that in most cases, much more innocuous examples or analogies are available." *Richardson*, 2010 WL 4320392 at *9.

### B.      References to Other Notorious Crimes

#### 1.      The Moilanen Murder

During jury selection, the prosecutor asked if any of the potential jurors had read a book concerning "a murder staged to look like something else, a hunting accident?"   (Trial Transcript, February 27, 2008, at PageID.3142).[6]   In her closing argument, the prosecutor made a brief reference to the Moilanen murder:

> Now, I've already mentioned the – the Moilanen murder, the shooting staged to look like a hunting accident, as another example of – of lookalike physical evidence.   But a – a dissimilarity between that situation and this one is that at least Mrs. Moilanen – Moilanen's death was humane.   She was shot while out walking in the woods with her dogs; and we should all be so lucky, you know, not to be murdered, but to die doing something we love and completely unaware of what's coming.   Mrs. Richardson obviously was not so lucky.

---

6  This was a reference to the "Moilanen murder" in which Bruce Moilanen "was convicted of shooting his wife with a rifle under circumstances in which it would appear that she was the victim of a hunting accident."   *People v. Moilanen*, 1996 WL 33362153 at *1 (Mich. Ct. App., Aug. 2, 1996).

(Trial Transcript, April 14, 2008, at PageID.9626).

While not particularly well articulated, the prosecutor clearly appears to have been arguing that the circumstances surrounding Juanita Richardson's killing were very different from Petitioner's description thereof. The Court agrees with the Michigan Court of Appeals which concluded that while the prosecutor "could have made this same argument by using the hypothetical of a husband shooting his wife, and then claiming it was an accident," the trial court's jury instructions "were sufficient to cure any perceived prejudice." Richardson, 2010 WL 4320392 at *10. The court reasonably concluded, therefore, that "[c]onsidering the overwhelming, properly admitted evidence of defendant's guilt and the trial court's instructions to the jury, any prejudicial implications of the prosecutor's statements were sufficiently mitigated so as not to deprive defendant of a fair trial." *Ibid.*

### 2. Scott Peterson and Other Notorious Criminals

During the lengthy jury selection process, the prosecutor twice asked prospective jurors if they had ever noticed that even notorious criminals "have people who support them. . . despite overwhelming evidence to the contrary?" (Trial Transcript, February 27, 2008, at PageID.3159-60; Trial Transcript, February 28, 2008, at PageID.3391). The prosecutor asked similar questions of three of Petitioner's witnesses at trial. (Trial Transcript, April 7, 2008, at PageID.8851, 8984-85; Trial Transcript, April 9, 2008, at PageID.9201-02). The prosecutor also asked one witness whether he believed Scott Peterson "when he went on T.V. to say where's Lacy?" (Trial Transcript, April 7, 2008, at PageID.8850).

With respect to the prosecutor's voir dire questions, the Court discerns nothing inappropriate as the prosecutor's questions were arguably designed to assess whether jurors understood the concept of reasonable doubt and could fairly assess the evidence and the credibility of witnesses.   As for the challenged questions which the prosecutor asked at trial, the context in which these questions were asked is relevant.   Each of the witnesses to whom these questions were posed had already suggested that their opinion that Petitioner was not involved in his wife's killing had been formed without benefit of many of the relevant facts and, moreover, would not likely be swayed by such facts.   (Trial Transcript, April 7, 2008, at PageID.8840-54, 8971-87; Trial Transcript, April 9, 2008, at PageID.9193-9203).   Thus, Petitioner's insinuation that the prosecutor simply interjected these allegedly improper questions out of thin air is not persuasive.

The Michigan Court of Appeals rejected this particular argument, concluding, "[w]hile we must advise against a line of questioning that infuses the trial with references to notorious criminals and could arose unnecessary prejudice against a defendant. . .the error was harmless because it is not more probable than not that the brief questioning, which did not directly suggest any comparison between defendant and a notorious criminal, affected the outcome of the trial." *Richardson*, 2010 WL 4320392 at *10.   The Court finds this conclusion to be reasonable in light of all of the relevant circumstances, specifically that in the context of Petitioner's very lengthy trial these comments were quite brief and, moreover, the evidence supporting Petitioner's guilt was overwhelming.

152

C.      Expressing Sympathy for the Victim

Petitioner next argues that the prosecutor improperly expressed sympathy for Juanita Richardson.  Specifically, Petitioner complains about the introduction of evidence that demonstrated Juanita's good character and that Petitioner's extra-marital affair caused her pain. That properly admitted evidence portrayed Juanita Richardson in a favorable or sympathetic light hardly merits habeas relief.   It is only when the prosecutor implores a jury to decide a case based on passion and/or prejudice, as opposed to the facts, that the prosecutor violates the proscription against appealing to jurors' sympathy.   *See, e.g., Broom v. Mitchell*, 441 F.3d 392, 412 (6th Cir. 2006).

Petitioner also complains that the prosecutor "pummeled the poor Richardson children [on cross-examination] for failing to side with the prosecution" and then made the following inappropriate comments during her closing argument:

> Now, I've already mentioned the – the Moilanen murder, the shooting staged to look like a hunting accident, as another example of – of lookalike physical evidence.  But a – a dissimilarity between that situation and this one is that at least Mrs. Moilanen – Moilanen's death was humane.   She was shot while out walking in the woods with her dogs; and we should all be so lucky, you know, not to be murdered, but to die doing something we love and completely unaware of what's coming.

> Mrs. Richardson obviously was not so lucky.   Did she experience the terror of knowing she was going to die?   Absolutely.   And did she experience the bitterness of that ultimate betrayal by someone she loved and trusted?   Yes.   And did she experience the frustration of not being able to tell anyone what he did?   Possibly. It's a lot to happen in two seconds.

> But that's not even what's bothering me now, even though I'm sure it still bothers her parents and her sister and her friends.   You know, what's bothering me now is this question.   Does she know now that the children she gave birth to and the children she nurtured for so

153

many years and the children she stayed in this miserable excuse for
a marriage for, the children that she, therefore, gave her life for have
also betrayed her and now stand with him against her?

(Trial Transcript, April 14, 2008, at PageID.9626-27).

As the Michigan Court of Appeals recognized, the comments regarding Petitioner's

children largely constituted proper argument that the children were not believable witnesses.

*Richardson*, 2010 WL 4320392 at *11.   It is certainly appropriate for a prosecutor to argue, in the

context of conflicting testimony, that "one of the two sides is lying."   *United States v. Collins*, 78

F.3d 1021, 1039-1040 (6th Cir. 1996)).   The prosecuting attorney did not indicate a personal

belief regarding the victim's credibility, nor did the prosecutor suggest that she possessed

information concerning such that was not presented to the jury.   Rather, the prosecutor simply did

what she is permitted to do under the law, namely argue to the jury that they should, based on the

evidence presented at trial, reach a specific conclusion regarding the credibility of certain

witnesses.

To the extent that the prosecutor's comments were improper, the Court finds

reasonable the conclusion reached by the Michigan Court of Appeals:

Even if the prosecutor exceeded the bounds of proper argument by
characterizing the children's testimony as an act of betrayal, and by
commenting on the manner in which the victim died, the trial court's
instruction that the jury was not to let sympathy or passion influence
its decision was sufficient to cure any prejudice.   The brief remarks
did not deprive defendant of a fair trial.

*Richardson*, 2010 WL 4320392 at *11.

154

D.    References to Petitioner's Exercise of Rights

Petitioner asserts several arguments that the prosecutor improperly referenced his exercise of his constitutional rights.    First, during the prosecutor's questioning of Robert Campbell, an acquaintance of Petitioner, the following exchange occurred:

| | |
|---|---|
| Prosecutor: | Did [Petitioner] reference having an attorney in this matter? |
| Defense: | Objection, your Honor, relevance. |
| Prosecutor: | Well, this is really just to trigger another topic.   I'll ask it a different way. |
| Prosecutor: | Did he reference a search warrant? |
| Campbell: | Yes, he did. |
| Prosecutor: | What did he tell you about that? |
| Campbell: | He explained to me one day when he returned home that there I believe was three police cars in his driveway.   So he had backed up and apparently took another drive around to the back of his pole barn and said he went inside his pole barn and called his attorney at the time. |
| Prosecutor: | Did he tell you why he had done that? |
| Campbell: | Wanting to know if there was a search warrant for – or I'm sorry. |
| Defense: | Objection, your Honor, relevance. |
| Prosecutor: | Well, these kinds of concerns go to consciousness of guilt, your Honor. |
| The Court: | Overruled. |
| Prosecutor: | And his reason for going to the pole barn and calling his attorney was what? |
| Campbell: | To see if there was a warrant for his arrest and asked his attorney what to do, I guess. |

(Trial Transcript, March 17, 2008, at PageID.6230-31).

Petitioner argues that the prosecutor's comment, in response to his objection, that "these kinds of concerns go to consciousness of guilt" was improper and denied him of a fair trial. As the Michigan Court of Appeals reasonably concluded, however:

> Although a prosecutor may not imply that an accused's decision to meet with counsel implies guilt, the record does not support defendant's claim that the prosecutor attempted to argue anything to the jury.    The prosecutor's statement was presented to the trial court in response to an objection.    The prosecutor suggested that defendant's conduct of hiding from the police during the execution of a search warrant was probative of his consciousness of guilt. Although the prosecutor also elicited that defendant had phoned his attorney, the significance of that testimony related to defendant's state of mind while hiding, namely, that he thought there could be an arrest warrant.  Evidence of flight is admissible to support an inference of consciousness of guilt, even where the defendant does not actually flee the scene. Therefore, viewing the challenged remark in context, defendant has not shown any error.

*Richardson*, 2010 WL 4320392 at *11.

Petitioner next argues that the prosecutor, during her questioning of Deputy Steve Blank, improperly commented on his Fifth Amendment right to remain silent.   Specifically, Petitioner refers to the following exchange:

> Prosecutor:    Okay, and did Tom Richardson ever tell you what we heard in opening at this trial, that he took the camera to the bathroom to clean the lens?
>
> Blank: That was never a story that he told me, no.

(Trial Transcript, March 10, 2008, at PageID.4816).

As the Michigan Court of Appeals observed, however, this line of questioning concerned Petitioner's "failure to convey information during pre-custody, pre-Miranda questioning and, accordingly, did not infringe on [Petitioner's] right to remain silent." *Richardson*, 2010 WL 4320392 at *12.   The Supreme Court has never held that use of pre-

156

Miranda silence as evidence of guilt violates the Fifth Amendment.   *See, e.g., Bond v. McQuiggan*, 506 Fed. Appx. 493, 498 (6th Cir., Nov. 29, 2012); *Isom v. Palmer*, 2017 WL 651949 at (E.D. Mich., Feb. 16, 2017).   Accordingly, this claim is without merit.

Petitioner next argues that the following statements by the prosecutor during her rebuttal closing argument were improper and violated his right to a fair trial:

> Now, defendant or the – the defense in closing clearly took the position that the defendant acted appropriately on June 22nd and that he was detained and interrogated.   So if there is a witness who was in a position to address his behavior on – on June 22nd, if there was a witness who was in a position to address his captivity, and if that witness was not called, you can and should infer that that's because the testimony wouldn't have been helpful. . .and the witness I'm talking about is the Baptist pastor at the hospital.

(Trial Transcript, April 15, 2008, at PageID.9758-59).

Petitioner's argument that these comments infringed on his Fifth Amendment right to remain silent is without merit as the prosecutor merely commented on Petitioner's failure to present testimony from an individual who witnessed certain events at issue.   It is not improper for a prosecutor "to comment on a defendant's failure to call witnesses to support his arguments." *United States v. Rivera*, 971 F.2d 876, 884 (2nd Cir. 1992); *see also*, *United States v. Farhane*, 634 F.3d 127, 167-68 (2nd Cir. 2011) (same); *Demirdjian v. Gipson*, 832 F.3d 1060, 1072 (9th Cir. 2016) (same).

Finally, Petitioner objects to the prosecutor's comment during her closing argument that "someday an army of appellate lawyers will flyspeck everything I have said."   (Trial Transcript, April 14, 2008, at PageID.9609).   The Michigan Court of Appeals rejected this claim, reasonably concluding that Petitioner "has failed to show that the prosecutor's brief remark in

157

closing argument regarding the possibility that her conduct would be flyspecked in a future appeal infringed on his right to counsel or was prejudicial."   *Richardson*, 2010 WL 4320392 at *12.

       E.      Attacking Petitioner's Character

      Petitioner identifies several comments by the prosecutor which he alleges were improper and deprived him of the right to a fair trial.   First, in her closing argument, the prosecutor commented that "for [Petitioner] to lay claim to Christian values is just blasphemous."   (Trial Transcript, April 14, 2008, at PageID.9530).   The Michigan Court of Appeals reasonably rejected this argument, concluding:

> It is impermissible for a prosecutor to appeal to a jury's religious duties at trial to inflame the jury's passions and fears.   Further, questions regarding a witness's religious beliefs are generally improper.   Here, however, the remark did not concern a witness's religious beliefs, but rather defendant's alleged motive.   Brophy testified that her involvement with defendant involved discussing the Bible or scripture, and that defendant had told her that he was opposed to divorce.   The prosecutor argued that part of defendant's motive for killing the victim was that "[b]eing widowed meant he could maintain his image as a morally and spiritually superior person, one who was opposed to divorce."   Further, defendant presented witnesses who testified regarding defendant's religious background and his involvement as a spiritual mentor and leader in Promise Keepers, an organization that was described as promoting men to be good husbands.   Examined in this context, the challenged remark was a fair response to the defense evidence.   Further, the prosecutor was not required to state her argument in the blandest of terms.

*Richardson*, 2010 WL 4320392 at *13.

      Petitioner next objects to the prosecutor's comment in closing argument that Kelli Brophy's "constant dissembling and her attitude are irritating" and that "with [Brophy], it's – it's the disconnect between these professed Christian values and the fact that she does not value the

truth for its own sake." (Trial Transcript, April 14, 2008, at PageID.9545). The prosecutor later referred to Brophy as "such a bottom feeder, so manipulative and greedy and self-absorbed." (Trial Transcript, April 14, 2008, at PageID.9556). The Michigan Court of Appeals reasonably rejected this argument on the grounds that the prosecutor was simply arguing that Brophy was not a credible witness and, moreover, the comments did not deny Petitioner of a fair trial. *Richardson*, 2010 WL 4320392 at *13.

Finally, Petitioner objects to the following exchange between the prosecuting attorney and Levi Richardson:

Prosecutor:    Wouldn't you agree that you've been toying with [Elizabeth Banda]?

Richardson:    No, not really.

Prosecutor:    Would you agree that she's a sensitive girl?

Richardson:    To a degree, I suppose.

Prosecutor:    Would you be surprised if she is now torn between wanting to please you and wanting to be faithful to the truth?

Richardson:    Would I be surprised if she was torn? Yeah, I suppose. I mean, I don't really think she's trying to please me.

Prosecutor:    Well, would you agree that the decent thing to do would be to leave the courtroom while she testifies?

(Trial Transcript, March 24, 2008, at PageID.7113-14).

As noted above, Elizabeth Banda testified for the prosecution. Specifically, Banda indicated that she dated Levi Richardson from 2004-2005. (Trial Transcript, March 25, 2008, at PageID.7436-42). During this time, Banda observed Petitioner mistreat Juanita Richardson. Banda also observed that Petitioner did not exhibit speech, memory, or vocabulary difficulties and,

159

furthermore, that Juanita Richardson was "relatively active" and never exhibited mobility difficulties.  (PageID.7442-47).

Banda also testified about her involvement in the investigation of Juanita Richardson's death.  Banda first spoke with law enforcement in October 2006.  (PageID.7447-48).  Shortly thereafter, Levi Richardson contacted Banda and indicated that he "want[ed] to get back together."  (PageID.7448).  On a subsequent visit with Banda, Richardson told Banda that he wanted her "to clarify some things [she] had said" to law enforcement.  (PageID.7448-52).  Banda conceded that she "possibly," in subsequent interviews with law enforcement, "watered things down or minimized" what she had previously described.  (PageID.7452-53).  Banda did not believe, however, that Levi Richardson was attempting to exploit her.  (PageID.7452).

Petitioner fails to articulate how this exchange prejudiced his defense or otherwise denied him of a fair trial.  In light of Elizabeth Banda's testimony, the exchange in question did not unfairly prejudice Petitioner.  Moreover, even if the Court assumes that the prosecutor's questions were inappropriate, the exchange in question was brief and because it concerned a tangential matter it is not reasonable to conclude that it had any appreciable impact on the jury.  The Court finds reasonable the conclusion of the Michigan Court of Appeals that this exchange did not violate Petitioner's right to a fair trial.  *Richardson*, 2010 WL 4320392 at *13.

> F.    Denigrating the Defense and Defense Counsel

Petitioner asserts several claims that the prosecuting attorney denigrated his attorneys and his defense strategy.

1.    Cartoon

As part of his defense, Petitioner created a computerized simulation depicting his version of the events in question.   In her closing argument, the prosecutor referred to this computer simulation as a "cartoon."   (Trial Transcript, April 15, 2008, at PageID.9749-52).   The prosecutor noted that the version of events depicted in the simulation contradicted the version of events Petitioner had told others and, therefore, argued that "even the defense doesn't believe the defendant."  (PageID. 9752).   The prosecutor also argued that Petitioner created this computer simulation "secure in the knowledge that you're not going to see reality, that you're not going to see this scene."   (PageID.9751).

The comment that Petitioner's computer simulation was a "cartoon" was hardly flagrant and it is not reasonable to conclude that such unfairly prejudiced Petitioner.   As for the comment that "even the defense doesn't believe" Petitioner, the Court agrees with the Michigan Court of Appeals that while such was "inartfully phrased," it was nevertheless fair commentary concerning conflicts in the evidence and, therefore, did not deprive Petitioner of a fair trial. *Richardson*, 2010 WL 4320392 at *14; *see also*, *Bates v. Bell*, 402 F.3d 635, 646 (6th Cir. 2005) (it is not inappropriate for a prosecutor to "highlight the inconsistencies or inadequacies of the defense, and forcefully assert reasonable inferences from the evidence"); *United States v. Forrest*, 402 F.3d 678, 686 (6th Cir. 2005) (the prosecutor is permitted to "point out the lack of evidence supporting [the defendant's] theories" of the case).   Finally, the prosecutor's comment that the jury would not be permitted to see or visit the location where Juanita Richardson fell off the cliff was neither inaccurate nor unfair as the prosecutor's motion to permit the jury to visit the crime scene was not granted.

161

2.    Gratuitous Nastiness

In her opening statement, the prosecutor addressed "police conduct issues" and how law enforcement performs many of its investigatory duties.   (Trial Transcript, March 3, 2008, at PageID.3820-22).   In the context of these remarks, the prosecutor stated:

> You'll also learn, still under the heading of police conduct, that modern day interview techniques involve building solidarity with suspects.   And the only place that you're going to see the shouting, the sarcasm, the bullying, the – the gratuitous nastiness that you would normally associate with an interrogation is right here in court during the cross examination of our witnesses.

(PageID.3822).

As the Michigan Court of Appeals properly recognized, Petitioner's argument that these comments were improper "ignores the full context of the remark."  *Richardson*, 2010 WL 4320392 at *14.   As the court observed, the challenged comments were "made in the context of addressing police interview techniques" and, moreover, completely ignores that Petitioner's counsel warned jurors during voir dire that "they should expect vigorous cross-examination." *Ibid.*   Accordingly, these comments did not deprive Petitioner of a fair trial.


3.    Manslaughter

During her opening statement, the prosecutor commented on the fact that Petitioner, in addition to being charged with murder, was also charged with manslaughter.   (Trial Transcript, March 3, 2008, at PageID.3815).   The prosecutor commented that "we don't think manslaughter fits this scenario, but if it wasn't charged, the defense would be free to make up a new scenario

162

that involves some impulsive or negligent act and then say, oh, too bad, it's not charged. I'm guilty of that, but too bad, it's not charged." (PageID.3815).

Petitioner fails to advance any argument how this statement violated his right to a fair trial. The prosecutor's statement was not inaccurate and the Court finds no prejudice in explaining to the jury why Petitioner was charged with manslaughter given the State's theory that Petitioner intentionally, and with premeditation, killed Juanita Richardson. As the Michigan Court of Appeals reasonably concluded, this argument is without merit. *Richardson*, 2010 WL 4320392 at *14.

### 4. Mistreatment of Witnesses by Defense Counsel

Petitioner makes the conclusory allegation that the prosecutor "continued [her attack] during the trial, asking multiple witnesses about their alleged mistreatment at the hands of defense counsel." (ECF No. 4 at PageID.78). The Michigan Court of Appeals rejected this claim on the ground that Petitioner failed to identify the offending remarks or articulate how such violated his rights. *Richardson*, 2010 WL 4320392 at *14. In his brief in this Court, Petitioner has identified three instances in which the prosecutor allegedly asked witnesses about their mistreatment by defense counsel.

The first example occurred when the prosecutor conducted redirect examination of Gary Koskiniemi, the Director of Nursing Services at Munising Memorial Hospital. (Trial Transcript, March 4, 2008, 4246). The prosecutor asked, "do you feel like you've just been interrogated?" to which Koskiniemi responded, "I feel like I had a very good interrogation, thank you." (PageID.4246). This argument is frivolous. The prosecutor's question hardly constituted

163

an attack on the witness or defense counsel's questioning thereof.   The other two examples cited by Petitioner likewise fail to advance his cause as neither involve questioning by the prosecutor about their questioning by defense counsel.   (Trial Transcript, March 6, 2008, at PageID.4699; Trial Transcript, April 8, 2008, at PageID.9156).   The Michigan Court of Appeals reasonably rejected this argument.   *Richardson*, 2010 WL 4320392 at *14.


      5.     Improper Argument

      In her closing argument, the prosecutor made the following comments which Petitioner asserts denied him of the right to a fair trial:

> We don't choreograph the testimony.   The defense clearly doesn't have a problem with it. . .You know, [Petitioner's theory concerning Juanita Richardson's death] just fails the fall-down-laughing test, and it does not belong in a courtroom.   But that didn't stop the defense from pursuing it.

(Trial Transcript, April 15, 2008, at 9570, 9589).

      Petitioner fails to articulate how these comments deprived him of a fair trial.   It is not inappropriate for a prosecutor to "highlight the inconsistencies or inadequacies of the defense, and forcefully assert reasonable inferences from the evidence."   *Bell*, 402 F.3d at 646.   Likewise, the prosecutor is permitted to "point out the lack of evidence supporting [the defendant's] theories" of the case.   *Forrest*, 402 F.3d at 686.   While a prosecutor may not "make unfounded and inflammatory attacks on the opposing advocate," *United States v. Young*, 470 U.S. 1, 9 (1985), or "argue that counsel is attempting to mislead the jury," *West v. Bell*, 550 F.3d 542, 565 (6th Cir. 2008), the comments in question fall well short of such.   Moreover, even if it is assumed that the comments in question were somehow improper, they were very brief and it is not reasonable to

164

conclude that such infected Petitioner's trial with unfairness.   The Michigan Court of Appeals reasonably rejected this argument.   *Richardson*, 2010 WL 4320392 at *14.


6.      Defense Whores

In her closing argument, the prosecutor challenged, at length, Dr. Kirkham's testimony and argued that such should not be accorded much weight or significance.   (Trial Transcript, April 14, 2008, 9562-80).   In the midst of such, the prosecutor made the following comment:

> You know, and we – we irreverently call witnesses like that defense whores, but it's not a gender-based slur.   It simply refers to opinions being for sale.

(Trial Transcript, April 14, 2008, at PageID.9574).

While the prosecutor's language was unprofessional, it is not improper to argue that an expert witness, who has been paid for their testimony, might be biased.   *See, e.g., Liu v. Mitchell*, 2006 WL 5740966 at *17 (S.D. Cal., Jan. 12, 2006); *see also*, *McBurney v. Rapelje*, 2013 WL 6885148 at *5 (E.D. Mich., Dec. 31, 2013) (it is not improper for a prosecutor to argue that an expert witness is biased).   The Michigan Court of Appeals reasonably denied this particular claim, concluding as follows:

> In another cursory argument, defendant asserts that the prosecutor committed misconduct by referring to a defense expert as a "whore" during closing argument. . . While a party may argue the potential financial incentives of a paid expert, and the prosecutor explained to the jury that her use of the term "whore," in reference to expert witnesses, is not "a gender-based slur" and "simply refers to opinions being for sale," we agree with defendant and the trial court that the prosecutor's choice of words was in bad taste and not befitting of a courtroom setting.   Defendant, however, has not established that he was denied a fair trial as a result of the statement.

*Richardson*, 2010 WL 4320392 at *14.

G.    Ignoring Court Rulings

Finally, Petitioner argues that prosecutor, in her opening statement and closing argument, improperly complained about rulings by the trial court with which she disagreed. Specifically, Petitioner complains about the following comments:

> And I'll tell you that our – our very strong preference was to have you all taken to the scene so that you could stand where people stood and – and see what it's like.   But this wasn't allowed, and the trial was moved from the summer months anyway.

(Trial Transcript, March 3, 2008, at PageID.3776).

> Now, our very strong preference was for the courtroom to be cleared during the playing of this tape so that you could focus on the content of the tape without all the drama in the courtroom.  But that's not going to happen either, so you really need to tune out whatever is going on in the courtroom and listen to what's on this tape and what's not on this tape.

(Trial Transcript, March 3, 2008, at PageID.3787).

> The psychologist will also weigh in on the defendant's post-incident behavior.   And our expert, who is Dr. Kahler, will certainly debunk the idea that it's consistent with acute stress disorder.   But she'll also tell you that the – the people in the best position to comment on the defendant's behavior are the people that – that aren't allowed to do so, the first responder type of people, the EMT's, the nurses, the deputies.   And that's frustrating because our witnesses have such a wealth of experience not only with observing crisis, but with experiencing crisis themselves.

(Trial Transcript, March 3, 2008, at PageID.3824-25).

> And I'm sure you're tired of arguments about the - the scope of expert testimony.  But you've seen firsthand one of the craziest things about this whole process.  You heard from deputies and

166

EMT's and a nurse and a physician's assistant who actually dealt with this defendant, and who have extensive experience dealing with people in crisis, yet they're not really allowed to tell you what they think of his behavior.   And you heard from the speech therapist who actually - actually treated this defendant, and who treats memory problems day in and day out for 21 years, and she's severely limited regarding what she could say.   And yet someone who never laid eyes on this defendant and relied on testimony from one of the 131 witnesses to whom you listened was allowed to say whatever the heck she wanted.

(Trial Transcript, April 14, 2008, at PageID.9562).

And that's another wonderful example of the craziness of this process.   You're being deprived of reality of the scene and in this case the next best thing, photographs, and you're going to be given fiction, fantasy, a cartoon.

(Trial Transcript, April 14, 2008, at PageID.9600).

Petitioner does not articulate how these particular comments deprived him of a fair trial.   The Court fails to discern how such rendered his trial fundamentally unfair.   While certain aspects of these comments were certainly irrelevant, the prosecutor did not improperly attack Petitioner.   Instead, the prosecutor largely argued, albeit in an inartful manner, that certain evidence was worthy of greater weight and consideration than other evidence.   The Michigan Court of Appeals reasonably denied this argument as follows:

Defendant also argues that the prosecutor acted improperly by complaining about court rulings not in her favor. . .During trial, the prosecutor announced her preferences for a jury view and for the courtroom to be cleared during the playing of certain tapes, and her frustration that certain nonexpert witnesses were not permitted to comment on defendant's behavior.   While we agree that the prosecutor's expressed preferences were not relevant and unnecessary, we fail to see how defendant was prejudiced by the comments.   Further, the trial court instructed the jury at the beginning of the trial that it was the court's responsibility to "make sure that the trial is run fairly and efficiently, and to make decisions about the evidence."   The jury was again instructed before

167

> deliberations began that "[i]t is my duty to see that the trial is conducted according to the law" and that the jury "must decide this case based only on the evidence admitted during this trial."  These instructions were sufficient to protect defendant's substantial rights.

*Richardson*, 2010 WL 4320392 at *14.


H.     Certificate of Appealability

As discussed herein, the Court concludes that the decision by the Michigan Court of Appeals denying Petitioner's various claims of prosecutorial misconduct was neither contrary to, nor involved an unreasonable application of, clearly established federal law and, furthermore, was not based on an unreasonable determination of the facts in light of the evidence presented. While mindful of its role when reviewing a state court conviction and the standard applicable thereto, the Court is nevertheless troubled by the prosecutor's behavior.

To obtain a certificate of appealability, Petitioner must make a "substantial showing of the denial of a constitutional right."  28 U.S.C. § 2253(c)(2); *Miller-El v. Cockrell*, 537 U.S. 322, 336 (2003).  To obtain a certificate of appealability where a district court has denied a habeas petition on the merits, the petitioner must demonstrate that the claim in question is one on which reasonable jurists could disagree.  *See Miller-El*, 537 U.S. at 336.  While the Court recognizes that a certain degree of zealousness on the part of a prosecutor is not inappropriate, the prosecutor in this case exhibited a degree of aggressiveness and singlemindedness that, in the Court's estimation, renders the question of the fairness of Petitioner's trial a matter on which reasonable jurists could disagree.

168

Accordingly, while the Court recommends that Richardson's petition be denied, the Court also concludes that Petitioner satisfies the standard for obtaining a certificate of appealability with respect to his claims of prosecutorial misconduct.

## V.        Material Witness Hearing

When Kelli Brophy testified at Petitioner's trial, she revealed that approximately one month before, prior to the start of Petitioner's trial, she had been subject to a material witness bond hearing prompted by concerns that she would decline to appear at Petitioner's trial.   (Trial Transcript, March 27, 2008, at PageID.7896-97).   With respect to this matter, Petitioner argues that he is entitled to relief for two reasons: (1) he was not permitted to participate in Brophy's material witness bond hearing, and (2) the prosecution failed to timely provide a copy of the testimony elicited at such hearing.   (ECF No. 4 at PageID.86-89).

### A.        Presence at Material Witness Bond Hearing

The parties do not dispute that Petitioner was not provided prior notice of Brophy's material witness bond hearing and that as a result Petitioner was unable to be present for such. Petitioner argues that this circumstance constituted a violation of his constitutional rights to counsel and to be present at his trial.

It is well settled that "a complete absence of counsel at a critical stage of a criminal proceeding is a *per* se Sixth Amendment violation warranting reversal of a conviction, a sentence, or both, as applicable, without analysis for prejudice or harmless error."   *Van v. Jones*, 475 F.3d 292, 311-12 (6th Cir. 2007) (citations omitted).   Relatedly, a criminal defendant also enjoys "a

due process right to be present in his own person. . .at any stage of the criminal proceeding that is critical to its outcome if is presence would contribute to the fairness of the procedure."  *Kentucky v. Stincer*, 482 U.S. 730, 745 (1987).

The Michigan Court of Appeals determined that a hearing to determine whether Kelli Brophy "intended to appear at trial. . .was not a critical stage of defendant's criminal proceeding."  *Richardson*, 2010 WL 4320392 at *17.  Petitioner has identified no authority holding that a material witness hearing constitutes a critical stage of a prosecution.   The Court has likewise located no Supreme Court or Sixth Circuit authority holding (or even suggesting) such. Furthermore, a review of the transcript of the material witness hearing reveals that such was limited to the issue of whether Brophy would appear for Petitioner's trial and no witness was questioned about or offered testimony on the subject of Petitioner's guilt.   (Hearing Transcript, February 22, 2008, at PageID.11413-39).

The determination by the Michigan Court of Appeals that Kelli Brophy's material witness bond hearing was not a critical stage of Petitioner's prosecution was neither contrary to, nor involved an unreasonable application of, clearly established federal law.   Furthermore, this decision was not based on an unreasonable determination of the facts in light of the evidence presented.   Accordingly, this claim raises no issue on which habeas relief may be granted.


B.      Production of *Brady* Material

In *Brady v. Maryland*, 373 U.S. 83 (1963), the Supreme Court held that "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good

170

faith  or bad faith of the prosecution." *Wilson v. Mitchell*, 498 F.3d 491, 512 (6th Cir. 2007) (quoting *Brady*, 373 U.S. at 87).   The material which must be disclosed under *Brady* "encompasses impeachment evidence as well as exculpatory evidence."  *Wilson*, 498 F.3d at 512 (citing *United States v. Bagley*, 473 U.S. 667, 676 (1985)).   To establish a *Brady* violation, Petitioner must establish: (1) the prosecution suppressed or withheld evidence, (2) such evidence was favorable to the defense, and (3) the suppressed evidence was material.  *See United States v. Dado*, 759 F.3d 550, 559-60 (6th Cir. 2014).

The materiality requirement is not a sufficiency of the evidence test.  *See In re McDonald*, 514 F.3d 539, 545-46 (6th Cir. 2008) (quoting *Kyles v. Whitley*, 514 U.S. 419, 434-35 (1995)).   In other words, Petitioner is not required to demonstrate that consideration of the undisclosed evidence results in less than sufficient evidence to support his conviction.   This is because "the possibility of an acquittal of a criminal charge does not imply an insufficient evidentiary basis to convict."  *In re McDonald*, 514 F.3d at 546 (quoting *Whitley*, 514 U.S. at 434-35).   Also, the withheld evidence must be considered "collectively, not item by item."  *Whitley*, 514 U.S. at 436-37.   The materiality requirement is satisfied where "the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict."  *Banks v. Dretke*, 540 U.S. 668, 698 (2004) (quoting *Whitley*, 514 U.S. at 435).   In short, Petitioner must demonstrate a "reasonable probability of a different result."  *Dretke*, 540 U.S. at 698 (quoting *Whitley*, 514 U.S. at 434).

Following Kelli Brophy's testimony, Jeff Fellows and Judy Owens testified briefly. (Trial Transcript, March 27, 2008, at PageID.7939-55).   Prior to adjourning for the day, the trial judge addressed, outside the jury's presence, the matter of Kelli Brophy's material witness bond

hearing.  (PageID.7956-66).  The judge ordered that Petitioner be provided with a copy of the material witness bond hearing transcript.  (PageID.7956-66).  Prior to the resumption of trial the following morning, Petitioner received a copy of the transcript in question.  (Trial Transcript, March 28, 2008, at PageID7971).

Petitioner's claim fails for two reasons.  First, a review of the material witness bond hearing transcript reveals that such does not satisfy the materiality requirement.  Nothing that transpired during this particular hearing reasonably undermines confidence in the jury's verdict or creates a "reasonable probability of a different result."  The hearing simply concerned whether Kelli Brophy would appear to testify at trial or instead whether there existed a legitimate concern that she might leave the jurisdiction to avoid testifying.  (Hearing Transcript, February 22, 2008, at PageID.11413-39).  Furthermore, because Petitioner was, in fact, provided this information prior to the conclusion of trial, he can obtain relief only if he demonstrates that he was prejudiced by the prosecution's failure to provide the information in a more timely fashion.  *See, e.g., United States v. Kuehne*, 547 F.3d 667, 698 (6th Cir. 2008) (recognizing that "*Brady* generally does not apply to delayed disclosure" of relevant information and that a "delay only violates *Brady* when the delay itself causes prejudice").

While the Michigan Court of Appeals did not address whether the information in question satisfied the materiality requirement, the court did address whether Petitioner was prejudiced by the delay in obtaining such information:

> Defendant did not establish that he was prejudiced by the untimely disclosure of the materials.  Although a transcript of the material witness hearing was not made available to defense counsel until after Brophy concluded her testimony at trial, defendant did not request an opportunity to recall Brophy as a witness for further cross-examination regarding that hearing.  Further, the transcript

172

and other materials were made available to defense counsel before the questioning of other witnesses involved in the procurement of the bench warrant and Brophy's arrest.   Defendant also received the benefit of a jury instruction regarding the lack of notice of the material witness hearing.   Because defendant failed to demonstrate that he was prejudiced by the late disclosure, appellate relief is not warranted.

*Richardson*, 2010 WL 4320392 at *18.

The rejection of this claim by the Michigan Court of Appeals was neither contrary to, nor involved an unreasonable application of, clearly established federal law.   Furthermore, this decision was not based on an unreasonable determination of the facts in light of the evidence presented.   Accordingly, this claim raises no issue on which habeas relief may be granted.


**VI.        Attorney-Client Privilege**

As noted above, attorney Anthony Badovinac and his assistant Amy Schmid both testified regarding Petitioner's interest in obtaining wills for himself and Juanita Richardson before traveling to the Upper Peninsula.   While Petitioner asserted that attorney-client privilege precluded Badovinac and Schmid from testifying, the trial court concluded that the testimony was proper pursuant to the crime-fraud exception to attorney-client privilege.   (Preliminary Examination Transcript, March 1, 2007, at PageID.1379-84; Motions Transcript, May 7, 2007, at PageID.1992; Trial Transcript, March 26, 2008, at PageID.7606-07, 7655).   Petitioner asserts that permitting Badovinac and Schmid to testify violated his due process right to a fair trial.   (ECF No. 4 at PageID.82-85).   As noted above, to obtain habeas relief based on a state court evidentiary ruling, Petitioner must demonstrate that the evidentiary ruling in question was "so egregious" that it denied him the right to a fair trial.

173

While the attorney-client privilege has been recognized as "the oldest of the privileges for confidential communications known to the common law," because the privilege "has the effect of withholding relevant information from the factfinder it applies only where necessary to achieve its purpose." *United States v. Zolin*, 491 U.S. 554, 562 (1989).   As the Court further observed:

> The attorney-client privilege must necessarily protect the confidences of wrongdoers, but the reason for that protection - the centrality of open client and attorney communication to the proper functioning of our adversary system of justice - "ceas[es] to operate at a certain point, namely, where the desired advice refers not to prior wrongdoing, but to future wrongdoing."   It is the purpose of the crime-fraud exception to the attorney-client privilege to assure that the "seal of secrecy," between lawyer and client does not extend to communications "made for the purpose of getting advice for the commission of a fraud" or crime.

*Id.* at 562-63 (internal citations omitted).

While *Zolin* concerned an Internal Revenue Service investigation, as opposed to a criminal prosecution, Petitioner has not identified (and the Court has not located) any Supreme Court authority holding or suggesting that the viability of the crime-fraud exception is in any way lessened in the context of a criminal prosecution.   Moreover, lower federal courts consistently recognize the viability of the crime-fraud exception in the context of criminal prosecutions.   *See, e.g., United States v. Gorski*, 807 F.3d 451 (1st Cir. 2015); *United States v. Matsa*, 540 Fed. Appx. 520 (6th Cir., Oct. 25, 2013); *United States v. Boender*, 649 F.3d 650 (7th Cir. 2011).   Thus, as a general matter, the admission of evidence pursuant to the crime-fraud exception is a long accepted practice and, therefore, does not violate due process.

This does not terminate the inquiry, however, as Petitioner has raised a question regarding the factual basis for concluding that the crime-fraud exception applied in this instance.

174

Specifically, Petitioner argues that the trial court "erred in taking the content of the privileged material into account in making its ruling."   In concluding that the crime-fraud exception applied in this matter, the trial court relied on *People v. Paasche*, 525 N.W.2d 914 (Mich. Ct. App. 1994), which, in turn, relied, in part, on the Supreme Court's *Zolin* decision.   *See Paasche*, 525 N.W.2d at 917-18.[7]   The trial court, relying on the prosecutor's offer of proof concerning the facts to which attorney Badovinac would testify, found that the crime-fraud exception applied.   (Preliminary Examination Transcript, March 1, 2007, at PageID.1379-84).   This determination appears to run afoul of the *Paasche* court's admonition that "th[e] showing [necessary to introduce evidence pursuant to the crime-fraud exception] must be made without reference to the allegedly privileged material."   *Paasche*, 525 N.W.2d at 918.

This Court, however, is not concerned with whether the trial court's ruling is consistent with Michigan law, but instead only whether such runs afoul of clearly established federal law.   While Michigan law may require courts to assess the applicability of the crime-fraud exception "without reference to the allegedly privileged material," the *Zolin* Court articulated no such proscription.   In fact, the *Zolin* Court found such an approach to be "Draconian" in that it "leads to an absurd result."   *Zolin*, 491 U.S. at 565-68 (the Court rejected an approach "categorically prohibiting the party opposing the privilege on crime-fraud grounds from relying on" the contents of the allegedly privileged communications).[8]

---

7 The Court recognizes that the *Zolin* decision concerned the interpretation of the Federal Rules of Evidence, rather than due process or fair trial concerns.   Nevertheless, in the absence of Supreme Court authority directly on point, the Court finds the *Zolin* decision to be relevant regarding these latter concerns.   Simply put, implicit in the *Zolin* Court's decision is that conformance therewith, by satisfying the Federal Rules of Evidence, by extension satisfies the dictates of due process.

8 Petitioner in his argument appears to be inferentially relying on the *Zolin* Court's statement that "we hold that the threshold showing to obtain *in camera* review may be met by using any relevant evidence, lawfully obtained, that

Thus, the reliance by the trial court on the purported content of Badovinac's testimony in finding the crime-fraud exception applicable does not clearly run afoul of the *Zolin* Court's decision or any other clearly established federal law.   In sum, the denial of this claim by the Michigan Court of Appeals was neither contrary to, nor involved an unreasonable application of, clearly established federal law.   Furthermore, this decision was not based on an unreasonable determination of the facts in light of the evidence presented.   Accordingly, this claim raises no issue on which habeas relief may be granted.

## VII.         Jury Instructions

As is clear from the discussion above, the case against Petitioner was based almost exclusively on circumstantial evidence.   Prior to the start of trial, Petitioner moved the trial court to provide the jury a supplemental instruction regarding circumstantial evidence.   (Hearing Transcript, February 13, 2008, at PageID.3022-33).   Specifically, Petitioner requested that the jury be instructed that if the circumstantial evidence is "open to two reasonable constructions, one indicating guilt and the other innocence, it is [the jury's] duty to accept the construction indicating innocence."   (PageID.3030). The trial court denied Petitioner's request and instead instructed the jury, regarding direct and circumstantial evidence, as follows:

> Facts can be proved by direct evidence from a witness or an exhibit. Direct evidence is evidence about what we actually see or hear.   For example, if a witness testified that he saw rain falling, that would be direct evidence that rain fell.   Facts can also be proved by indirect

---

has not been adjudicated to be privileged."   *Zolin*, 491 U.S. at 575.   Notably, this observation concerns only the showing necessary to obtain *in camera* review of allegedly privileged material, which the Court found required a "lesser evidentiary showing. . than is required ultimately to overcome the privilege."   *Id.* at 572-75.   The prosecutor did not request that the trial court conduct an *in camera* review of the evidence in question and the trial court conducted no such assessment.   Thus, this particular aspect of the *Zolin* Court's decision does not appear relevant presently.

or circumstantial evidence.   Circumstantial evidence is evidence
that normally or reasonably leads to other facts.   For example, if a
witness testified that he saw a person wearing a raincoat covered
with small drops of rain, that would be circumstantial evidence that
rain fell.

You may consider circumstantial evidence.   Circumstantial
evidence by itself or a combination of circumstantial evidence and
direct evidence can be used to prove the elements of a crime.   In
other words, you should consider all the evidence that you believe.
In considering circumstantial evidence, all necessary and material
facts to be proven and on which a conviction depends must be
proven beyond a reasonable doubt.

(Trial Transcript, April 15, 2008, at PageID.9772).

Petitioner asserts that he is entitled to relief because the trial court's rejection of his

requested instruction denied him of the right to a fair trial.   (ECF No.4 at PageID.90-92).   Habeas

relief is not appropriate merely because jury instructions "contain technical and unsubstantial

errors."   *Fears v. Bagley*, 462 Fed. Appx. 565, 578 (6th Cir., Feb. 16, 2012).   Instead, relief is

available only where "the ailing instruction by itself so infected the entire trial that the resulting

conviction violates due process."   *Id.* (quoting *Estelle v. McGuire*, 502 U.S. 62, 72-73 (1991)).

Because the trial court's decision was not improper, Petitioner's due process right to a fair trial

was not violated.

More than sixty years ago, the United States Supreme Court rejected the type of

special circumstantial instruction requested by Petitioner.   In *Holland v. United States*, 348 U.S.

121 (1954), the Hollands were convicted of tax evasion on the basis of circumstantial evidence.

*Id.* at 124-27.   The Hollands argued that their convictions should be overturned because "the

instructions of the trial court were so erroneous and misleading as to constitute grounds for

reversal."   *Id.* at 139.   Specifically, the Hollands challenged "the refusal of the trial judge to

instruct that where the Government's evidence is circumstantial it must be such as to exclude every reasonable hypothesis other than of guilt."   *Ibid.*

The Court rejected this argument, noting that while "[t]here is some support for this type of instruction. . .the better rule is that where the jury is properly instructed on the standards for reasonable doubt, such an additional instruction on circumstantial evidence is confusing and incorrect."  *Id.* at 139-40).   In reaching this conclusion, the Court observed:

> Circumstantial evidence in this respect is intrinsically no different from testimonial evidence.  Admittedly, circumstantial evidence may in some cases point to a wholly incorrect result.  Yet this is equally true of testimonial evidence.  In both instances, a jury is asked to weigh the chances that the evidence correctly points to guilt against the possibility of inaccuracy or ambiguous inference. In both, the jury must use its experience with people and events in weighing the probabilities.  If the jury is convinced beyond a reasonable doubt, we can require no more.

*Id.* at 140.

Accordingly, so long as the instructions "correctly convey the concept of reasonable doubt to the jury," any resulting conviction satisfies the Constitution and does not offend due process.  *Victor v. Nebraska*, 511 U.S. 1, 5 (1994); *see also*, *Desert Palace, Inc. v. Costa*, 539 U.S. 90, 100 (2003) ("we have never questioned the sufficiency of circumstantial evidence in support of a criminal conviction, even though proof beyond a reasonable doubt is required"); *Gipson v. Sheldon*, 659 Fed. Appx. 871, 881 (6th Cir., Sept. 14, 2016) ("[t]he evidence is entirely circumstantial, to be sure[, b]ut the Supreme Court has held that 'circumstantial evidence. . .is intrinsically no different from testimonial evidence,' and that it is sufficient as long as the jury is convinced beyond a reasonable doubt").

The jury instruction quoted above accurately described the difference between direct and circumstantial evidence.   Moreover, while the jury was correctly instructed that it could consider circumstantial evidence, it was cautioned that "[i]n considering circumstantial evidence, all necessary and material facts to be proven and on which a conviction depends must be proven beyond a reasonable doubt."   (Trial Transcript, April 15, 2008, at PageID.9772).   On the specific topic of reasonable doubt and the burden of proof, the jury was instructed as follows:

> A person accused of a crime is presumed to be innocent.   This means you must start with the presumption that the defendant is innocent.   This presumption continues throughout this trial and entitles the defendant to a verdict of not guilty unless you are satisfied beyond a reasonable doubt that he is guilty.   Every crime is made up of parts called elements.   The prosecutor must prove each element of the crime beyond a reasonable doubt.   The defendant is not required to prove his innocence or do anything.   If you find that the prosecutor has not proven every element beyond a reasonable doubt, then you must find the defendant not guilty.
>
> A reasonable doubt is a fair, honest doubt, growing out of the evidence or lack of evidence.   It is not merely an imaginary or possible doubt, but a doubt based on reason and common sense.   A reasonable doubt is just that, a doubt that is reasonable after careful and considered examination of the facts and circumstances of this case.

(Trial Transcript, April 15, 2008, at PageID.9764).

The Constitution does not mandate any particular or specific instruction on the concept of reasonable doubt and so long as a trial court's reasonable doubt instruction cannot reasonably be understood to permit conviction on a standard of proof lesser than beyond a reasonable doubt, the Constitution is not violated.   *See, e.g., Victor*, 511 U.S. at 5; *see also*, *United States v. Rios*, 830 F.3d 403, 432-33 (6th Cir. 2016) (same).   In the Court's estimation, the jury was properly instructed on these matters.

179

The trial court's decision denying this claim was neither contrary to, nor involved an unreasonable application of, clearly established federal law.   Furthermore, this decision was not based on an unreasonable determination of the facts in light of the evidence presented. Accordingly, this claim raises no issue on which habeas relief may be granted.

**VIII.**        **Walker Hearing**

As noted above, several law enforcement officials testified at trial regarding statements Petitioner made in the immediate aftermath of his wife's death.   Prior to trial, Petitioner moved to suppress this testimony on the ground that his statements were the product of custodial interrogation which rendered his comments, in the absence of *Miranda* warnings, inadmissible.   Following a *Walker* hearing,[9]  the trial court denied Petitioner's motion to suppress. Petitioner now asserts that he is entitled to relief for two reasons: (1) the decision denying his motion to suppress was erroneous and (2) he was improperly forced by the trial court, during the suppression hearing motion, to answer questions in violation of Fifth Amendment right to not be subjected to compelled self-incrimination.   (ECF No. 4 at PageID.92-100).

A.        Custodial Interrogation

The Fifth Amendment provides, in part, that no person "shall be compelled in any criminal case to be a witness against himself."   U.S. Const. amend. V.   In an attempt to secure this right, the United States Supreme Court ultimately held that prior to custodial interrogation, an

---

9 Following the Michigan Supreme Court's decision in *People v. Walker*, 132 N.W.2d 87 (Mich. 1965), proceedings challenging the admissibility of a criminal defendant's statements are generally referred to as *Walker* hearings.

accused must be informed of the following: (1) his right to remain silent; (2) that anything he says may be used against him; (3) his right to have an attorney present during questioning; and (4) that if he cannot afford an attorney one will be appointed for him.  *See Miranda v. Arizona*, 384 U.S. 436, 444 (1966)).  Because these prophylactic measures "protect the individual against the coercive nature of custodial interrogation, they are required only where there has been such a restriction on a person's freedom as to render him 'in custody.'"  *J.D.B. v. North Carolina*, 564 U.S. 261; 131 S.Ct. 2394, 2402 (2011) (citations omitted).

In this context, the term "custody" refers to "circumstances that are thought generally to present a serious danger of coercion."  *Howes v. Fields*, 565 U.S. 499, 508-09 (2012). This is an objective inquiry which requires a court to determine whether, given the specific circumstances surrounding the interrogation, "a reasonable person would have felt he or she was at liberty to terminate the interrogation and leave."  *J.D.B.*, 131 S.Ct. at 2402.  Moreover, the Court, observing that "not all restraints on freedom of movement amount to custody for purposes of *Miranda*," has "declined to accord talismanic power to the freedom-of-movement inquiry." *Howes*, 565 U.S. at 509.

While there does not exist a defined set of factors which much be assessed in every circumstance, some of the factors relevant to this determination include the following: (1) the location of the questioning; (2) its duration; (3) statements made during the questioning; (4) the presence or absence of physical restraints during the questioning; and (5) the release of the interviewee when questioning is complete.  *Howes*, 565 U.S. at 509.  As if to underscore that this is an objective assessment, the Supreme Court has stated, "the subjective views harbored by either the interrogating officers or the person being questioned are irrelevant.  The test, in other words,

involves no consideration of the 'actual mindset' of the particular suspect subjected to police questioning." *J.D.B.*, 131 S.Ct. at 2402.

In denying Petitioner's motion to suppress, the trial court observed, in part, as follows:

> The officers were faced with what was either accident, suicide, or murder, with the defendant being the only source of information as to the cause for the fall.  Defendant knew early on that he was a party of interest.  He was quite talkative for the most part.  The believable testimony generally shows the deputies and the defendant both playing each other for their own interests.   Although defendant was never explicitly told he could leave, there is no evidence defendant's will was overborne, nor was the atmosphere at the hospital so coercive that any statement sought to be suppressed was involuntary.  The credible evidence supports this Court's finding that the timing of the interviews was not protracted for the purpose of gaining an advantage over the defendant.  Defendant never requested to leave and he was told he was not under arrest, and defendant of his own volition was cooperating by giving consent to move and search his car.  There were other instances where defendant showed no reluctance to say no to deputies' questions; i.e., he would 'rather' notify family in person and his refusal to give a written statement.

> Under the totality of the circumstances, there was no custodial interrogation.  A reasonable person would have concluded he was free to go had he asserted himself.  The various and miscellaneous statements sought to be suppressed from these interviews, if relevant, should be allowed into evidence.  The credible evidence supports their overall voluntariness.

*People v. Richardson*, Order (Alger Cnty. Cir. Ct., July 13, 2007) (ECF No. 14-55 at PageID.9865-67).

The trial court's conclusions are consistent with and supported by the testimony presented at the Walker hearing.  (Hearing Transcript, July 2, 2007, at PageID.2043-2193; Hearing Transcript, July 3, 2007, at PageID.2197-2386).  Petitioner reasserted this claim in his

post-conviction motion for relief from judgment.    The trial court again denied Petitioner's claim

observing as follows:

> The Defendant's questioning, for the most part, took place at the
> hospital, where his wife was transported after her recovery from the
> base of the cliff at the Pictured Rocks National Park.    He was told
> he was not under arrest.    The Defendant expressed no outward
> desire to leave or even contact his family.    He cooperated with the
> officers and was provided with a person of the cloth to comfort him
> and a place to stay that evening.    He was allowed to leave the next
> morning and only asked to stay in touch with the authorities.    The
> Defendant went as far, before leaving, to hug one of the officers,
> Deputy Steven Blank.

*People v. Richardson*, Opinion and Order (Alger Cnty. Cir. Ct., May 29, 2013) (ECF No. 14-55 at

PageID.9855).

   The denial of this particular claim by the state courts was neither contrary to, nor

involved an unreasonable application of, clearly established federal law.    Furthermore, this

decision was not based on an unreasonable determination of the facts in light of the evidence

presented.    Accordingly, this claim raises no issue on which habeas relief may be granted.


   B.  Fifth Amendment Privilege

   At the aforementioned *Walker* hearing, Petitioner, in consultation with his attorney,

voluntarily chose to testify concerning the issues raised by his motion to suppress.    (Hearing

Transcript, July 3, 2007, at PageID.2329-86).    Petitioner now asserts that he is entitled to habeas

relief on the ground that the trial court forced him to testify in violation of his Fifth Amendment

right against compelled self-incrimination.

   In *Simmons v. United States*, 390 U.S. 377 (1968), Garrett moved, prior to trial, to

suppress evidence allegedly obtained in violation of his Fourth Amendment rights.    *Id.* at 381.

Garrett's suppression hearing testimony was subsequently introduced at trial as substantive evidence of Garrett's guilt. *Id.* at 381, 389. Recognizing that "a defendant who knows that his testimony may be admissible against him at trial will sometimes be deterred from presenting the testimonial proof [in support of] a Fourth Amendment claim," the Supreme Court held that "when a defendant testifies in support of a motion to suppress evidence on Fourth Amendment grounds, his testimony may not thereafter be admitted against him at trial on the issue of guilt unless he makes no objection." *Id.* at 389-94. While the Court has not located any Supreme Court authority extending this holding to circumstances in which a criminal defendant seeks to suppress evidence on Fifth Amendment grounds, the underlying rationale is equally applicable. *See, e.g., United States v. Harrison*, 461 F.2d 1127, 1131-32 (5th Cir. 1972) (holding that *Simmons* precluded the prosecution from introducing as substantive evidence of guilt at trial statements made by the defendant at a motion to suppress his confession on Fifth Amendment grounds).

Petitioner's *Walker* hearing testimony was neither introduced against Petitioner at trial nor referenced in any way.[10] Accordingly, Petitioner's Fifth Amendment rights were not violated. *See Simmons*, 390 U.S. at 389-94; *United States v. Balsys*, 524 U.S. 666, 682-83 (1998) (recognizing that "at its heart" the Fifth Amendment prohibits the government from compelling a criminal defendant "to furnish testimonial evidence that may be used to prove his guilt"). The denial of this particular claim was neither contrary to, nor involved an unreasonable application of, clearly established federal law. Furthermore, this decision was not based on an unreasonable

---

10 In its order denying Petitioner's motion to suppress, the trial court also ordered that such be "sealed and not. . .released or viewed or discussed by any court officers." *People v. Richardson*, Order (Alger Cnty. Cir. Ct., July 13, 2007) (ECF No. 14-55 at PageID.9867). The trial court took this measure in recognition that because Petitioner testified at the *Walker* hearing "the Court is forced to make a credibility determination, which, if released, would compound the problem of jury selection by releasing a judicial determination on defendant's credibility in a pretrial proceeding." *Ibid.*

determination of the facts in light of the evidence presented.   Accordingly, this claim raises no issue on which habeas relief may be granted.

**IX.          GPS Tracking Device Claim**

On cross-examination, Detective Jeff Herweyer testified that a GPS tracking device had been placed on Petitioner's vehicle on or about October 3, 2006.   (Trial Transcript, April 2, 2008 at PageID.8777).   Detective Herweyer indicated that the GPS device remained on Petitioner's vehicle until "just prior to [Petitioner's] arrest" early the following year. (PageID.8777-78).   Petitioner asserts that he was not provided the police reports "and other evidence" concerning the placement of the GPS device in violation of his rights under *Brady v. Maryland*.   (ECF No. 4 at PageID.122-26).

As previously noted, to establish a *Brady* violation, Petitioner must establish: (1) the prosecution suppressed or withheld evidence, (2) such evidence was favorable to the defense, and (3) the suppressed evidence was material.   *See Dado*, 759 F.3d at 559-60.   To satisfy the materiality requirement, Petitioner must establish that "the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict." *Dretke*, 540 U.S. at 698.

Petitioner's claim fails because he cannot satisfy the first prong.   At a post-trial motion for new trial, Petitioner's attorney acknowledged that he was, in fact, timely provided a police report indicating that a tracking device had been placed on Petitioner's vehicle.   (Motion Transcript, August 13, 2008, at PageID.9800, 9824-25).   Petitioner attempts to sidestep this inconvenient fact by arguing that the initial police report which he was, in fact, timely provided

185

referred to the tracking device as a "bird dog tracking device" and that the police later amended the report in question to describe the tracking device as an "intelligence gathering device." (PageID.9802-03).   As the trial court recognized, this argument is unavailing because "[t]he bottom line is that [Petitioner] was on notice of the GPS device's existence early on in the investigation. . ."   *People v. Richardson*, Opinion and Order (Alger Cnty. Cir. Ct., May 29, 2013) (ECF No. 14-55 at PageID.9860).

As for Petitioner's allegation that the police failed to produce copies of the "other evidence" produced as a result of the placement of the GPS device on his vehicle, Petitioner has no evidence that any such evidence was ever created.   Detective Herweyer testified that no reports were produced "based on the tracking device."   (Trial Transcript, April 2, 2008 at PageID.8777). Petitioner has identified no evidence to the contrary.[11]

The trial court's decision denying this claim was neither contrary to, nor involved an unreasonable application of, clearly established federal law.   Furthermore, this decision was not based on an unreasonable determination of the facts in light of the evidence presented. Accordingly, this claim raises no issue on which habeas relief may be granted.

## X.        Illegal Search

As noted above, Tammy Sian testified concerning her relationship with Petitioner following Juanita Richardson's death.   Petitioner alleges that the prosecution only learned of Sian's relationship with Petitioner through information obtained from the GPS tracking device

---

11 In his Memorandum of Law in support of his petition, Petitioner makes reference to "attached Exhibit K" and "attached Exhibit I."   (ECF No. 4 at PageID.123).   No such exhibits are attached to or included with Petitioner's Memorandum of Law.   Moreover, the Court cannot locate any such exhibits in the record.

placed on Petitioner's vehicle.   Petitioner now argues that because placement of the GPS device on his vehicle violated his Fourth Amendment rights, the introduction of Sian's testimony entitles him to habeas relief.   (ECF No. 4 at PageID.114-16).

In *Stone v. Powell*, 428 U.S. 465 (1976), the Supreme Court held that "where the State has provided an opportunity for full and fair litigation of a Fourth Amendment claim, a state prisoner may not be granted federal habeas corpus relief on the ground that evidence obtained in unconstitutional search or seizure was introduced at his trial." *Id.* at 494.   The Sixth Circuit recently clarified that "we make clear that the *Powell* 'opportunity for full and fair consideration' means an available avenue for the prisoner to present his claim to the state courts, not an inquiry into the adequacy of the procedure actually used to resolve that particular claim." *Good v. Berghuis*, 729 F.3d 636, 639 (6th Cir. 2013).

Pursuant to Michigan court rules, criminal defendants can challenge the admissibility of evidence during a preliminary examination or in the trial court.   M.C.R. 6.110(D). Michigan court rules further provide criminal defendants with the right to appeal should such a challenge prove unsuccessful.   M.C.R. 7.203(A)(1).   The mechanisms provided by the State of Michigan are, therefore, clearly adequate.   *See, e.g., Orlando v. Smith*, 2014 WL 555182 at *1 (E.D. Mich., Feb. 12, 2014) (recognizing that the procedures available to Michigan criminal defendants are "adequate" for purposes of the *Stone v. Powell* analysis).   Furthermore, Petitioner has neither asserted nor demonstrated that the available procedural mechanisms failed or that his attempts to employ such were frustrated.   To the contrary, Petitioner was able to assert his Fourth Amendment claims in state court.   That these courts found Petitioner's claim to lack merit does not alter the outcome.   In sum, the Court finds that the State of Michigan afforded Petitioner "an

opportunity for full and fair litigation of [his] Fourth Amendment claim."    Accordingly, this claim is not cognizable in this Court.

**XI.**         **Impeachment of the Jury Verdict**

Petitioner argues that the trial court's decision denying his motion for new trial constituted an abuse of discretion.    Specifically, Petitioner asserts that the trial court should have granted his request for a new trial on the ground that the jurors performed an inappropriate experiment during their deliberations.    (ECF No. 4 at PageID.117-20).

Petitioner's argument ignores the well established rule that except in cases of extraneous influence, evidence cannot later be submitted for the purpose of impeaching the jury's verdict.    *See Tanner v. United States*, 483 U.S. 107, 117-18 (1987).    Extraneous influence refers to information derived "from a source external to the jury."    *Warger v. Shauers*, 135 S.Ct. 521, 529 (2014).    As Petitioner acknowledged at the hearing on his motion for new trial, this particular claim is premised on unsworn comments one or two jurors allegedly made to the media following the conclusion of Petitioner's trial.    (Hearing Transcript, August 13, 2008, at PageID.9809-11). Petitioner has presented no evidence that the jurors were improperly swayed by, or even considered, extraneous information.    Petitioner simply objects to the manner in which the jury allegedly conducted its deliberations.    Any examination of such is foreclosed, however, by clearly established Supreme Court authority.    The denial of this claim was neither contrary to, nor involved an unreasonable application of, clearly established federal law.    Furthermore, this decision was not based on an unreasonable determination of the facts in light of the evidence presented.    Accordingly, this claim raises no issue on which habeas relief may be granted.

**XII.**          **Jailhouse Informer**

As noted above, Dylan Bonevelle was briefly a cellmate of Petitioner at the Alger County Jail.   During this time, Bonevelle surreptitiously recorded conversations with Petitioner at the behest of law enforcement.   Bonevelle also read Petitioner's legal documents without Petitioner's knowledge or permission.   Petitioner argues that Bonevelle's actions violated his Fourth, Fifth, Sixth and Fourteenth Amendment rights.   (ECF No. 4 at PageID.100-06).   While Petitioner's Sixth Amendment rights were clearly violated, habeas relief is nevertheless not appropriate because this violation was harmless.   Petitioner's other claims are without merit.

A.       Fourth Amendment

Petitioner argues that his Fourth Amendment right to be free from unreasonable searches was violated when Bonevelle conducted "an illegal search of his personal legal material including attorney mail and work product."   Petitioner's claim fails because as previously noted, habeas relief cannot be premised upon alleged Fourth Amendment violations.

B.       Fourteenth Amendment

Petitioner's vague claim that Bonevelle's actions violated his Fourteenth Amendment right to a fair trial fails because the conduct which forms the basis of this claim is expressly protected by specific constitutional amendments.   *See, e.g., Hoffman v. Harris*, 2017 WL 3951852 at *2 (6th Cir., Apr. 5, 2017) (quoting *Albright v. Oliver*, 510 U.S. 266, 273 (1994)) ("[w]here a particular Amendment provides an explicit textual source of constitutional protection

189

against a particular sort of government behavior, that Amendment, not the more generalized [protections of the Fourteenth Amendment] must be the guide for analyzing these claims"); *see also*, *Wymer v. Workman*, 311 Fed. Appx. 106, 109 n.3 (10th Cir., Feb. 6, 2009) (same).

C.    Sixth Amendment

In *Massiah v. United States*, 377 U.S. 201 (1964), Massiah was charged with a criminal offense after which he pleaded not guilty, retained legal counsel, and was released on bail. *Id.* at 201-02. Thereafter, one of Massiah's co-defendants, Colson, agreed "to cooperate with the government agents in their continuing investigation." *Id.* at 202. Specifically, Colson permitted law enforcement officials to place in his vehicle a radio transmitter. *Id.* at 202-03. Massiah later made incriminating statements while in Colson's vehicle. *Id.* at 203. These statements were intercepted by law enforcement and introduced against Massiah at his trial. *Ibid.* The Supreme Court overturned Massiah's conviction on the ground that his Sixth Amendment right to counsel had been violated by Colson's actions. *Id.* at 203-07. Specifically, the Court held:

> We hold that the petitioner was denied the basic protections of [the Sixth Amendment right to counsel] when there was used against him at trial evidence of his own incriminating words, which federal agents had deliberately elicited from him after he had been indicted and in the absence of counsel.

*Id.* at 206.

The Supreme Court revisited this issue in *United States v. Henry*, 447 U.S. 264 (1980). Billy Henry was charged with armed robbery and incarcerated pending trial. *Id.* at 265-66. An inmate named Nichols, a paid informant for the Federal Bureau of Investigation (FBI),

190

subsequently notified law enforcement officials that he was "housed in the same cellblock with several federal prisoners awaiting trial, including Henry." *Id.* at 266.   An FBI agent instructed Nichols "to be alert to any statements made by the federal prisoners, but not initiate any conversation with or question Henry regarding the bank robbery." *Ibid.*   Nichols later informed FBI officials that "he and Henry had engaged in conversation and that Henry had told him about the [bank] robbery." *Ibid.*   At Henry's trial, Nichols related Henry's incriminating statements. *Id.* at 266-67.

In addressing whether Henry's conviction was obtained in violation of his Sixth Amendment rights, the Court articulated the issue as follows:

> The present case involves incriminating statements made by the accused to an undisclosed and undercover Government informant while in custody and after indictment. . .The question here is whether under the facts of this case a Government agent "deliberately elicited" incriminating statements from Henry within the meaning of *Massiah.*

*Id.* at 269-70.

The Court concluded that Henry's Sixth Amendment rights had been violated, in the process dismissing the government's argument that Henry's rights had not been violated because "the federal agents instructed Nichols not to question Henry about the robbery." *Id.* at 271-75.   In this regard, the Court observed:

> It is undisputed that Henry was unaware of Nichols' role as a Government informant.   The government argues that this Court should apply a less rigorous standard under the Sixth Amendment where the accused is prompted by an undisclosed undercover informant than where the accused is speaking in the hearing of persons he knows to be Government officers.   That line of argument, however, seeks to infuse Fifth Amendment concerns against compelled self-incrimination into the Sixth Amendment protection of the right to the assistance of counsel.   An accused

speaking to a known Government agent is typically aware that his statements may be used against him. The adversary positions at that stage are well established; the parties are then "arms' length" adversaries.

When the accused is in the company of a fellow inmate who is acting by prearrangement as a Government agent, the same cannot be said. Conversation stimulated in such circumstances may elicit information that an accused would not intentionally reveal to persons known to be Government agents. Indeed, the *Massiah* Court noted that if the Sixth Amendment "is to have any efficacy it must apply to indirect and surreptitious interrogations as well as those conducted in the jailhouse." The Court pointedly observed that Massiah was more seriously imposed upon because he did not know that his codefendant was a Government agent.

Moreover, the concept of a knowing and voluntary waiver of Sixth Amendment rights does not apply in the context of communications with an undisclosed undercover informant acting for the Government. In that setting, Henry, being unaware that Nichols was a Government agent expressly commissioned to secure evidence, cannot be held to have waived his right to the assistance of counsel.

Finally Henry's incarceration at the time he was engaged in conversation by Nichols is also a relevant factor. As a ground for imposing the prophylactic requirements in *Miranda v. Arizona*, this Court noted the powerful psychological inducements to reach for aid when a person is in confinement. While the concern in *Miranda* was limited to custodial police interrogation, the mere fact of custody imposes pressures on the accused; confinement may bring into play subtle influences that will make him particularly susceptible to the ploys of undercover Government agents. The Court of Appeals determined that on this record the incriminating conversations between Henry and Nichols were facilitated by Nichols' conduct and apparent status as a person sharing a common plight. That Nichols had managed to gain the confidence of Henry, as the Court of Appeals determined, is confirmed by Henry's request that Nichols assist him in his escape plans when Nichols was released from confinement.

*Id.* at 272-74 (internal citations omitted).

Accordingly, the Court concluded:

> By intentionally creating a situation likely to induce Henry to make incriminating statements without the assistance of counsel, the Government violated Henry's Sixth Amendment right to counsel. This is not a case where, in Justice Cardozo's words, "the constable. . .blundered, rather, it is one where the "constable" planned an impermissible interference with the right to the assistance of counsel.

*Id.* at 274-75 (internal citations omitted).

The holdings in *Massiah* and *Henry*, would appear to compel the conclusion that Petitioner's Sixth Amendment right to counsel was violated in this matter.   It is undisputed that Bonevelle was acting at the direction of law enforcement officials and was specifically instructed to interact with Petitioner in an attempt to obtain incriminating information which was subsequently introduced against Petitioner to establish the charges for which he was then incarcerated.   The trial court disregarded this authority, and found no violation of Petitioner's Sixth Amendment rights, on the ground that law enforcement was merely investigating a potential threat against the prosecuting attorney.   *People v. Richardson*, Case No. 07-1782-FC, Order (Nov. 5, 2007) (ECF No. 14-55 at PageID.9870-74); *People v. Richardson*, Case No. 07-1782-FC, Order (May 29, 2013) (ECF No. 14-55 at PageID.9856-58).   The Supreme Court, however, explicitly rejected this argument more than twenty (20) years before Petitioner's trial.

In *Maine v. Moulton*, 474 U.S. 159 (1985), Moulton and Coulson were charged with multiple counts of theft.   *Id.* at 162.   Moulton later suggested to Coulson that they kill one of the witnesses who would testify against them at trial.   *Id.* at 162.   During a subsequent meeting with law enforcement officials, Coulson revealed Moulton's plan to murder a witness.   *Id.* at 162-63.   Coulson thereafter agreed to the police's request to surreptitiously record his conversations with Moulton.   *Id.* at 163-66.   During these subsequent conversations, Moulton made many

193

incriminating statements which were introduced against him at his trial on the theft charges.  *Id.* at 163-67.   Moulton argued that his conviction was obtained in violation of his Sixth Amendment rights.  *Id.* at 167-69.

The Court concluded that, based upon *Massiah* and *Henry*, Moulton's Sixth Amendment rights had been violated.  *Id.* at 168-77.   The Court first rejected the State's argument that because Moulton, and not Coulson, had initiated the telephone calls and meetings during which Moulton made incriminating statements, Moulton's rights were not violated.  *Id.* at 174-76.   In this respect, the Court observed:

> the State's attempt to limit our holdings in *Massiah* and *Henry* fundamentally misunderstands the nature of the right we recognized in those cases.   The Sixth Amendment guarantees the accused, at least after the initiation of formal charges, the right to rely on counsel as a "medium" between him and the State.   As noted above, this guarantee includes the State's affirmative obligation not to act in a manner that circumvents the protections accorded the accused by invoking this right.   The determination whether particular action by state agents violates the accused's right to the assistance of counsel must be made in light of this obligation.   Thus, the Sixth Amendment is not violated whenever - by luck or happenstance - the State obtains incriminating statements from the accused after the right to counsel has attached.   However, knowing exploitation by the State of an opportunity to confront the accused without counsel being present is as much a breach of the State's obligation not to circumvent the right to the assistance of counsel as is the intentional creation of such an opportunity.   Accordingly, the Sixth Amendment is violated when the State obtains incriminating statements by knowingly circumventing the accused's right to have counsel present in a confrontation between the accused and a state agent.

*Id.* at 176 (internal citations omitted).

Pertinent to the present matter, the State of Maine then argued that "the incriminating statements obtained by the Maine police nevertheless should not be suppressed

194

because the police had other, legitimate reasons for listening to Moulton's conversations with Colson, namely, to investigate Moulton's alleged plan to kill [a witness] and to insure Colson's safety." *Id.* at 178.   The Court rejected this argument:

> The police have an interest in the thorough investigation of crimes for which formal charges have already been filed. They also have an interest in investigating new or additional crimes. Investigations of either type of crime may require surveillance of individuals already under indictment.    Moreover, law enforcement officials investigating an individual suspected of committing one crime and formally charged with having committed another crime obviously seek to discover evidence useful at a trial of either crime.   In seeking evidence pertaining to pending charges, however, the Government's investigative powers are limited by the Sixth Amendment rights of the accused.   To allow the admission of evidence obtained from the accused in violation of his Sixth Amendment rights whenever the police assert an alternative, legitimate reason for their surveillance invites abuse by law enforcement personnel in the form of fabricated investigations and risks the evisceration of the Sixth Amendment right recognized in *Massiah.*   On the other hand, to exclude evidence pertaining to charges as to which the Sixth Amendment right to counsel had not attached at the time the evidence was obtained, simply because other charges were pending at that time, would unnecessarily frustrate the public's interest in the investigation of criminal activities. Consequently, incriminating statements pertaining to pending charges are inadmissible at the trial of those charges, not withstanding the fact that the police were also investigating other crimes, if, in obtaining this evidence, the State violated the Sixth Amendment by knowingly circumventing the accused's right to the assistance of counsel.

*Id.* at 179-80.

Accordingly, with respect to the State's enlistment of Dylan Bonevelle as an agent to obtain incriminating evidence against Petitioner, there exists a clear distinction between: (1) then pending charges against Petitioner arising from Juanita Richardson's death and (2) investigation to determine whether to charge Petitioner for threats allegedly made against the

195

prosecuting attorney.   With respect to the former, Petitioner's Sixth Amendment right to counsel had already attached whereas such was not the case with respect to the latter.

Thus, while the Sixth Amendment would not have been violated had the State introduced Bonevelle's testimony against Petitioner in a subsequent action for threats made against the prosecuting attorney, Petitioner's Sixth Amendment rights were clearly violated when the State introduced, at his trial for killing Juanita Richardson, testimony from Bonevelle concerning statements Petitioner made to Bonevelle after Bonevelle became a government agent.   This temporal distinction is important because with respect to Bonevelle's testimony concerning statements Petitioner made before Bonevelle became a government agent, Petitioner's Sixth Amendment rights were not violated.   *Id.* at 176 ("the Sixth Amendment is not violated whenever – by luck or happenstance – the State obtains incriminating statements from the accused after the right to counsel has attached").[12]

While Petitioner's Sixth Amendment rights were blatantly violated in this matter, he is entitled to habeas relief only if the error resulting from such was not harmless.   *See, e.g., United States v. Mir*, 525 F.3d 351, 358 n.1 (4th Cir. 2008) (citing *Milton v. Wainwright*, 407 U.S. 371 (1972)) (noting that violations of the *Massiah* Sixth Amendment right to counsel are subject to harmless error analysis).   In the context of a petition for writ of habeas corpus, relief based on an alleged "trial error" is warranted only if the error in question "had substantial and injurious effect or influence in determining the jury's verdict."   *Brecht v. Abrahamson*, 507 U.S. 619, 623,

---

12  As previously noted, Benjamin Borowski and Timothy Mozader also testified as to comments Petitioner made while housed at the Alger County Jail.   There is neither evidence nor argument, however, that Borowski or Mozader ever acted as government agents or that the comments by Petitioner about which they testified were made after Bonevelle began acting as a government agent.   Thus, the testimony by Borowski and Mozader does not appear to implicate or violate Petitioner's Sixth Amendment rights.

638 (1993); *see also*, *Fry v. Pliler*, 551 U.S. 112, 116-22 (2007) (in the context of a habeas corpus action brought pursuant to 28 U.S.C. § 2254, a trial error is considered harmless "unless it had substantial and injurious effect or influence in determining the jury's verdict"). To satisfy this standard, Petitioner must establish that he suffered "actual prejudice" as a result of the alleged error. *Brecht*, 507 U.S. at 637. A review of Bonevelle's testimony reveals that introduction of such was harmless.[13]

Bonevelle testified that before speaking with Trooper Michelin, Petitioner made the comment that the prosecuting attorney would "be the next bitch to go off a cliff." (Trial Transcript, April 1, 2008, at PageID.8432-35). This was certainly relevant evidence as it suggests that there had been a previous "bitch" who went "off a cliff," an inference which supports the conclusion that Petitioner murdered Juanita Richardson by forcing her off the cliff. Petitioner's offer to Bonevelle of a boat and Corvette if he would "take care of" the prosecutor was also made before Bonevelle spoke with Trooper Michelin. (PageID.8433). As Bonevelle testified, it was these particular statements that caused him to meet with Trooper Michelin. (PageID.8435-36). After Bonevelle agreed to act as a government agent, Petitioner did not speak about the prosecutor quite so forcefully. Petitioner "wouldn't say to kill the prosecutor," but instead indicated that he would "take care of" the prosecutor. (PageID.8438-39). While introduction of these latter statements violated Petitioner's Sixth Amendment rights, such were, at most, merely vague reiterations of properly admitted testimony that Petitioner stated that the prosecutor would "be the

---

13 Again, in assessing the impact of Bonevelle's testimony it is important to distinguish between the statements Petitioner made to Bonevelle before Bonevelle was enlisted as a government agent and those made thereafter because introduction of the former do not violate Petitioner's Sixth Amendment rights and, therefore, could not have resulted in unfair prejudice.

next bitch to go off a cliff."   As such, it is not reasonable to conclude that consideration of the improperly admitted testimony "had substantial and injurious effect or influence in determining the jury's verdict."

Bonevelle also testified that Petitioner described to him the events surrounding his wife's death.   (PageID.8430).   Petitioner told Bonevelle that "he left to use the bathroom" and "when he came back, that she had fallen or whatever."   (PageID.8430).   Bonevelle also noted that "at one point [Petitioner's] stories were, you know, somewhat different," but did not elaborate on the point.   (PageID.8430).   It is not clear whether Petitioner made these statements before or after Bonevelle became a government agent, but even if the Court assumes that these particular statements were improperly admitted, such could not have prejudiced Petitioner as such mirror the testimony of numerous witnesses to whom Petitioner spoke about the events in question.[14]

In sum, while certain portions of Bonevelle's testimony were admitted in violation of Petitoner's Sixth Amendment right to counsel, relief is not appropriate as such did not result in actual prejudice to Petitioner.   Accordingly, this claim cannot form the basis for habeas corpus relief.[15]

---

14 In his brief in support of this claim, Petitioner references testimony presented at a pre-trial hearing on his motion to suppress.   (ECF No. 4 at PageID.104; Hearing Transcript, Aug. 20, 2007).   However, because this particular testimony was not before or presented to the jury, such is not presently relevant.

15 Petitioner also asserts that introduction of Bonevelle's testimony violated his Fifth Amendment rights.   (ECF No. 4 at PageID.100-06).   However, because Petitioner has not sufficiently developed this argument, the Court simply cannot discern the nature or basis of such.   This is of no consequence, however, as any violation of Petitioner's Fifth Amendment rights is harmless for the reasons discussed herein.   *See Neder v. United States*, 527 U.S. 1, 18 (1999) (the "erroneous admission of evidence" in violation of the Fifth Amendment is "subject to harmless-error analysis").

**XIII.**         **Ineffective Assistance of Trial Counsel**

Petitioner asserts that he is entitled to relief on the ground that he was denied the right to the effective assistance of trial counsel.  Specifically, Petitioner argues that his trial counsels' performance was deficient in the following ways: (1) failing to question Dr. Werner Spitz at trial; (2) failing to object to the trial court's decision not to provide a requested special jury instruction; and (3) failing to request that the jury not conduct experiments during their deliberations.

To establish ineffective assistance of counsel, Petitioner must show both deficient performance by his counsel and prejudice resulting therefrom.  *See Premo v. Moore*, 131 S.Ct. 733, 739 (2011) (quoting *Knowles v. Mirzayance*, 129 S.Ct. 1411 (2009)).   To establish deficient performance, Petitioner must show that "counsel's representation fell below an objective standard of reasonableness."  *Premo*, 131 S.Ct. at 739 (quoting *Strickland v. Washington*, 466 U.S. 668, 688 (1984)).   A court considering a claim of ineffective assistance must apply a "strong presumption that counsel's representation was within the 'wide range' of reasonable professional assistance."  *Premo*, 131 S.Ct. at 739 (quoting *Strickland*, 466 U.S. at 689).   Petitioner's burden is to show that "counsel made errors so serious that [he] was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment."  *Premo*, 131 S.Ct. at 739 (quoting *Strickland*, 466 U.S. at 687).

Petitioner must further establish that he suffered prejudice as a result of his attorney's allegedly deficient performance.  Prejudice, in this context, has been defined as "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different."  *Premo*, 131 S.Ct. at 739 (quoting *Padilla v. Kentucky*, 130 S.Ct.

199

1473, 1485 (2010)); *see also*, *Mahdi v. Bagley*, 522 F.3d 631, 636 (6th Cir. 2008).    The issue is whether counsel's representation "amounted to incompetence under 'prevailing professional norms,' not whether it deviated from best practices or most common custom."    *Premo*, 131 S.Ct. at 739 (quoting *Strickland*, 466 U.S. at 690).    This is a heavy burden for Petitioner to meet, because he must establish that his counsel's performance was "so manifestly ineffective that defeat was snatched from the hands of probable victory."    *Jacobs v. Mohr*, 265 F.3d 407, 418 (6th Cir. 2001).

As the Supreme Court has made clear, even when reviewing an ineffective assistance of counsel claim *de novo*, "the standard for judging counsel's representation is a most deferential one."    *Premo*, 131 S.Ct. at 740.    Likewise, the standard by which petitions for habeas relief are judged is "highly deferential."    Thus, when reviewing, in the context of a habeas petition, whether a state court unreasonably applied the *Strickland* standard, review is "doubly" deferential.    *Id.* (citations omitted).    As the Supreme Court recently concluded:

> The *Strickland* standard is a general one, so the range of reasonable applications is substantial.    Federal habeas courts must guard against the danger of equating reasonableness under *Strickland* with unreasonableness under § 2254(d).    When § 2254(d) applies, the question is not whether counsel's actions were reasonable. The question is whether there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard.

*Id.* (internal citations omitted).

A.    Dr. Werner Spitz

The question whether to permit Dr. Werner Spitz, an expert witness retained by Petitioner, to testify was protracted.    The trial court initially precluded Dr. Spitz from testifying

200

both as a discovery sanction and on the ground that his opinions were not sufficiently supported.

*People v. Richardson*, Case No. 07-1782-FC, Order (Oct. 4, 2007) (ECF No. 14-59 at PageID.10413-15). The Michigan Court of Appeals vacated the trial court's order and remanded the matter to the trial court for further consideration. *People v. Richardson*, Case No. 281359, Order (Mich. Ct. App., Nov. 15, 2007) (ECF No. 14-59 at PageID.10393-94). On December 12, 2007, the trial court again excluded Dr. Spitz's testimony on the grounds that his opinions were premised on speculation and, moreover, that precluding his testimony would not unfairly prejudice Petitioner. *People v. Richardson*, Case No. 07-1782-FC, Order (Dec. 12, 2007) (ECF No. 14-60 at PageID.10459-63). The Michigan Court of Appeals, again, reversed this determination and remanded the matter to the trial court. *People v. Richardson*, Case No. 282830, Order (Mich. Ct. App., Feb. 1, 2008) (ECF No. 14-60 at PageID.10441). On March 14, 2008, the trial court conducted a *Daubert* hearing after which it concluded:

> Despite the initial marginal reports submitted by Dr. Spitz and the limited conformity to the criteria for the admission of expert testimony in his Third Supplemental Report, as contemplated under *Daubert*, MCLA 600.2955(1), MRE 104(a) (b) and MRE 702, the Court will not limit or preclude the testimony of Dr. Spitz.

*People v. Richardson*, Case No. 07-1782-FC, Order (Apr. 2, 2008) (ECF No. 14-66 at PageID.11216-17). Petitioner nevertheless declined to call Dr. Spitz as a witness at trial. A review of the testimony received at the *Daubert* hearing reveals that the decision to not question Dr. Spitz at trial was a reasonable strategic decision.

At the *Daubert* hearing, Dr. Spitz, a pathologist, concluded that "[i]n view of [Juanita Richardson's] history of – psychiatric history, in view of her physical history, in view of the circumstances at the scene, in view of what I know of the day in question, my opinion is that

201

this is an accidental death to the – to meet the classification of accident as – as proposed by the Michigan – by the National Association of Medical Examiners to the tune of 70 percent certainty of accidental death."   (Hearing Transcript, March 14, 2008, at PageID.5814-41).   In support of his opinion that Richardson's death was accidental, the doctor found relevant the following factors: (1) the absence of evidence that Petitioner and his wife were engaged in a physical altercation prior to her death; (2) Juanita Richardson's prior medical history; (3) his belief that when Juanita Richardson fell she was not wearing the sandal later recovered below the cliff edge; and (4) Juanita Richardson's previous treatment for depression.   (PageID.5814-48).

On cross-examination, Dr. Spitz was unable to explain the significance of his conclusion that there was no evidence of an altercation between Petitioner and his wife prior to her death.   (PageID.5854-58).   The doctor also later conceded that it was possible for an individual to be choked to unconsciousness in a manner that did not leave any physical marks. (PageID.5869).   Dr. Spitz was likewise unable to explain the significance of his belief that when Juanita Richardson fell she was not wearing the sandal later discovered below the cliff edge. (PageID.5858-61).   One of the doctor's theories was that Juanita Richardson accidentally fell off the cliff after backing up too far when attempting to take a photograph.   (PageID.5832-33).   With respect to this theory, Dr. Spitz acknowledged that he only recently learned that Petitioner, in fact, was in possession of the couple's camera at the time of Richardson's death.   (PageID.5861).   Dr. Spitz was also unaware that Petitioner and Juanita Richardson had previously visited the location in question.   (PageID.5860-61).

With respect to Juanita Richardson's prior physical injuries, Dr. Spitz conceded that "the issue is not whether they existed, these old injuries, but whether they were affecting her

on the day in question." (PageID.5862-63). In this respect, the doctor acknowledged that he had not considered contemporaneous evidence of Juanita Richardson's physical condition and whether she was actually experiencing any gait or coordination difficulties at the time of her death. (PageID.5864-65). As for Juanita Richardson's prior treatment for depression, Dr. Spitz speculated that Richardson may have been suffering dizziness because she had stopped taking anti-depressant medication several years previously. (PageID.5866-67).

Forensic pathologist, Dr. Stephen Cohle, Kent County Medical Examiner, also testified at the *Daubert* hearing. (PageID.5880-916). With respect to determining Juanita Richardson's cause of death, Dr. Cohle found only "minimally" significant the absence of evidence of an altercation between Juanita and Petitioner. (PageID.5891-92). As for whether Juanita was wearing, at the time of her death, the sandal recovered below the cliff edge, the doctor found that such was had no relevance to determining the cause of Richardson's death. (PageID.5891-93). Regarding Dr. Spitz's theory that Juanita Richardson accidentally fell due to physical infirmity caused by pervious injury, Dr. Cohle indicated that Richardson's medical records were inconsistent with Dr. Spitz's theory. (PageID.5893-95). As for Dr. Spitz's reliance on Juanita Richardson's previous treatment for depression, Dr. Cohle likewise found such to be inconsistent with Richardson's medical records. (PageID.5895-96). Dr. Cohle concluded that Dr. Spitz's opinions were "conjecture," "pretty weak," and "unsupported" by Richardson's medical records. (PageID.5896-901).

As noted above, following the *Daubert* hearing, the trial court ruled that Dr. Spitz could testify without limitation. In the Order determining such, however, the court also observed:

> The Court notes that mostly what has been produced, to date, by Dr. Spitz and testified to at the *Daubert* hearing, in particular, is

significantly lacking in the way of scientific foundation and is grounded more on speculation and conjecture. As such, much of what has been proffered goes to weight, reliability and validity of the evidence used to arrive at his ultimate opinion on manner of death. This opinion, therefore, falls within the province of the jury to weigh the merits of the same. As always, the People have the opportunity to challenge opposing experts through vigorous cross exam and provide what evidence they believe is relevant and reliable in contrast to that which may be offered by opposing counsel.

*People v. Richardson*, Case No. 07-1782-FC, Order (Apr. 2, 2008) (ECF No. 14-66 at PageID.11216-17).

In rejecting Petitioner's claim that his trial counsel was ineffective for failing to question Dr. Spitz at trial, the trial court observed:

The decision of defense counsel not to call Dr. Spitz was the subject of much debate and involved two interlocutory appeals as a result of the paucity of information provided by Dr. Spitz early in the discovery period as to his conclusions and analysis of the circumstances resulting in the victim's death. After a *Daubert* Hearing the trial court allowed the defense to call Dr. Spitz. The fact that they didn't, in this Court's opinion, was wise and certainly would have been a logical trial strategy under the circumstances. The *Daubert* Hearing gave the People ample opportunity to, in effect, not only filet, but pin bone Dr. Spitz from gills to tail. Having called the expert at trial would certainly have given the People further chance to eviscerate Dr. Spitz in front of a jury. His complete lack of any reasonable, let alone scientific basis, for his conclusions as to how the death of the victim occurred was obvious. To say his opinions, at the *Daubert* Hearing, were anything but conjecture and speculation would be gratuitous.

*People v. Richardson*, Opinion and Order (Alger Cnty. Cir. Ct., May 29, 2013) (ECF No. 14-55 at PageID.9849).

While perhaps slightly overstated, the trial court's assessment of Dr. Spitz's *Daubert* hearing testimony is nonetheless accurate. Dr. Spitz's opinions were not founded in science, but instead appeared to be little more than speculation. The doctor admittedly did not

204

consider certain relevant evidence and his opinions appeared to be inconsistent with a great deal of objective evidence, most notably Juanita Richardson's medical records.   While the Court understands why Petitioner might disagree with his counsels' decision to not question an "expert" who was willing to testify that he was 70 percent certain that Juanita Richardson's death was an accident, such testimony hardly seems particularly beneficial if its proponent is demonstrated to be engaging in speculation and advancing opinions which are inconsistent with the objective medical evidence.   Also, it is not reasonable to argue that Dr. Spitz's testimony would have altered the outcome in this matter in light of the overwhelming evidence of Petitioner's guilt.

In short, counsels' decision appears to be the type of strategic decision which courts have consistently held are "virtually unchallengeable."  *See United States v. Washington*, 715 F.3d 975, 982 (6th Cir. 2013) (quoting *Strickland*, 466 U.S. at 690-91); *Lundgren v. Mitchell*, 440 F.3d 754, 770 (6th Cir. 2006) (when "assessing deficient performance, reviewing courts must take care to avoid 'second guessing' strategic decisions that failed to bear fruit").   The denial of this claim was neither contrary to, nor involved an unreasonable application of, clearly established federal law.   Furthermore, this decision was not based on an unreasonable determination of the facts in light of the evidence presented.   Accordingly, this claim raises no issue on which habeas relief may be granted.

B.     Special Jury Instruction

Petitioner argues that his trial counsel were ineffective for failing to object to the trial court's decision denying his request to provide the jury the aforementioned supplemental instruction regarding circumstantial evidence.   As discussed above, however, the trial court's

205

ruling with respect to the special instruction Petitioner requested was not inappropriate.   As such, Petitioner cannot demonstrate that he was prejudiced by his counsels' failure to object to the trial court's ruling.   Thus, this claim is without merit.


          C.      Instruction Regarding Experimentation

As previously noted, following Juanita Richardson's death, one of her sandals was recovered from just below the edge of the cliff where she fell.   During closing argument, the prosecutor commented about this sandal, specifically whether Richardson was wearing this sandal when she fell.   (Trial Transcript, April 14, 2008 at PageID.9490-95).   In the process of making these comments, the following exchange occurred:

| | |
|---|---|
| Prosecutor: | Then Undersheriff Hughes notices this big pattern of non-injury on her left foot, as though the sandal had protected her foot.   And we originally theorized that because being pushed makes you step forward, and you can all – all try it in the jury room.   You have to sneak up on each other.   It doesn't work if someone is expecting it.   But people tend to step forward with their right foot.   And so we originally theorized that because making – being pushed makes you step forward, usually with your right foot, that she stepped forward with her right foot and dragged her left so that it – it scraped on the edge as she went over.   And that same scrape scraped off the sandal and flipped it into the spot where it was found. |
| | And I should say here that no doubt you want – you'll want to handle this sandal, perhaps even if there are – are ladies who wear a size nine to try it on, so I want to mention – |
| Defense: | Your Honor, I'm going to object that the jury shouldn't be doing experiments with the evidence.   That's objectionable. |
| The Court: | I would agree. |
| Defense: | Thank you. |
| Prosecutor: | That's objectionable for the jury to try on the sandal? |

The Court: That would, in my opinion, Mrs. Bahrman, reflect an experiment.

(PageID.9490-91).

The following day, prior to the prosecutor's rebuttal argument, this particular issue was revisited, outside the jury's presence, during which the following exchange occurred:

Prosecutor: The only other thing I have for in here, Judge, is I – I was also a little taken aback by the idea that the jury handling this sandal in the jury room constitutes an experiment.   I realize there is a jury instruction on how they can't go to the scene or conduct experiments.   You know, I think that's an instruction that is – is exclusive of deliberations.   You know, it's extremely common, you know, to give jurors, you know, the murder weapon and they go into the jury room and they act out little scenarios with each other.   And – and no one considers that an experiment.   So for them to have the idea that they're not allowed to handle the sandal or try it on, you know, I think is kind of out there.

The Court: I don't have any problem with them handling it.   But where do you draw the line?   Where do – where do you draw the line?   You know, do you have them sit on a table and – and shake it or what?   And that's what I want to avoid.

Prosecutor: Well –

The Court: They can pick it up, they can match it to their sole.   But to put it on to – to experiment, if you will, or demonstrate it's being able to be shook off –

Prosecutor: Well, I think they're entitled to act out scenarios that have been suggested.   I don't think that constitutes an experiment.   And now they're probably all wondering, well, what can we do with this evidence?   This is – what happens in the jury room stays in the jury room, and I don't think they should be given a lot of rules about what they can and can't do in there.

Defense: That's a problem though.   Let's say you get a woman with a size eight foot who puts it on and it's snugly fit and says, oh, it doesn't come off.   That experiment could sway things, and it's not – it's not appropriate.   Then you get a person with a size five foot and puts the sandal on.   We – we can't control that.   They shouldn't be

207

experimenting with the sandal.  Looking at it, examining it is one thing.  Taking it the next step and experimenting with it is prohibited.

The Court:    Well, and I think the amount of information that they have in front of them any way is – is certainly – I mean, women are going to understand, I think, probably better than any of us as to whether or not that sandal could come off.  I mean, I – I think that's something they can weigh, they can look at it, they can put it up next to their foot, they can examine the straps, they can see the tensile strength of the straps or whatever.  It's leather.  It could have been wet that day.  Would that make the sandal tighter?  Or will that make the sandal looser?

You know, the next step then is, okay, it was wet.  Her foot could have been wet.  Let's stick it under the sink and see what the impact of that is.  And, you know, and what goes on in there, who knows what goes on in there.  I'm not even going to suggest that somebody won't try it on unbeknownst to us[.  I ] mean, that – that could happen.  I just don't want to encou[rage] it.  It's that simple.  So I want to leave it at that.  All ri[ght?]

Defense:    Okay.

(Trial Transcript, April 15, 2008 at PageID.9734-36).

Despite the comments identified above, the trial judge did not provide the jury with any instructions on the issue of experimentation.  Petitioner argues that his trial counsel was ineffective for "failing to request a jury instruction not to conduct experiments with the evidence."  The Court interprets Petitioner's argument as faulting his attorney for failing to object to the trial court's failure to provide such an instruction.  Petitioner's argument fails for two reasons.

First, Petitioner has presented no evidence that the jury conducted any kind of experiment.  This claim appears to be based on unsworn comments one or two jurors allegedly made to the media following the conclusion of Petitioner's trial.  (Hearing Transcript, August 13, 2008, at PageID.9806-11).  However, Petitioner has presented no evidence that the jurors

conducted any kind of experiments during their deliberations.   Second, even if the Court assumes the jury conducted some sort of experiment with or regarding the evidence presented at trial, Petitioner has failed to demonstrate that any such experiment was improper or otherwise denied him a fair trial.

Contrary to Petitioner's assertion, it is not necessarily improper for a jury to conduct experiments with or concerning properly admitted evidence.   The Sixth Amendment provides to every criminal defendant the right to confront the evidence against him.   Thus, if a jury conducts an "out of court experiment," relief may be appropriate, not because the jury conducted an experiment, but because such a circumstance may result in the jury considering evidence which the defendant was not permitted to confront.   *See, e.g., Fletcher v. McKee*, 355 Fed. Appx. 935, 937-38 (6th Cir., Dec. 11, 2009) (citations omitted).   However, unless a jury's "experiment" involved extrinsic evidence, relief is not justified.   *Ibid.* ("[w]here no extraneous influence is present, courts will not intrude into matters internal to jury deliberations"); *see also*, *United States v. Avery*, 717 F.2d 1020, 1025-26 (6th Cir. 1983) ("[e]ven assuming the jury did recreate the defendant's actions, we find no error in such conduct [because] defendant does not allege that the jurors were exposed to any extraneous materials during their deliberations"); *Bogle v. Galaza*, 38 Fed. Appx. 437, 438 (9th Cir., Mar. 21, 2002) (habeas relief not appropriate where jury "consider[ed] the result of its attempt to insert a key into the lock of a safe, both items being in evidence before it. . .because a jury is permitted to examine all pieces of evidence carefully and to reenact the crime using the evidence before it").

Accordingly, even if the Court assumes that counsel's failure to object constituted deficient performance, Petitioner cannot demonstrate that he was prejudiced thereby because there

209

is no evidence that the jury conducted any improper experiments.   The denial of this claim by the Michigan courts was neither contrary to, nor involved an unreasonable application of, clearly established federal law.   Furthermore, this decision was not based on an unreasonable determination of the facts in light of the evidence presented.   Accordingly, this claim raises no issue on which habeas relief may be granted.

### XIV.           Ineffective Assistance of Appellate Counsel

Petitioner asserts that his appellate counsel was ineffective "for failing to raise significant issues on direct appeal which were obvious from the trial records and for not filing a motion for a *Ginther* hearing to make an appellate record of trial counsel's ineffective representation."[16]   (ECF No. 4 at PageID.112).   Petitioner's claim that his appellate counsel improperly failed to request a *Ginther* hearing is without merit.   Because Petitioner has failed to establish that his trial counsel rendered ineffective assistance, Petitioner cannot establish that he was prejudiced by his appellate counsel's failure to request a hearing regarding such.   As for Petitioner's claim that his appellate counsel failed to "raise significant issues" which were "obvious from the trial records," the Court notes that Petitioner has failed to identify what "obvious" issues counsel should have asserted.   (ECF No. 4 at PageID.112-14).   Nevertheless, because Petitioner has failed to identify any issue which would have entitled him to relief, this aspect of Petitioner's claim fails.   In sum, this claim raises no issue on which habeas relief may be granted.

---

16  Hearings at which evidence is presented regarding claims of ineffective assistance of counsel are, in Michigan, referred to as *Ginther* hearings.   *See People v. Ginther*, 390 Mich. 436 (1973).

## CONCLUSION

For the reasons articulated herein, the undersigned concludes that Petitioner is not being confined in violation of the laws, Constitution, or treaties of the United States. Accordingly, the undersigned recommends that Richardson's petition for writ of habeas corpus be **denied**.   The undersigned further recommends that a certificate of appealability be denied except as to Petitioner's claims of prosecutorial misconduct.   *See Slack v. McDaniel*, 529 U.S. 473 (2000); *Miller-El*, 537 U.S. at 336.

OBJECTIONS to this Report and Recommendation must be filed with the Clerk of Court within 14 days of the date of service of this notice.   28 U.S.C. § 636(b)(1)(C).   Failure to file objections within the specified time waives the right to appeal the District Court's order. *Thomas v. Arn*, 474 U.S. 140 (1985); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).

Respectfully submitted,


Date: December 19, 2017                              /s/ Ellen S. Carmody
                                                    ELLEN S. CARMODY
                                                    United States Magistrate Judge